# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cr-00165-MSN |
| | ) | Hon. Michael S. Nachmanoff |
| HATCHET M. SPEED, | ) | |
| *Defendant.* | ) | |

## DEFENDANT'S MOTION TO DISMISS INDICTMENT

Comes now, the defendant, Hatchet M. Speed, by counsel Brooke S. Rupert, Assistant Federal Public Defender, and Courtney Dixon, Assistant Federal Public Defender, and pursuant to Federal Rule of Criminal Procedure 12(b) moves this Court to dismiss the three-count indictment as void for vagueness as applied to Mr. Speed. Mr. Speed submits that the meaning of the term "silencer" as set forth in 18 U.S.C. § 921(25), as employed via 26 U.S.C. § 5861(d), and as applied against Mr. Speed is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. Ever-shifting ATF regulations and internal enforcement guidance preclude both Mr. Speed from having fair notice that possessing solvent traps is prohibited, and the ATF from enforcing its laws and regulations with any consistency. In the alternative, Mr. Speed moves this Court to dismiss the indictment as an unconstitutional violation of Mr. Speed's Second Amendment rights.

## BACKGROUND

On September 6, 2022, a grand jury in the Eastern District of Virginia issued an indictment charging Mr. Speed with three counts of knowing possession of a firearm not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. *See* Indictment at 1-3 (ECF No. 1), Sept. 6, 2022. Specifically, each count of the indictment charges:

> On or about June 22, 2022, in Alexandria, Virginia, within the Eastern District of Virginia, the defendant, HATCHET M. SPEED, knowingly possessed a firearm, to wit: a silencer (as defined in section 921 of Title 18 of the United States Code), not registered to him in the National Firearms Registration and Transfer Record.

*Id.* Discovery provided to date indicates that the charges are based upon the allegations that Mr. Speed purchased three solvent traps — devices used to capture solvents used to clean a firearm — from a website called Hawk Innovative Tech in March 2021. Upon receiving his purchases from Hawk Innovative Tech, Mr. Speed kept them in a storage unit along with other weapons and silencers he previously purchased and registered in accordance with relevant federal regulations. Following an investigation of Mr. Speed, the Government received a warrant to search the storage unit and found the three solvent traps inside, kept in their original packaging and without any modifications. The Government alleges the characteristics of these solvent traps qualify them as "silencers" as defined in 18 U.S.C. § 921. Because Mr. Speed had not yet registered them with the National Firearms Registration and Transfer Record, as is required of all silencers, the Government brought the instant charges pursuant to 26 U.S.C. §§ 5841, 5861(d), and 5871.

The purpose of a silencer is to "reduc[e] noise at the source" of a firearm. Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 34 (2016). But "the term 'silencer' is a misnomer, in that — despite movie fantasies — a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm. Noise may be muffled or diminished, and maybe only by a few decibels at that, but it can still be heard." *Id.* at 36. When a shot is fired, "[a] bullet rides an expanding cloud of gas from that propellant out of a weapon's barrel," creating a loud explosion. Lee Hutchinson, *Learning the Science Behind Silencers on the Range with SilencerCo*, Ars Technica (Dec. 2, 2014), https://arstechnica.com/gadgets/2014/12/learning-the-science-behind-silencers-on-the-range-with-silencerco/. A silencer, typically a hollow cylinder or tube, "trap[s] that gas" by requiring

the bullet to pass through a series of "interlinked" "chambers," which slows the exhaust gas. *Id.* This process functions similarly to the mechanics of an automobile muffler. To use a silencer, it is typically attached to a firearm barrel. *Id.*

By contrast, solvent traps are "devices which are attached to the barrel of a firearm during cleaning in order to catch excess cleaning fluids." Ex. 1 (ATF Technical Bulletin 17-02) at 1. A solvent trap, typically a cylindrical tube, includes a chamber that "collect[s] solvent and debris" when a firearm is cleaned. *Id.* at 3. Solvent traps may be converted into a silencer by "drilling or shooting" through the device to create a passage for a bullet to exit. *Id.* The Government contends that the design features of the solvent traps that Mr. Speed purchased are consistent with those of "silencers," and therefore should be characterized as such.

Mr. Speed lacks the requisite criminal intent for the Government to prevail on these charges because the discovery provided by the Government demonstrates that Mr. Speed never intended to possess devices that qualify as "silencers" without registering them first. *See Elonis v. United States*, 575 U.S. 723, 734 (2015) (noting that "wrongdoing must be conscious to be criminal"); *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022) (explaining that statutes that "contain no *mens rea* provision" should be read to require "that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct'" (quoting *Elonis*, 575 U.S. at 736). Mr. Speed purchased the three solvent traps from Hawk Innovative Tech based on the (correct) understanding that they were not functional as silencers upon purchase. He kept the solvent traps in their original conditions for 15 months, only taking them out of their packaging on the day they arrived and immediately putting them back in their boxes. He never looked at them again. Though Mr. Speed appeared to be aware of how to convert the solvent traps into silencers, the Government has not shown that he took any steps toward doing so. Indeed, Mr. Speed could not have converted the

3

solvent traps because he did not possess the necessary tools to do so, such as a drill press (used to drill the hole into the solvent trap that would allow a bullet to exit), or the information required to do so, namely, determining which drill bit would be the correct size (to ensure the hole was sized to the correct caliber). *See* Ex. 2 (Storage Unit Inventory). Moreover, Mr. Speed was aware that he needed to submit a Form One to the ATF before drilling the solvent traps to convert them into silencers. Mr. Speed submitted all required paperwork to register the other silencers in his possession, and the Government has not shown that Mr. Speed intended to waver from that established practice. Despite all of this, the Government is seeking to prosecute Mr. Speed on the basis that someday the devices he stored in their original packaging for over a year *could* be converted into "silencers," and that Mr. Speed *might* do so without registering them properly.

Accordingly, Mr. Speed submits that the meaning of the term "silencer" as set forth in 18 U.S.C. § 921(25), as employed via 26 U.S.C. § 5861(d), and as applied against Mr. Speed is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. In the alternative, Mr. Speed submits that 26 U.S.C. § 5861(d) unconstitutionally violates his Second Amendment rights by prohibiting unregistered possession of a "silencer." Accordingly, the indictment should be dismissed.

## ARGUMENT

"A district court may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution.'" *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (quoting *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010)).

I. **Statutory and Regulatory Background**

Mr. Speed was charged with violating 26 U.S.C. §§ 5841, 5861(d), and 5871, three provisions of the Gun Control Act of 1968 ("GCA"). Pub. L. No. 90-618, 82 Stat. 1213 (1968). 26 U.S.C. § 5841 requires the Secretary of the Treasury to "maintain a central registry of all

firearms in the United States which are not in the possession or under the control of the United States." *Id.* § 5841(a). An entry in the registry must include "(1) identification of the firearm; (2) date of registration; and (3) identification and address of person entitled to possession of the firearm." *Id.* § 5841(a)(1)-(3). 26 U.S.C. § 5861(d) makes it "unlawful for any person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." And 26 U.S.C. § 5871 sets the penalties for failing to comply with these requirements at a fine of "not more than $10,000," imprisonment of "not more than ten years," or both.

These statutory provisions incorporate the definition of "firearm" from 26 U.S.C. § 5845(a), which includes, among other devices, "any silencer (as defined in section 921 of title 18, United States Code)." *Id.* at § 5845(a)(7). Section 921, in turn, defines "firearm silencer," or "firearm muffler," as:

> [A]ny device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

18 U.S.C. § 921(25). In other words, the GCA establishes criminal liability for failure to register any device deemed a "firearm silencer" in the National Firearms Registration and Transfer Record.

## II.   Section 5861(d) Is Unconstitutionally Vague

The charges brought against Mr. Speed must be dismissed because the statutory scheme on which they are based is improperly vague, and therefore violates his constitutional right to due process of law.

### A.   The Vagueness Doctrine

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. Ingrained

5

in this concept of due process is the underlying principle of notice — that an individual should not "be held criminally responsible for conduct which [they] could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quoting United *States v. Harriss*, 347 U.S. 612, 617 (1954)); *see also United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997) ("[I]t is well established in criminal law that no punishment can be imposed without notice."). *See, e.g.*, *Rabe v. Washington*, 405 U.S. 313 (1972) (reversing conviction that relied on an unforeseeable construction of a statute because the defendant was "not given fair notice" of the additional "vital element of the offense"). Notice is required, for example, "before property interests are disturbed, before assessments are made, before penalties are assessed." *Lambert v. California*, 355 U.S. 225, 229 (1958) (reversing conviction where defendant was "given no opportunity to comply with the law and avoid its penalty, even though her default was entirely innocent"). The fair notice requirement also applies to federal regulations that impose criminal liability. *See, e.g.*, *General Elec. Co. v. United States EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) ("In the absence of notice — for example, where the regulation is not sufficiently clear to warn a party about what is expected of it — an agency may not deprive a party of property by imposing civil or criminal liability.").

Specifically, the Supreme Court has explained that due process "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" and can conform their conduct to stay within the confines of the law. *Beckles v. United States*, 580 U.S. 256, 262 (2017) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *see also Kolender*, 461 U.S. at 353-54 (holding criminal statute "as it has been construed" unconstitutionally vague because it "fail[ed] to clarify what is contemplated by the requirement that a suspect provide a 'credible and reliable' identification"); *United States v. Yates*,

6

574 U.S. 528, 547 (2015) (reversing conviction where defendant "would have had scant reason to anticipate a felony prosecution, and certainly not one instituted at a time when" his conduct was no longer illegal under the relevant regulations). A criminal defendant may therefore challenge a criminal statute or regulation as unconstitutionally vague. *See Bouie*, 378 U.S. at 351. Outside of the First Amendment context, as here, "[v]agueness challenges . . . must be analyzed as applied to the specific facts of the case at hand." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

A vagueness challenge may address one or both requirements of the vagueness doctrine. Specifically, the doctrine requires first that a criminal statute provide clear and adequate notice of its prohibited conduct. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly . . . ."); *see also United States v. Cardiff*, 344 U.S. 174, 177 (1952) ("The vice of vagueness in criminal statutes is the treachery they conceal either in determining what persons are included or what acts are prohibited."). The doctrine also requires a criminal statute to provide "explicit standards for those who apply [it]" to prevent "arbitrary and discriminatory enforcement." *Greyned*, 408 U.S. at 108; *see also Kolender*, 461 U.S. at 358 (holding vagueness doctrine requires that a "legislature establish minimal guidelines to govern law enforcement"). Lack of notice and arbitrary and capricious application are particularly troublesome in the criminal context. Without minimal enforcement guidelines set forth in a statute, "policemen, prosecutors, and juries [are allowed] to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974). Accordingly, laws that impose criminal penalties are held to a higher standard of certainty when reviewed on vagueness grounds than other statutes. *Kolender*, 461 U.S. at 359 n.8.

### B. Section 5861(d) Fails to Provide Fair Notice of Prohibited Conduct

As applied to Mr. Speed, 26 U.S.C. § 5861(d) is unconstitutionally vague because neither citizens nor law enforcement have fair warning of the application of the statute to solvent traps like those Mr. Speed purchased.

#### 1. The Relevant Statutes Did Not Give Mr. Speed Fair Notice

The Government claims that the solvent traps Mr. Speed possessed are firearm silencers as defined by 18 U.S.C. § 921(25) and therefore must be registered pursuant to 26 U.S.C. §§ 5841 and 5861(d). But neither the definitional statute nor the statute criminalizing unregistered possession, Section 5861(d), lists any essential or easily identifiable design, physical feature, or characteristic that a device must have to make it subject to registration requirements as a silencer. Rather, the definition states broadly that *any* device for silencing, muffling, or diminishing the report of a portable firearm qualifies as a "silencer." 18 U.S.C. § 921(25). Such devices could include, for example, plastic bottles, potatoes, pillows, books, banners, flags, clothing, tools, electronic equipment, etc. — so long as the object is "for" silencing, muffling, or diminishing a firearm's report. *Id.* The Supreme Court declines to accept "boundless reading[s]" of statutory terms where such reading would lead to "deeply serious consequences." *Bond v. United States*, 572 U.S. 844, 860 (2014). *See also United States v. Schrum*, 346 F. Supp. 537-537-38 (E.D. Va. 1972) (cautioning against an overly broad approach to analyzing whether a device was intended "for" reducing noise level"). Such serious consequences are plainly possible here.

The definitional statute further explains that a "firearm silencer" "includ[es] any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(25). While the requirement that the parts must be "intended for use" in assembling or fabricating a firearm silencer appears to cabin the broad definition

8

somewhat, it does not eliminate the problem, as any of the objects listed above could still be "intended for use" in this proscribed manner.  It is also unclear how far that mens rea requirement goes.  Here, the Government cannot show that Mr. Speed actually planned to convert his solvent traps into silencers at any point in the foreseeable future.  Rather, Mr. Speed had the three solvent traps in his possession for 15 months at the time they were seized.  Throughout those 15 months, Mr. Speed kept the solvent traps in their original packaging.  He removed the solvent traps from the boxes they came in only once, when they arrived, and put them back immediately.  He also did not own the drill press required to convert the solvent traps into silencers, nor did he know what size drill bit was required to ensure the hole was the correct size for a particular caliber of weapon.  The Government also cannot show that Mr. Speed intended not to follow the proper registration procedure if he eventually did convert the solvent traps into silencers.  Moreover, Mr. Speed had lawfully registered the other silencers in his possession by submitting the proper paperwork for each of them.  The Government has also not shown that Mr. Speed intended to deviate from that pattern of lawful possession.

Given the realm of possibilities of devices that could minimize the report of a firearm, the statute simply does not guide a person of ordinary intelligence on what constitutes a "silencer" that must be registered with the National Firearms Registration and Transfer Record, particularly as silencers can be made out of a variety of commonly and legally available products sold by firearms dealers and vendors like Amazon.  *See, e.g.*, Champe Barton, *The Online Silencer Market Is Booming – Just Don't Call It a Silencer*, The Verge (Aug. 26, 2019), https://www.theverge.com/2019/8/26/20828900/silencer-suppressor-online-sales-gun-accesories-atf-rules.  The broad, vague language in the statute permitted the ATF to determine for itself what

9

it actually considered a "silencer" and left Mr. Speed in the dark as to whether the devices he bought had to be registered — even as he sought to comply with law as he understood it.

In *City of Chicago v. Morales*, 527 U.S. 41 (1991), the Supreme Court reviewed a city ordinance that prohibited gang members from loitering in public places. The Court found that although the term "loitering" was defined in the statute ("to remain in place with no apparent purpose"), the definition was unconstitutionally vague because it did not adequately apprise people how to comply. *Id.* at 56-59 ("It is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose.'"). Here, similarly, § 921(25)'s definition of "silencer" — which, again, informs 26 U.S.C. § 5845(a)'s definition of "firearm," which then informs § 5861's prohibitions — provides no clarity as to which devices the ATF will opt to classify as "silencers" or as to how to understand whether such a device is "intended for use in assembling or fabricating a firearm silencer or firearm muffler."

### 2. ATF Regulations Did Not Give Mr. Speed Fair Notice

The ATF's regulations and other public guidance issued to interpret and enforce the Gun Control Act and this provision in particular also fail to clarify the scope of the criminal offense such that an "ordinary [person] can understand what conduct is prohibited." *Beckles*, 580 U.S. at 626. Instead, the ATF appears to have drastically expanded its interpretation of the definition of "silencer" for purposes of enforcement by characterizing solvent traps as silencers — without issuing public guidance to provide fair notice to individuals who may inadvertently possess the previously legal solvent traps. *See* Ex. 3 at 2 (Letter, Republican Senators to Attorney General Merrick Garland & ATF Acting Director Marvin Richardson, Mar. 11, 2022) ("Mar. 11, 2022 Letter") ("[I]t has recently come to our attention that ATF has formulated secret *internal* guidance

documents 'to assist ATF personnel tasked with differentiating so-called 'solvent traps' from firearm silencers' . . . .").

On April 20, 2017, ATF Firearms & Ammunition Technology Division issued Technical Bulletin 17-02 for use by "ATF Special Agents and Industry Operations Investigators and [ATF's] Federal, State and local law enforcement partners" to clarify the distinction between solvent traps and "silencers." Ex. 1 (ATF Technical Bulletin 17-02) at 8. The Bulletin, which was for internal use and not made public, acknowledged that "[s]ome devices called 'solvent traps' may have a legitimate purpose as a firearm accessory." *Id.* at 1. Though "the objective design characteristics must support this use," solvent traps, like those purchased by Mr. Speed, "are unregulated *until* a possessor assembles, accumulates, or otherwise demonstrates these articles are to be used for making a firearm silencer." *Id.* at 1-2. The Bulletin stated that "flashlight 'solvent traps'" that have "index marking[s]" or a "hole drilled in the forward end-cap *could* be classified as a firearm silencer." *Id.* at 5 (emphasis added). But the Bulletin recognized that "mere possession of a 'solvent trap' or components which *could* be used in the assembly of a firearm silencer does not necessarily constitute possession of a firearm silencer." *Id.* at 7. Rather, "[i]*ntent must be demonstrated or communicated.*" *Id.*

Over two years later, on October 30, 2019, ATF Firearms & Ammunition Technology Division issued another bulletin "to assist ATF personnel in identifying devices marketed as 'inline filters'" — another kind of device used to collect solvent and debris like a solvent trap — "that are actually firearm silencers." Ex. 4 (ATF Technical Bulletin 20-01) at 1. This Bulletin states that solvent traps "that have a hole in or indexing mark for a hole in the front end-cap *are* classified as a 'firearm silencer' under the [National Firearms Act]." *Id.* at 2. This shift in guidance was not made public. While some individuals who had purchased solvent traps received letters from the

11

ATF advising them that their solvent traps were now "silencers" due to the new interpretation (*see* Ex. 5 (U.S. Department of Justice Warning Notice)), not everyone did, including Mr. Speed.

The ATF's unpublished, ever-shifting internal guidance and its selective notification of individuals who purchased solvent traps cannot constitute fair notice as the Due Process Clause envisions it. *See* Ex. 3 at 1 (Mar. 11, 2022 Letter) (referring to ATF's practice of sending letters making "blanket threats based on the recipient allegedly purchasing and possessing various firearms accessories" "without offering any explanation as to why" solvent traps are considered "unregistered silencers"). As the D.C. Circuit has explained, often a federal agency gives "the regulated public" adequate notice of its "regulatory interpretations" "in its efforts to bring about compliance," such as by "inform[ing] a regulated party that it must seek a permit for a particular process." *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). Unlike many individuals in his position, Mr. Speed was not informed of the ATF's new interpretation that required him to register or forfeit his solvent trap. *See also* Ex. 5. Indeed, commentators have criticized the ATF's "inconsistency in defining what constitutes a silencer" based on shifting "technical determinations issued by the ATF's Firearms Technical Division since 2011." Barton, *The Online Silencer Market Is Booming*.

In other circumstances, as here, an agency "will provide no pre-enforcement warning, effectively deciding 'to use a citation [or other penalty] as the initial means for announcing a particular interpretation' — or for making its interpretation clear." *Gen. Elec. Co.*, 53 F.3d at 1329. This strategy satisfies the fair notice requirement only where "a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform" "by reviewing the regulations and other public statements issued by the agency." *Id.*; *see also Martin v. Occupational Safety & Health Review Comm'n*, 499

U.S. 144, 158 (1991) ("[T]he decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties . . . ."); *Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976) ("If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express."). As explained above, Mr. Speed could not have identified with ascertainable certainty that the ATF expected him to register his solvent traps before possessing them, as the ATF did not make the relevant information available for him to find. Indeed, Mr. Speed has complied with all laws and regulations applicable to the other firearms he possesses, and knew when he purchased the solvent traps that he needed to register them before turning them into silencers. Moreover, Mr. Speed was aware that he would need a Form 1, or the ATF application to register a firearm, if he decided to convert the solvent traps into silencers and before he took any steps to do so.

Further, this ever-shifting internal guidance and context-specific application of vague regulations obscures enforcement standards, allowing for arbitrary and discriminatory enforcement. *Greyned*, 408 U.S. at 108. Because a "silencer" can be made with such a vast array of objects and because internal agency guidance changes so frequently, it is unclear how the ATF can identify and apply an "explicit standard[]" for enforcement of the law. This vagueness allows for the consequences warned of in *Smith v. Goguen* — "policemen, prosecutors, and juries [pursuing] their personal predilections." *Smith*, 415 U.S. at 572-73. Accordingly, the statutory scheme as applied against Mr. Speed — 26 U.S.C. § 5861(d) as incorporating the term "silencer" defined by 18 U.S.C. § 921(25) — must be void for vagueness.

C. **The Ambiguity in the Statutory Scheme Should be Resolved in Favor of Lenity**

If any doubt remains as to the meaning of "silencer" as the term is used in this statutory scheme, this Court must "invoke the rule that 'ambiguity concerning the ambit of criminal statutes

13

should be resolved in favor of lenity'" and deem the provisions unconstitutionally vague as applied to Mr. Speed. *Yates*, 574 U.S. at 547-48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)). Another doctrine grounded in the due process notice right, the rule of lenity "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Id.* at 548 (quoting *Liparota v. United States*, 471 U.S. 419, 427 (1985)). The rule of lenity embodies the "notion," accepted in early Supreme Court jurisprudence with an extensive common law history, "that 'penal laws should be construed strictly.'" *Wooden v. United States*, 142 S. Ct. 1063, 1082 (2022) (Gorsuch, J., concurring) (quoting *The Adventure*, 1 F. Cas. 202, 204, F. Case No. 93 (CC Va. 1812) (Marshall, C.J.)).

The rule of lenity is relevant here, where the Government seeks to enforce a statute carrying a possible 10-year prison sentence based on an ambiguous and arbitrarily applied definitional statute. *See Liparota*, 471 U.S. at 426 (resolving statutory ambiguity in favor of lenity where "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct"). The ambiguity inherent in the statutory scheme is underscored by the ATF's shifting interpretation of the "silencer" definition, which shows that reasonable people can have varying understandings of the term. In such circumstances, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Yates*, 574 U.S. at 548 (quoting *Cleveland*, 531 U.S. at 25). Accordingly, this Court should interpret § 921(25)'s requirement that the device is "intended for use" as a silencer as assuming that the device — here, a solvent trap — is not a silencer "<u>until</u> a possessor assembles, accumulates, or otherwise demonstrates these articles are to be used for making a firearm silencer," as the ATF's 2017 Bulletin explained. Ex. 1 at 1-2.

14

**III.     Section 5861 Violates Mr. Speed's Second Amendment Right to Keep and Bear Arms**

In the alternative, the indictment should be dismissed because § 5861(d) violates Mr. Speed's Second Amendment right to keep and bear arms. The Supreme Court recently articulated "the standard for applying the Second Amendment" in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). First, a court determines whether "the Second Amendment's plain text covers" the "proposed course of conduct." *Id.* at 2129-30. If the Second Amendment covers that conduct, the Government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg v. State Bar of Calif.*, 366 U.S. 36, 50 n.10 (1961)). Assuming *arguendo* that the solvent traps in question are "silencers," the Second Amendment protects their receipt and possession, and the Government cannot justify its prohibition on their unregistered possession as consistent with the United States' historical tradition of firearm regulation.

**A.  *Bruen* Step One: "Receiv[ing] or Possess[ing]" a "Firearm" under the Second Amendment's Plain Text**

The Second Amendment's plain text covers the proposed course of conduct, *i.e.*, possessing a silencer without having to register it in the National Firearms Registration and Transfer Record. Specifically, the Amendment sets forth that the right to "keep and bear arms" shall not be infringed, and the Supreme Court has recognized that items and accessories that make firearms usable, such as "ammunition, bayonets, and other accoutrements," also fall within the concept of "arms." *Firearm Sound Moderators*, *supra* at 54 (citing *United States v. Miller*, 307 U.S. 174, 179-82 (1939)). In *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), the Supreme Court cited to founders-era dictionaries to define "arms" as "weapons of offence, or armour of defence," and "any thing that a man wears for his defence, or takes into his hands, or

15

useth in wrath to cast at or strike another." Silencers plainly fall into this definition. That silencers had not yet been invented at the time of the founding is of no note; the Court in *Heller* made clear that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Indeed, as the Government's case makes clear, Congress and the ATF both expressly and implicitly treat silencers as "firearms," defining them as such under the relevant statutory schemes and subjecting them to the same registration requirement.

## B. *Bruen* Step Two: Regulating Silencers Is Not Consistent with Historical Tradition

Because a silencer falls within the ambit of the Second Amendment's protection, the Government carries the burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Government must do so by showing that § 5861(d) as applied to silencers is consistent with the "historical understanding" of the Second Amendment. *Id.* at 2131. Where the regulation "addresses a general societal problem" that has existed since the founding era, that the founders did not address that problem or addressed it through "materially different means" suggests that the regulation "is inconsistent with the Second Amendment." *Id.*; *see* Mem. Op. & Order, *United States v. Price*, No. 2:22-cr-97 (S.D.W.V. Oct. 12, 2022), ECF No. 48 at 12 (invalidating prohibition on possession of firearms with the serial number removed on the basis that the "societal problem" addressed by the challenged regulation "was likely in existence at the founding" and the Government failed to show that the problem was "addressed by similar means"). If the "general societal problem" is "unprecedented" such that it would have been "unimaginable at the founding" or is based on "dramatic technical changes," the inquiry "may require a more nuanced approach." *Id.* at 2132. Further, when inquiring about "modern 'arms'" that were unknown at the time of the founding, courts must perform this "reasoning by analogy" by determining whether a historical

16

regulation and a contemporary one are "relevantly similar." *Id.* at 2132 (quoting C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).

The Government cannot justify its regulation. States began to enact prohibitions on silencers in the early 1900s, soon after silencers were invented, in conjunction with broader efforts to regulate weapons that were identified "as dangerous or unusual," like "machine guns, sawed-off shotguns, pistols, weapons and mechanisms that allowed firearms to be fired a certain number of times rapidly without reloading," and "airguns." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Problems 55, 67 (2017). Silencers were unfamiliar to the founding era. While laws "restricting or barring certain dangerous or unusual weapons" were also enacted in the late 18th century, these earlier laws were "aimed in part at pistols and offensive knives, like most concealed carry laws, [and] also at the practice of rigging firearms to be fired with a string or similar method to discharge a weapon without an actual finger on the firearm trigger." *Id.* The weapons subject to these early regulations were themselves particularly violent and dangerous in their time, and therefore cannot be analogous to later regulations on silencers, a "modern arms" of an entirely different character, as they are not themselves violent or dangerous.

In fact, legislative history shows that the legislation that first sought to regulate silencers focused primarily on weapons capable of being concealed on a person, and only included silencers in its prohibition that could be used with such weapons. *See* Halbrook, 46 Cumb. L. Rev. at 47 (explaining that "[t]he initial [National Firearms Act] bill, H.R. 9066, would have defined 'firearm' to mean 'a pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun,'" and did not reference a silencer for a larger firearm that could not be concealed on the person

17

(quoting *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. On Ways & Means*, 73rd Cong. 1 (1934)). The final bill included mufflers and silencers without this restriction, but the committee reports included no explanation for this change, suggesting it was merely carried over from the initial drafts amid disputes over which weapons should be included. *See id.* at 48-51.

Silencers are very rarely used to commit crimes, unlike actual "violent and dangerous" arms. Over one million silencers have been registered under the National Firearms Act, but only .003 percent of silencers are used in crimes each year. S. Gutowski, *ATF: 1.3 Million Silencers in U.S. Rarely Used in Crimes*, Wash. Free Beacon (Feb. 17, 2017); *see also* Nathan Rott, *Debate Over Silencers:Hearing Protection or Public Safety Threat?*, All Things Considered (NPR Mar. 21, 2017) ("From 2012-15, 390 silencers were removed from crime scenes where an ATF trace was requested. During that same period, more than 600,000 pistols were recovered."); Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 Western Criminology Rev. 44, 49-51 (2007) (finding only 153 cases from 1995 to 2005 "in which the evidence suggests a silencer was used for a criminal purpose," 80% of which involved nonviolent victimless crimes).

Silencers also serve a variety of lawful purposes, such as protecting one's hearing and improving accuracy by eliminating the distraction caused by a loud report, for lawful gun use in a variety of contexts, such as hunting, sport-shooting, or self- or home-defense. *See* A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 Marq. L. Rev. 853, 892 n.221 (2014); Halbrook, 46 Cumb. L. Rev. at 69 ("Legitimate advantages could also be listed for a suppressor, whether used for sporting purposes or for self-defense—reduction of noise, recoil, and muzzle rise immediately come to mind.").

## CONCLUSION

For the reasons set forth above, 26 U.S.C. § 5861(d) and 18 U.S.C. § 921(25) are unconstitutionally vague as applied in this case, or in the alternative, violate Mr. Speed's Second Amendment rights. The indictment must be dismissed.

Respectfully submitted on October 19, 2022.

          **HATCHET SPEED**
          by counsel:

          Geremy C. Kamens
          Federal Public Defender for the
          Eastern District of Virginia


          by:_____/s/_____
          Courtney Dixon
          *Pro hac vice*
          DC Bar No. 1766415
          Assistant Federal Public Defender
          1650 King Street, Suite 500
          Alexandria, Virginia 22314
          Telephone: (703) 600-0800
          Facsimile: (703) 600-0880
          courtney_dixon@fd.org

          Brooke Rupert
          VA Bar No. 79729
          Assistant Federal Public Defender
          1650 King Street, Suite 500
          Alexandria, Virginia 22314
          Telephone: (703) 600-0800
          Facsimile: (703) 600-0880
          brooke_rupert@fd.org