IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|                              |     |                        |
|------------------------------|-----|------------------------|
| UNITED STATES OF AMERICA     | )   |                        |
|                              | )   | Case No. 1:22-cr-165   |
| v.                           | )   |                        |
|                              | )   |                        |
| HATCHET M. SPEED,            | )   |                        |
|                              | )   |                        |
| Defendant.                   | )   |                        |

## RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS INDICTMENT

The defendant, Hatchet Speed, has been indicted on three counts of possession of a

silencer not registered to him in the National Firearms Registration and Transfer Record, in

violation of the National Firearms Act, 26 U.S.C. § 5861(d).  He has moved to dismiss the

indictment, arguing that the statute is unconstitutionally vague and violates the Second

Amendment.  Neither argument has merit, and the Court should deny the motion.

Speed's vagueness challenge fails as a matter of procedure and substance.  As a

procedural matter, the Fourth Circuit has held that constitutional as-applied challenges to a

statute, such as Speed's vagueness argument, are not suitable for pretrial resolution on a motion

to dismiss when they depend on facts outside of the indictment.  *See United States v. Hill*, 700 F.

App'x 235, 237-38 (4th Cir. 2017).  This case exemplifies why: the legal question is closely

intertwined with factual issues concerning the nature of the devices that Speed possessed and his

mens rea in possessing them—issues that the factfinder must determine at trial.

In any event, as a substantive matter, the statute gave Speed fair notice that the devices he

possessed constituted "silencers."  The statutory definition of the term "silencer" focuses on the

*purpose* of the device, not its operability: a "device" constitutes a silencer if it is "*for* silencing,

muffling, or diminishing the report of a portable firearm." 18 U.S.C. § 924(a)(25) (emphasis added). And the statutory definition goes beyond a device to include "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer." *Id.* It even includes a single "part intended only for use" in assembling or fabricating a firearm silencer. *Id.* Long before Speed purchased the devices at issue, courts had held that a device could constitute a silencer even if it was not operable, as long as its purpose was to silence, muffle, or diminish the report of a portable firearm.

Under these standards, Speed's devices plainly met the statutory definition of a silencer. The evidence—which includes Speed's statements to an undercover law enforcement agent, the surrounding context of his purchase of the devices, and the design of the devices—shows that Speed acquired the devices knowing that their purpose was to silence, muffle, or diminish the report of a portable firearm. At the very least, the evidence leaves no doubt that Speed knew the devices entailed a combination of parts designed and intended to be used in assembling or fabricating such a silencer. Speed's primary defense, at bottom, is that he did not know inoperable devices qualified as silencers. But such an ignorance of the law is not a legally cognizable defense.

Speed's challenge based on the Second Amendment fares no better. As multiple courts have held, silencers are not "arms" within the meaning of the Second Amendment. Even if they were, silencers fall within the class of "dangerous and unusual" weapons that the Supreme Court has recognized are not protected by the Second Amendment. And even if the silencers warranted Second Amendment protection, the National Firearms Act does not infringe on their possession but simply imposes reasonable regulations regarding their registration and taxation.

# BACKGROUND

## A.     Regulatory Framework

### 1.     *The National Firearms Act*

The National Firearms Act (NFA), 26 U.S.C. §§ 5801–5872, "subjects 'firearms' to various taxes and regulatory requirements, including that the firearm be registered with the [Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)]." *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016).  The purpose of the NFA "is to curb the proliferation of especially dangerous weaponry 'identifiable generally and broadly, if not exclusively, with criminal activities.'"  *United States v. Springer*, 609 F.3d 885, 888 (6th Cir. 2010) (quoting *United States v. Black*, 431 F.2d 524, 528 (6th Cir. 1970)).  Consistent with that purpose, the NFA defines the term "firearm" to include specifically listed weapons, such as sawed-off shotguns, short-barrel rifles, machineguns, destructive devices, and as relevant here, silencers. *See* 26 U.S.C. § 5845(a).

All NFA-covered firearms that are not in the possession or control of the United States must be registered in a central registry called the National Firearms Registration and Transfer Record (NFRTR).  *See id.* § 5841(a); 27 C.F.R. § 479.101.  The NFRTR includes information about the "identification of the firearm," "date of registration," and "identification and address of [the] person entitled to possession of the firearm."  26 U.S.C. § 5841(a).  "Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes.  Each firearm transferred shall be registered to the transferee by the transferor."  *Id.* § 5841(b).

The NFA imposes requirements that must be met before a firearm may be transferred.  A firearm may not be transferred unless the transferor files an application, called a Form 4, with the ATF and pays a tax.  *See id.* §§ 5811–5812; 27 C.F.R. §§ 479.82–479.86.  If the application is approved, the ATF Director will affix an NFA stamp on the original application and return the

3

approved application to the transferor.  *See* 27 C.F.R. § 479.86.  The NFA forbids the transferee from taking possession of a firearm before the ATF Director has approved the application and the firearm is registered to the transferee.  *See* 26 U.S.C. § 5812(b); 27 C.F.R. § 479.86.

Individuals who want to make an NFA-covered firearm must follow a similar procedure. A firearm may not be made unless the maker files an application, called a Form 1, with the ATF and pays a tax.  *See* 26 U.S.C. §§ 5821–5822; 27 C.F.R. §§ 479.61–479.64.  The ATF Director must approve the application before the firearm may be made.  *See* 27 C.F.R. § 479.64.

The NFA imposes criminal penalties for violations of its provisions.  *See* 26 U.S.C. § 5861.  As relevant here, it is "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the [NFRTR]."  *Id.* § 5861(d).  A violation of this statute carries a statutory maximum term of imprisonment of ten years.  *Id.* § 5871.

### 2.    *Definition of a Silencer*

Under the NFA, the term "firearm" includes "any silencer (as defined in section 921 of title 18, United States Code)."  26 U.S.C. § 5845(a)(7).  Section 921, in turn, defines the term "firearm silencer" to "mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."  18 U.S.C. § 921(a)(25).

By the plain language of the statute, a device constitutes a silencer if its *purpose* is to silence, muffle, or diminish the report of a portable firearm.  *See United States v. Crooker*, 608 F.3d 94, 97 (1st Cir. 2010); *United States v. Rose*, 522 F.3d 710, 720 (6th Cir. 2008); *United States v. Carter*, 465 F.3d 658, 667 (6th Cir. 2006); *United States v. Rogers*, 270 F.3d 1076, 1081-82 (7th Cir. 2001); *United States v. Syverson*, 90 F.3d 227, 232 (7th Cir. 1996).  This interpretation is faithful to the statutory text's focus on what the device is *for*, as opposed to

"statutory language such as 'is capable of silencing' or 'that silences.'" *Carter*, 465 F.3d at 667.

That "word choice indicates a concern for the *purpose* of the mechanism, and the parts thereof,

not the *function*." *Id.* "Where Congress wanted to define a device by its capability, it said so

explicitly." *United States v. Musso*, 914 F.3d 26, 31 (1st Cir. 2019) (holding that a grenade with

an inoperable fuze constituted a "destructive device"). Thus, a device need not be functional or

operable to constitute a silencer, as long as its purpose is to silence, muffle, or diminish the

report of a portable firearm.[1] *See Rose*, 522 F.3d at 720; *Carter*, 465 F.3d at 667; *Rogers*, 270

F.3d at 1081-82; *United States v. Siemers*, No. 99-4928, 2000 WL 864208, at *1 (4th Cir. June

29, 2000); *Syverson*, 90 F.3d at 232; *United States v. Hawkins*, No. 3:20-cr-642, 2022 WL

743571, at *5 (N.D. Ohio Mar. 11, 2022).

As reflected in the statute, the definition of the term "silencer" includes not just devices,

but also parts intended for use in fabricating or assembling a silencer. If a "combination of

parts" is "designed or redesigned, and intended for use in assembling or fabricating a firearm

silencer," then it qualifies as a "silencer." § 921(a)(25). And a single part qualifies as a

"silencer" if it is "intended only for use" in assembling or fabricating a firearm silencer. *Id.* As

the First Circuit has noted, the statute can be viewed as "three tests" with "gradations of purpose

---

[1] The Eighth Circuit has stated that a defendant must know "that the relevant item could in fact function to diminish the sound of a gun." *United States v. Hall*, 171 F.3d 1133, 1151 (8th Cir. 1999). But in that case, the court addressed a functioning silencer and the primary issue involved the defendant's knowledge. *See id.* at 1151-52. The court was not confronted with the issue of whether an inoperable device met the definition of a silencer if its purpose was to silence, muffle, or diminish the report of a portable firearm. However, even if this case were considered to create a circuit split, such a difference of interpretation would not "necessarily establish vagueness." *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019); *see also United States v. Morrison*, 686 F.3d 94, 104 (2d Cir. 2012) ("[I]t is manifest that conflicts between courts over the interpretation of a criminal statute do not in and of themselves render that statute unconstitutionally vague."). In any event, as described below, the evidence will prove that, with very minimal modifications, Speed's devices constituted functioning and effective silencers.

made more rigorous as the statute extends from a self-sufficient device to a collection of parts to a single part." *Crooker*, 608 F.3d at 97.

### B. Offense Conduct

#### 1. Speed's Purchase of Hawk Innovative Tech Devices

On January 6, 2021, Speed participated in the incursion at the U.S. Capitol.[2] *See* Decl. of Special Agent Christon Turner ¶¶ 3-4 (Sept. 7, 2022) (Dkt. No. 10-1) (hereafter, "Turner Decl."). In the five months that followed, he went on a firearm-buying spree, purchasing at least twelve firearms (rifles, shotguns, and handguns) and spending tens of thousands of dollars at firearm and firearm-part retailers. *Id.* ¶¶ 5-7. He later made comments to an FBI undercover employee (UCE) that he was "panic buying" around that time. *Id.* ¶ 5.

On or about February 16, 2021, during the time that he was panic buying, Speed purchased four silencers from Silencer Shop, a company in Texas. *See* Ex. A. Speed paid for four NFA tax stamps and completed paperwork for the ATF Form 4s. *Id.* Speed designated Herndon Arms as the location where he would pick up the silencers. *Id.* The total for his purchase of the four silencers and NFA tax stamps was $4,109.00. *Id.* A Herndon Arms employee has informed law enforcement that he told Speed that the typical ATF processing time for NFA transfers was six to fourteen months, and not to expect a tax stamp before one year.[3]

On March 11, 2021, Speed received an email from Silencer Shop informing him that his

---

[2] Speed is currently facing misdemeanor charges in the U.S. District Court for the District of Columbia related to his participation in the incursion at the U.S. Capitol on January 6, 2021. *See United States v. Hatchet Speed*, No. 1:22-CR-244 (D.D.C.).

[3] The employee subsequently contacted Speed in or around early February 2022 to inform him that the tax stamps had been approved and that he could pick up the silencers. All four of the silencers that Speed purchased in February 2021 were recovered from his storage unit during the search in June 2022.

"application was received by the ATF and the payment for [his] tax stamp(s) was cashed." Ex. B. The email stated that "[f]or many people, the best way to pass the time waiting for their approval is to just forget about it, but we realize that can be hard." *Id.* The email provided Speed with resources for tracking approval times for NFA transfers. *See id.*

Faced with the delay in obtaining approval of the transfer of the silencers, Speed made a purchase from Hawk Innovative Tech, a company in Georgia, on March 17, 2021. Financial records and emails show that Speed spent a total of $887.49 to purchase the following items from Hawk Innovative Tech:

> (1) Titanium B Size Particulate Filter – 3/8" (9mm) = $330.86
> (2) Aluminum B Size Particulate Filter - 7/16" (.45) = $170.89
> (3) Hybrid D Size Particulate Filter - 1/4" (.223/5.56) = $311.31
> (4) Standard Adapters - 13/16-16 to 5/8-24 Stainless = $16.54
> (5) EZ Connect Diffuser Adapter - 1/2-28 = $57.89

*See* Ex. C. The invoice for the three "particulate filters" (also known as "solvent traps")— hereafter collectively referred to as the "HIT Devices"—reflected a specific caliber size for each device. *Id.* On or about March 19, 2021, Hawk Innovative Tech sent a package via priority mail to Speed at his home address in Vienna, Virginia.

In his motion to dismiss, Speed implicitly admits that he received and possessed the HIT Devices. According to Speed (at 3), he purchased the devices with the "understanding that they were not functional as silencers upon purchase. He kept the solvent traps in their original conditions for 15 months, only taking them out of their packaging on the day they arrived and immediately putting them back in their boxes. He never looked at them again."

### 2. Speed's Comments to the FBI UCE

After acquiring the HIT Devices, Speed made multiple comments to the UCE reflecting that he knew the HIT Devices were for silencing, diminishing, or muffling the report of a

portable firearm, and that he possessed them for that purpose.

During a meeting with Speed in March 2022, the UCE mentioned seeing on YouTube how people were selling and making solvent traps as a way to circumvent suppressors (i.e., silencers). *See* Ex. D, at 1. Speed responded that he "bought a couple of those," referring to solvent traps. *Id.* Speed stated that a hole had to be bored, which he said that he had not done yet. *Id.* But Speed observed that "the idea is to get everything except that, and then . . . you get a good drill press, and . . . just drill straight through," though Speed stated that he did not yet have a drill press. *Id.* at 2. Speed noted that if you drill the solvent trap and do not "submit the Form 1," then you have committed a felony. *Id.* Speed stated, "I figure, at least I'm closer. If I do ever need to use it, all I have to do is find somebody with a drill press." *Id.* Speed did not indicate that he possessed the devices for any other purpose (such as to clean his firearms).

In a subsequent meeting in April 2022, the UCE and Speed again discussed the use of solvent traps to make silencers. The UCE asked if a solvent trap could shoot more than one round and stay quiet. Ex. E, at 1. Speed responded that he had "to test and see . . . but yeah, uh, they stay quiet." *Id.* When the UCE asked where he could buy one, Speed responded that a local firearm store had them or he could get them online. *Id.* Speed stated that he purchased his solvent traps online before realizing that the local firearm store sold them. *Id.* at 1, 4. Speed could not remember the name of the site where he bought his solvent traps, but he said that they seemed to be good quality. *Id.* at 4. Speed indicated that if the UCE went to the local firearm store or any place that sells solvent traps, the retailers there would know the purpose of the solvent trap and that UCE would not have to "say . . . what it's for." *Id.* at 2.

Speed stated that he had not used his solvent traps as silencers yet. *See id.* Speed repeated that a "Form 1" must be submitted before drilling the hole in order to make the silencer

legally.  *See id.* at 4-5.  Speed, however, stated, "[T]hat would be the legal way of doing it, you know.  If you forget to fill out Form One, nobody ever finds you on the form."  *Id.* at 4.  When the UCE asked about the drill bit size to use, Speed noted that "you buy [the solvent trap] sized for a particular caliber . . . but then . . . your drill bit has to be the right size."  *Id.* at 5.  Speed explained, "I haven't figured that detail out.  I just figure when I want to figure that detail out, it will be easier to figure out the drill bits and whatnot.  If that's all I have to figure out then everything is," and then was interrupted.  *Id.*

At one point during the same meeting, Speed confirmed to the UCE that he had the solvent traps for potential use in an act of violence in furtherance of his anti-Semitic ideology.  *See* Turner Decl. ¶¶ 19-27 (describing Speed's comments about using violence in furtherance of his anti-Semitic ideology).  Speed explained that, living in the D.C. area, there were a lot of "enemies that appear because this is where the seat of government is."  *Id.* ¶ 21.  Speed discussed trying to figure out how to identify potential targets who were "reachable" by someone like him.  *Id.* ¶ 24.  When the UCE asked if he was referring to the "ADL" (the Anti-Defamation League), Speed confirmed that he was and that "they're . . . pretty high up."  *Id.* ¶ 25.  Speed suggested using a "mock trial" to identify potential targets.  Ex. F, at 2.

The UCE then asked Speed, "You think at that point your . . . solvent traps would come in handy?" *Id.*  Speed responded, "My what?" *Id.* at 3.  The UCE repeated, "your solvent traps would come in handy at that point?" *Id.*  Speed responded, "Yeah.  Yeah, that's the idea." *Id.*  Speed then proceeded to praise the approach of jihadists and suggested that their approach would be an effective way to "wipe out" the opposition, referring to Jewish people.  Turner Decl. ¶ 26.  He also described how kidnappings would be more effective than killing people.  *See id.* ¶ 27.

### 3.    *Seizure and Examination of Hawk Innovative Tech Devices*

On June 22, 2022, the FBI executed a search warrant on Speed's storage unit in

Alexandria, Virginia. During the search, the FBI seized the three HIT Devices from Speed's storage unit. *See* Ex. G (pictures taken of the three devices during the search). The HIT Devices were still in their original packaging when the FBI seized them. The packaging advertised each device as an "HIT Solvent Filter" and stated, "Use Only as Intended." *See id.* Inside the packaging were instructions ostensibly on how to assemble the device and use it to clean a firearm. *See* Ex. H (instructions accompanying one of the devices). The instructions stated that "[a]ny modifications or alterations for purposes other than those stated are not condoned by the seller or manufacturer and are the sole responsibility of the user." *Id.* The instructions disclaimed responsibility of the seller or manufacturer "for misuse of the product." *Id.*

In addition, the FBI also seized numerous firearms and firearm parts. Some of the firearms that the FBI seized could be fitted with the HIT Devices. The FBI also seized multiple silencers that were registered to Speed (or his trust, "Concord Trust") in the NFRTR.

The FBI provided the HIT Devices to ATF's Firearms Technology Criminal Branch. An ATF Firearms Enforcement Officer (FEO) examined the HIT Devices. On August 11, 2022, the FEO issued a report with her findings.

Despite the advertisement of the devices as solvent traps (or particulate filters), the FEO concluded that each of the HIT Devices was a "device for silencing, muffling, or diminishing the report of a portable firearm" and therefore a silencer. The FEO explained that the "objective design features and characteristics of these [devices] demonstrate that they are both inefficient when used as solvent traps but are particularly effective firearm silencers. This includes the presence of parts and dimensions that are unnecessary for solvent traps but effective in reducing the report of a portable firearm." The FEO's report detailed the design characteristics that showed the HIT Devices were meant to be used as silencers, not solvent traps.

The HIT Devices seized from Speed's storage unit did not have a completed hole already drilled into the front end-cap for a bullet to pass through. Instead, each front end-cap had a screw that was drilled into the center and attached an extra baffle and spacers. As the FEO noted, "the center holes could be completed in a matter of minutes using a hand drill or drill press." In fact, the FEO tested one of the devices by using a hand drill to drill a center hole in the front end-cap (where the screw had been located) and assembling the rest of the silencer with the parts included with the device. The whole drilling and assembly took less than 10 minutes. The FEO then fired a handgun with the device attached. The device effectively reduced the report of the handgun by 23.58 decibels. Exhibit I reflects pictures of the tested device.

## C.    Procedural History

On September 6, 2022, the grand jury returned an indictment charging Speed with three counts of unlawful possession of a silencer that was not registered to him in the NFRTR, in violation of 26 U.S.C. §§ 5841, 5861(d), 5871. *See* Indictment (Sept. 6, 2022) (Dkt. No. 1). The next day, Speed was arrested, had his initial appearance, and was released on a personal recognizance bond with conditions. *See* Minute Entry (Sept. 7, 2022) (Dkt. No. 12). The Court held Speed's arraignment on September 22 and scheduled his jury trial to begin on December 12, 2022. *See* Minute Entry (Sept. 22, 2022) (Dkt. No. 17).

Speed filed the pending motion to dismiss the indictment on October 19. In his motion, Speed argues (1) that § 5861(d) is unconstitutionally vague as applied to him and (2) that it violates the Second Amendment. Neither argument has any merit.

## DISCUSSION

Under Federal Rule of Criminal Procedure 12, the Court "may dismiss an indictment . . . 'where there is an infirmity of law in the prosecution.'" *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (quoting *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010)). But

the Court "may not dismiss an indictment . . . on a determination of facts that should have been developed at trial." *Id.* (quoting *Snipes*, 611 F.3d at 866).

## I.  THE COURT SHOULD DENY SPEED'S VAGUENESS CHALLENGE

The "[v]agueness doctrine is an outgrowth . . . of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008).  To satisfy due process, "a criminal statute must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Moriello*, 980 F.3d 924, 931 (4th Cir. 2020) (quoting *Doe v. Cooper*, 842 F.3d 833, 843 (4th Cir. 2016)).  "A statute is unconstitutionally vague if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Barronette*, 46 F.4th 177, 190 (4th Cir. 2022) (quoting *United States v. Bennett*, 984 F.2d 597, 605 (4th Cir. 1993)) (internal quotation marks omitted).  "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Where, as here, a criminal statute does not involve First Amendment freedoms, a vagueness challenge "must be examined in the light of the facts of the case at hand." *Moriello*, 980 F.3d at 931 (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)).  In such situations, defendants cannot assert a facial attack against a statute on vagueness grounds. *See id.*  "[A] defendant who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Barronette*, 46 F.4th at 190 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010)) (alterations and internal quotation marks omitted).

### A.  The Court Should Defer Ruling on the Vagueness Challenge Until Trial.

Rule 12 provides that a defendant must raise an objection to a defective indictment in a pretrial motion "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Generally, in addressing a motion to dismiss, the Court may consider facts outside of the indictment "where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts.'" *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011). "No circuit, though, allows such a review on an incomplete or disputed factual record." *United States v. Rodríguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019).

The Fourth Circuit has reversed an order dismissing an indictment when the issue involved an as-applied constitutional challenge under the Commerce Clause. *United States v. Hill*, 700 F. App'x 235, 237 (4th Cir. 2017). The court distinguished *Weaver* on the ground that it involved a "purely legal" issue of statutory interpretation. *Id.* The court emphasized that the as-applied constitutional challenge "involve[d] questions of law and fact," and determined it was "not prudent at th[at] point to consider the extraneous facts, most of which were proffered by the government in an attempt to strengthen its case." *Id.* The court reasoned that the presumption of innocence and presumption of a statute's constitutionality further counseled against considering extraneous facts at the motion-to-dismiss stage. *See id.* at 237-38.

In light of *Hill*, the Court should defer ruling on Speed's vagueness challenge until trial. First, it is not apparent that Speed agrees with the government's factual proffer, as a lot of daylight exists between the factual recitations in the two briefs. Second, Speed's vagueness argument is an as-applied constitutional challenge—the type of issue that the Fourth Circuit held was inappropriate for a pretrial motion to dismiss in *Hill. See also United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016) (holding that the district court erred in "definitively ruling" on a

pretrial motion to dismiss making an as-applied vagueness challenge).

**B.      The Statute Is Not Unconstitutionally Vague.**

To the extent the Court addresses the merits of Speed's motion, it should reject his

vagueness challenge.

>   ***1.      The statute provides reasonably clear standards for ordinary people to understand what conduct is prohibited and to prevent arbitrary and discriminatory enforcement.***

Speed's primary argument (at 8) is that the statute is unconstitutionally vague because it

does not sufficiently define what constitutes a "silencer" to put him on fair notice that his

possession of the HIT Devices was unlawful.  This argument has no merit.

The statute provides reasonably clear standards for ascertaining whether a device,

collection of parts, or single part constitutes a "silencer."  As described above, the statute sets

forth essentially three standards:

>   (1) A device constitutes a silencer if it is "for silencing, muffling, or diminishing the report of a portable firearm," that is, if its purpose is to silence, muffle, or diminish the report of a portable firearm.  18 U.S.C. § 921(a)(25).

>   (2) Multiple parts constitute a "silencer" if they are a "combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler."  *Id.*

>   (3) A single part constitutes a "silencer" if it is "intended only for use" in assembling or fabricating a firearm silencer or firearm muffler.  *Id.*

*See supra* pp. 4-6.  A common thread of all three aspects of the definition is that the purpose of

the device, parts, or part must be to silence, muffle, or diminish the report of a portable firearm,

or to assemble or fabricate a device that does so.

This focus on the purpose of the device or parts—and, at least in the context of a

combination of parts, on the design—presents "clear questions of fact," a "true-or-false

determination," not "wholly subjective judgments."[4] *Williams*, 553 U.S. at 306. And, as the First Circuit has recognized, the statute's focus on the purpose of the device "is conventional with criminal statutes in order to provide fair notice" and "tempers problems of overbreadth and vagueness created by the multiple legitimate objects that can be used to silence a firearm." *Crooker*, 608 F.3d at 99.

The scienter requirement for proving a violation of § 5861(d) further safeguards against any vagueness concerns. It is well established that a knowledge requirement tends to defeat any vagueness concerns. *See, e.g.*, *United States v. Saunders*, 828 F.3d 198, 207 (4th Cir. 2016) ("A 'scienter requirement alone tends to defeat' vagueness challenges to criminal statutes."); *United States v. Jaensch*, 665 F.3d 83, 90 (4th Cir. 2011) ("Given that Section 1028(a)(1) has a scienter requirement specifically requiring the Government to prove beyond a reasonable doubt that [the defendant] *knew* that the ID *appeared to be* issued by or under the authority of the United States Government, this scienter requirement alone tends to defeat [his] vagueness challenge."). "[A] scienter requirement in a statute alleviates vagueness concerns, narrows the scope of its prohibition, and limits prosecutorial discretion." *McFadden v. United States*, 576 U.S. 186, 197 (2015) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)) (alterations and internal quotation marks omitted).

To obtain a conviction under § 5861(d), the government must "prove that [the defendant] knew of the features of his [firearm] that brought it within the scope of the [National Firearms]

---

[4] That distinguishes this case from the loitering provision in *City of Chicago v. Morales*, 527 U.S. 41 (1999), relied upon by Speed (at 10). There, a Chicago ordinance "prohibit[ed] 'criminal street gang members' from 'loitering' with one another or with other persons in any public place." *Id.* at 45-46. "Loitering" was defined as "remain[ing] in any one place with no apparent purpose." *Id.* at 47. As the Court noted, "[t]he 'no apparent purpose' standard for making that decision is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene." *Id.* at 62.

Act." *Staples v. United States*, 511 U.S. 600, 619 (1994). With respect to silencers, then, the government must show that the defendant *knew* either (1) that the device was "for silencing, muffling, or diminishing the report of a portable firearm"; (2) that the "combination of parts" was "designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler"; or (3) that the single part was "intended only for use" in assembling or fabricating a firearm silencer or firearm muffler. *See United States v. Moore*, 253 F.3d 607, 610-11 (11th Cir. 2001). This scienter requirement defeats Speed's vagueness challenge by ensuring that he cannot be convicted for possessing devices that he was unaware had the attributes of a silencer as defined by the statute.

Speed argues (at 8) that the statute is vague because it fails to "list[] any essential or easily identifiable design, physical feature, or characteristic that a device must have to make it subject to registration requirements as a silencer." But "perfect clarity and precise guidance have never been required" to avoid vagueness concerns. *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The Fourth Circuit has rejected vagueness challenges to other firearm definitions that do not go into that level of granularity. *See United States v. Williams*, 364 F.3d 556, 560 (4th Cir. 2004) (rejecting a vagueness challenge to the NFA's definition of "machinegun"); *United States v. Morningstar*, 456 F.2d 278, 281 (4th Cir. 1972) (rejecting a vagueness challenge to the NFA's definition of "destructive device"). Here, as described above, the statute provides sufficient and readily understandable standards for determining when a device, parts, or part constitutes a "silencer."

Speed contends (at 8) that the definition of silencer "could include, for example, plastic bottles, potatoes, pillows, books, banners, flags, clothing, tools, electronic equipment, etc." By resorting to such hypotheticals, however, Speed "attempts to take [the Court] beyond the facts of

[his] own case" and make an "inappropriate" facial challenge. *Moriello*, 980 F.3d at 931. "In criminal cases, . . . 'if a law clearly prohibits a defendant's conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be vague for other hypothetical defendants.'" *United States v. Hasson*, 26 F.4th 610, 616-17 (4th Cir. 2022) (quoting *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016)); *see also Williams*, 553 U.S. at 305-06 (rejecting a lower court's reliance on hypotheticals to find a statute vague and explaining that the "basic mistake" with the approach was that it "lies in the belief that the mere fact that close cases can be envisioned renders a statute vague"). As described below, the statute clearly prohibited Speed's conduct, so such hypotheticals should not be entertained.

Speed's reliance (at 8) on *United States v. Schrum*, 346 F. Supp. 537 (E.D. Va. 1972), is misplaced. In that case, the court addressed the NFA's former definition of "firearm," which included "a muffler or a silencer for any firearm whether or not such firearm is included within this definition." *Id.* at 538. The case pre-dated the enactment of the Firearm Owners' Protection Act, Pub. L. No. 99-308, §§ 101, 109, 100 Stat. 449, 451, 460 (1986), which added the definition of the term "silencer" in 18 U.S.C. § 921 and incorporated that definition in the NFA.

The *Schrum* court, moreover, *rejected* the defendant's argument that the definition of silencer was unconstitutionally vague. In *Schrum*, the court "define[d] a silencer as a device which is designed to reduce the noise of a weapon," describing its standard as "an objective inquiry into the mechanical functioning of the device." 346 F. Supp. at 540. According to the court, "[b]efore any device could be termed a silencer, one of its primary purposes or functions must be to reduce noise levels." *Id.* The defendant argued that "unless the definition is limited to one which *substantially* reduces the noise [of a firearm], then any legitimate device attached to a firearm and reduces the noise could be called a silencer." *Id.* In rejecting this argument, the

court noted that its definition of "the term silencer . . . comports with [the] commonly accepted meaning of the term." *Id.* As a result, the court rejected the defendant's argument that the definition of silencer was unconstitutionally vague. *See id.*

2.  ***Speed cannot sustain a vagueness challenge because the statute clearly prohibited his conduct.***

To establish that Speed violated § 5861(d), the government will prove the following elements beyond a reasonable doubt: (1) Speed possessed the HIT Devices; (2) the HIT Devices constituted silencers under 18 U.S.C. § 921(a)(25); (3) Speed knew of the characteristics of the HIT Devices that brought them within the scope of the NFA, that is, he knew the HIT Devices had the characteristics of a silencer (as defined by § 921(a)(25)); and (4) the HIT Devices were not registered to Speed in the NFRTR. *See* 26 U.S.C. § 5861(d); *Staples*, 511 U.S. at 619; *United States v. Springer*, 609 F.3d 885, 888 (6th Cir. 2010).

There is no dispute that Speed possessed the HIT Devices. Bank records, emails, and other evidence establish that he purchased the HIT Devices from Hawk Innovative Tech and had them shipped to his address in Vienna, Virginia. The FBI seized the HIT Devices from his storage unit. In his brief, Speed implicitly concedes (at 3) that he possessed the HIT Devices when he discusses what he did with them after they arrived. And the government's evidence will establish that the HIT Devices were not registered to Speed in the NFRTR—a fact that he does not dispute in his brief.

At the crux of the case, the government will establish that the HIT Devices were silencers. Specifically, the government will prove that the purpose of HIT Devices was for silencing, muffling, or diminishing the report of a portable firearm or, at minimum, that the HIT Devices were a combination of parts designed and intended for use in assembling or fabricating a firearm silencer or firearm muffler. The evidence will further establish that Speed knew this was

the purpose and design of the HIT Devices, and that he possessed them for that purpose.

*First*, expert testimony will establish that the HIT Devices were designed to silence, muffle, or diminish the report of a portable firearm (or to assemble or fabricate such a device). In fact, the FEO tested one of the HIT Devices, and it served as an effective silencer. The device included all the requisite parts for using it as a silencer and just required drilling through the center-hole marking. This expert testimony will show that the HIT Devices were meant for silencing, muffling, or diminishing the report of a portable firearm (or assembling or fabricating such a device).

*Second*, Speed's statements to the UCE demonstrate that he knew and intended the HIT Devices were for silencing, muffling, or diminishing the report of a portable firearm (or to assemble or fabricate such a device), and that he possessed them for that purpose. Speed's comments show that he knew he just needed to drill a hole for the HIT Devices to function as silencers. Speed also coached the UCE on purchasing a solvent trap to use as a silencer, explaining that he did not need to say what it is for because the seller "know[s] . . . why you're doing it." Ex. E, at 2. And when discussing his thoughts on using violence to further his anti-Semitic ideology, Speed confirmed to the UCE that he had the devices for that purpose. Speed never indicated that he possessed the HIT Devices for use in cleaning his firearm or any legitimate purpose.

*Third*, the context of Speed's purchase of the HIT Devices further establishes his knowledge and intent. As described above, the evidence shows that Speed purchased the HIT Devices to circumvent the wait time for NFA approval and obtain additional silencers more quickly because he was panic buying firearms after January 6. *See supra* pp. 6-7.

Speed's primary defense (at 3-4) is that he cannot be guilty of the charges because he

understood the HIT Devices not to be functional as silencers upon purchase and he intended to file a Form 1 and register them if he drilled them to make them functional. But that defense is too clever by half. As Speed's statements to the UCE reflect, he knew the devices were designed to require very minimal modification to become fully functional and effective—essentially drilling through a pre-marked indexing hole with a hand drill, a process that took a matter of minutes. Excluding such devices from the definition of a silencer would establish a major loophole in the NFA and encourage the proliferation of unregulated silencers. As described above, however, the law is written in a manner to foreclose the knowing possession of such devices if the evidence shows, as here, that the purpose of the device is to silence, muffle, or diminish the report of a portable firearm (or that the device involves a combination of parts designed and intended for use in fabricating or assembling such a silencer).

At bottom, Speed's defense rests on a mistake of law that the HIT Devices had to be fully functional to qualify as silencers. As courts have recognized, a device need not be functional or operable to constitute a silencer, as long as the purpose of the device is to silence, muffle, or diminish the report of a portable firearm. *See supra* pp. 4-5. Because the HIT Devices fit that definition of "silencer," Speed could not take possession of them unless they were registered to him in the NFRTR. It is irrelevant whether Speed thought the devices did not become a "silencer" and subject to the NFA's registration requirement until the hole was drilled. Ignorance or mistake of law is no excuse. *See United States v. Moody*, 2 F.4th 180, 197-98 (4th Cir. 2021); *United States v. Dodson*, 519 F. App'x 344, 350-51 (6th Cir. 2013).

Finally, Speed's argument overlooks the fact that the definition of "silencer" includes "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler." 18 U.S.C. § 921(a)(25). By arguing that he

would file a Form 1 before drilling the HIT Devices, Speed implicitly admits that he knew the HIT Devices—which involved a combination of parts (end-caps, spacers, baffles, etc.)—were designed and intended for use in assembling or fabricating a firearm silencer.

### 3. The ATF Technical Bulletins provided consistent guidance on how to identify when a device constitutes a legitimate solvent trap or a silencer.

Speed argues (at 10-13) that the ATF produced shifting guidance for determining whether a device constitutes a legitimate solvent trap or a silencer. To support this argument, Speed does not point to any regulations promulgated by the ATF. Instead, Speed relies on two ATF bulletins: Technical Bulletin 17-02 (issued in April 2017) and Technical Bulletin 20-01 (issued in October 2019). As reflected in the documents themselves, both bulletins were guidance documents provided to ATF personnel to assist in differentiating between legitimate solvent traps and silencers. Contrary to Speed's arguments, the bulletins provided consistent guidance for determining whether a device is a silencer or legitimate solvent trap.

The first bulletin, Technical Bulletin 17-02, notes that "a key factor in distinguishing between a 'solvent trap' and a firearm silencer is the intended use of the device." Exhibit 1, at 1 (Oct. 19, 2022) (Dkt. No. 23-1). The bulletin recognizes that solvent traps "are unregulated until a possessor assembles, accumulates, *or otherwise demonstrates these articles are to be used for making a firearm silencer*." *Id.* at 2 (emphasis added). The bulletin states, "Once such an item(s) is possessed *with the intent to be used in assembling or fabricating a firearm silencer*, it comes within the purview of the [Gun Control Act] and NFA and is properly classified as a 'firearm silencer.'" *Id.* (emphasis added). The bulletin recognized that "mere possession of a 'solvent trap' or components which *could* be used in the assembly of a firearm silencer does not necessarily constitute possession of a firearm silencer." *Id.* at 7. It noted that "[i]ntent must be demonstrated or communicated." *Id.* This guidance follows the statutory definition of a

"silencer," which focuses on the purpose of the device.  *See supra* pp. 4-5.

As particularly relevant here, Technical Bulletin 17-02 discusses how the presence of holes or index markings on the end of a "solvent trap" can demonstrate that the device is meant to be used as a silencer.  The bulletin notes that "flashlight 'solvent traps' are sometimes sold with index markings, showing where the hole would need to be drilled in order to modify the 'solvent trap' into a firearm silencer."  *Id.* at 5.  The bulletin states that "any flashlight 'solvent trap' with a hole drilled in the forward end-cap could be classified as a firearm silencer."  *Id.* Later in the bulletin, when discussing the current trend in "solvent trap" designs, the bulletin states that "indexing holes as shown above demonstrate such intent [for the device to be used as a silencer] because these serve no benefit in collecting solvent or debris, but demonstrate the location of holes if these parts are to be used in a silencer."  *Id.* at 7.  The photographs reflect an end-cap with an indexing hole in the center—similar to the hole in the front end-caps of the HIT Devices.  *See* Ex. I.

Technical Bulletin 20-01 also discusses how to differentiate between legitimate solvent traps and silencers based on the presence of a center hole in the end-cap.  This bulletin states, "The front end-cap of a solvent trap must be solid and have no hole that will allow a projectile to pass-through (including 'pilot' holes that can be widened to allow a projectile to pass-through or marks indicating the location to drill such a hole)."  Exhibit 4, at 2 (Oct. 19, 2022) (Dkt. No. 23-4).  The bulletin further notes, "Devices that have a hole in or indexing mark for a hole in the front end-cap are classified as a 'firearm silencer' under the NFA."  *Id.*

The takeaway of the two bulletins is the same.  A hole or indexing/pilot hole in the end-cap of a "solvent trap" is an indicator that the device is meant to be used as a silencer.  Such a hole serves no beneficial purpose for a legitimate solvent trap but facilitates using the device as a

silencer. Thus, the bulletins provided consistent guidance to ATF personnel to look for such holes when evaluating whether a device was a legitimate solvent trap or a silencer. This guidance comported with the statutory focus on the *purpose* of the device in determining whether the device constituted a silencer. *See United States v. Hay*, 46 F.4th 746, 750 (8th Cir. 2022) ("[R]ather than attempting to change the law, [Technical] Bulletin [20-01] merely seeks to inform law enforcement officers of items that qualify as firearm silencers under the law as it already exists.").

### 4. The rule of lenity is inapplicable because the statute is unambiguous.

Speed urges (at 13-14) the Court to apply the rule of lenity in sustaining his vagueness challenge. But the rule of lenity "is reserved for cases where, 'after seizing everything from which aid can be derived, the Court is left with an ambiguous statute.'" *DePierre v. United States*, 564 U.S. 70, 88 (2011) (quoting *Smith v. United States*, 508 U.S. 223, 239 (1993)). For the rule of lenity to apply, the defendant must show a "grievous ambiguity or uncertainty that would trigger the rule's application." *Salman v. United States*, 137 S. Ct. 420, 429 (2016) (quoting *Barber v. Thomas*, 560 U.S. 474, 492 (2010)). As discussed above, Speed has failed to make such a showing of ambiguity. The rule of lenity therefore has no work to do here.

## II. THE COURT SHOULD DENY SPEED'S SECOND AMENDMENT CHALLENGE

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "Like most rights," however, "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). It does not allow every person to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The *Heller* Court made clear that its opinion recognizing an individual right to possess a handgun for self-defense should not "be taken to cast

doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*." *Id.* at 626-27 (emphasis added); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (same).

In *New York State Rifle & Pistol Ass'n v. Bruen*, the Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. 2111, 2134 (2022). It elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense: "When the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct. The government must *then* justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30 (emphasis added). Only after the government makes that showing "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961)).

The *Bruen* Court recognized that the first step of analyzing the "plain text" of the Second Amendment "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. However, the Court rejected the post-*Heller* test that had developed among the circuit and district courts at the second step of the analysis, in which courts applied means-end scrutiny to laws regulating conduct that was found to fall within the Second Amendment's "plain text." *Id.* Instead, the Court held that an analysis of the "Nation's historical tradition of firearm regulation," not means-end scrutiny, was the appropriate standard at the second step. *Id.* at 2130.

To determine whether a particular regulation is "consistent with the Nation's historical tradition of firearm regulation," courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id*. at 2131-32 (quoting *Heller*, 554 U.S. at 631). The inquiry will often require "reasoning by analogy." *Id*. at 2132. Because self-defense lies at the core of the Second Amendment, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id*. at 2133 (quoting *McDonald*, 561 U.S. at 767). Significantly, however, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

A.      **Silencers Are Not "Arms" Within the Meaning of the Second Amendment.**

The Second Amendment's protection applies to "Arms." U.S. Const. amend. II. This protection "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. The 18th-century meaning of the term "arms" involved "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*. at 581 (internal quotation marks omitted). With this in mind, the *Heller* Court noted that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* at 582. More recently, the *Bruen* Court recognized that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." 142 S. Ct. at 2132.

As multiple courts have held, a silencer is not a "bearable arm" and therefore falls outside of the plain text of the Second Amendment. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *United States v. Al-Azhari*, No. 8:20-cr-206-T-60AEP, 2020 WL 7334512, at *3

(M.D. Fla. Dec. 14, 2020); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at \*4 (D. Md. Sept. 20, 2019). "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')." *Cox*, 906 F.3d at 1186. It "is not itself used 'to cast at or strike another,' it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose." *Hasson*, 2019 WL 4573424, at \*4. Nor is a silencer necessary to the operation of a firearm, like ammunition, magazines, or even the availability of firing ranges, without which one could not train or qualify to exercise his Second Amendment rights. *See id.* at \*4-5. An operable firearm will work perfectly well without a silencer, and a silencer will not transform an inoperable firearm into an operable one.

Indeed, Speed even explains (at 15) that the "bearable arms" under the Second Amendment are limited to those "items and accessories that make firearms *useable*." Further, he admits (at 17) that silencers "are not themselves violent or dangerous," implicitly recognizing that silencers are firearm accessories, not weapons. Because silencers are not "bearable arms," they are not entitled to Second Amendment protection.[5]

### B. Even if Silencers Are "Bearable Arms," They Are "Dangerous and Unusual Weapons," the Regulation of Which Is Consistent with Historical Tradition.

Even if silencers were "bearable arms," the NFA's prohibition on possession of unregistered silencers falls within the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see also Bruen*, 142 S. Ct. at 2143-44. As such, it falls beyond the scope of Second Amendment protection. *See United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (holding that silencers are "dangerous and unusual" and therefore fall outside of the Second Amendment's protections); *United States v.*

---

[5] Speed simply asserts (at 15-16) that "[s]ilencers plainly fall into this definition" because the NFA includes them in its definition of "firearms." But the NFA definition does not dictate a silencer's nature under the Second Amendment.

*Perkins*, No. 4:08CR3064, 2008 WL 4372821, at *4 (D. Neb. Sept. 23, 2008) (same).

Silencers remain both dangerous and unusual—especially for self-defense purposes—regardless of whether they existed at the time of the founding or are comparable to any weapon that did. The historical record shows that silencers were perceived as dangerous almost immediately after their invention and that they were quickly used to facilitate crimes. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 L. & Contemp. Probs. 231, 246-49 (2020). When the silencer was invented in the early 1900s and patented in 1908, "[o]bjections to civilian use of silencers appeared almost immediately." *Id*. at 246. By 1909, just one year later, the first state, Maine, had banned the sale or possession of silencers, and New Jersey followed two years later with a prohibition on the use of silencers for hunting. *Id*. at 247. From the beginning, there were "two primary concerns about unregulated possession of silencers: that they would be used by criminals seeking to avoid detection, and that they would be used by hunters with a similar motivation." *Id*. "From 1909 and 1936, at least fifteen states enacted silencer restrictions, with eight of them specifically barring their use in hunting." *Id*. at 248. Ultimately, the inventor of the silencer "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id*. at 248 n.125 (quoting *Maxim Bans Gun Silencer*, N.Y. TIMES, May 8, 1930, at 27).

None of the concerns regarding silencers articulated in the early 20th century has changed such that silencers are no longer dangerous and unusual today. *See McCartney*, 357 F. App'x at 76; *Perkins*, 2008 WL 4372821, at *4. Even if silencers can provide some noncriminal benefit to protecting hearing and improving accuracy as Speed argues (at 18), such incidental benefits do not reduce the inherently high degree of dangerousness of devices that reduce the report of a firearm. Nor does Speed's argument (at 18) that "only .003 percent of silencers are

used in crimes each year" suggest that silencers are no longer dangerous. Such statistics suggest that the NFA regulation of silencer is doing its job.

Unlike handguns, which are "indisputably in 'common use' for self-defense today," *Bruen*, 142 S. Ct. at 2143, silencers remain relatively uncommon and not necessary (or truly intended or used) for self-defense. *See McCartney*, 357 F. App'x at 76 ("Silencers, grenades, and directional mines are not 'typically possessed by law-abiding citizens for lawful purposes, … and are less common than either short-barreled shotguns or machine guns."). Further underscoring their unusualness, in 2021, there were almost 2.7 million registered silencers in the United States—less than 1% of the estimated 393 million total firearms in the United States. *Firearms Commerce in the United States – Annual Statistical Update 2021*, Bureau of Alcohol, Tobacco, Firearms & Explosives, https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download; Global Firearms Holdings, Small Arms Survey (Mar. 29, 2020), https://www.smallarmssurvey.org/database/global-firearms-holdings.

Consequently, the NFA restrictions of silencers that are at issue in this case fit within the historical tradition of prohibitions on "dangerous and unusual weapons" recognized by *Heller* and reemphasized in *Bruen*. Because silencers have always been, and remain, dangerous and unusual weapons, § 5861(d)'s prohibition on possession of unregistered silencers does not run afoul of the Second Amendment.

**C.    The NFA's Requirements Do Not "Infringe" on the Second Amendment.**

Even setting aside the question of whether silencers are "bearable arms" or "dangerous and unusual weapons," the text of the Second Amendment commands only that the right to keep and bear arms shall not be "infringed," not that such right cannot be burdened in any way. U.S. Const. amend. II. Here, the NFA's registration and taxation requirements do not "infringe" on the right to keep and bear arms. Individuals like Speed may receive and possess silencers as long

as they comply with the registration and taxation requirements.

Administrative burdens that stop far short of disarming law-abiding citizens do not "infringe" the right to keep and bear arms. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Bruen*, for example, expressly did not disturb the "shall-issue" licensing laws that exist in 43 States, which "do not require applicants to show an atypical need for armed self-defense" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9. Indeed, Justice Kavanaugh's concurrence emphasized that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring).

As described above, the NFA's registration requirements for silencers is no more burdensome than the kind of firearms registration requirements that the Supreme Court left intact in *Bruen*. *See supra* pp. 3-4. The statutes with which Speed has been charged do not ban silencer possession. Rather, they require registration and documentation, as well as the payment of an appropriate, reasonable tax, and impose criminal penalties for not complying with these regulatory requirements. Such a system does not "infringe" on the right to keep and bear arms, and therefore does not violate the Second Amendment.

D.    **The NFA's Requirements Are Analogous to Historical Laws Regulating Firearms in Commerce.**

Finally, the NFA's registration requirement is analogous to historical laws regulating firearms in commerce, meaning that it satisfies both steps of the *Bruen* analysis. *See* 142 S. Ct. at 2130. "[C]olonial governments substantially controlled the firearms trade." *Teixeira v.*

*County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id*. In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id*. at 685 n.18 (emphasis added). And other colonies "controlled the conditions of trade" in firearms. *Id*. at 685. States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *See* Spitzer, *Gun Law History*, *supra*, at 74.

Like the early laws, the NFA's registration requirement for silencers does not prohibit possession, but imposes record-keeping requirements to ensure they do not fall into the wrong hands or can be traced when used in a crime. Although not identical to the historical statutes, *Bruen* made clear that the government need only identify a "historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. Because the registration requirement is analogous to historical laws regulating firearms in commerce, § 5861(d) satisfies *Bruen*'s two-step test.

## CONCLUSION

For the foregoing reasons, the Court should deny Speed's motion to dismiss the indictment.

Respectfully submitted,

Jessica D. Aber
United States Attorney

       /s/
_____
Thomas W. Traxler
Amanda Lowe
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3746
Facsimile (703) 299-3980
Email: Thomas.traxler@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of November, 2022, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system.

_____/s/_____
Thomas W. Traxler
Assistant United States Attorney
