IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:22-CR-165 |
| | ) | |
| HATCHET M. SPEED, | ) | |
| | ) | |
| Defendant. | ) | |

## **GOVERNMENT'S MOTION IN LIMINE**

The defendant, Hatchet Speed, has been indicted on three counts of possession of a silencer not registered to him in the National Firearms Registration and Transfer Record (NFRTR), in violation of the National Firearms Act (NFA), 26 U.S.C. § 5861(d).  The offense conduct involves Speed's possession of three unregistered silencers that he purchased from Hawk Innovative Tech on March 17, 2021 (hereinafter, the "HIT Devices").  The case is scheduled to be tried before a jury beginning on December 12, 2022.

In advance of trial, the government moves for the Court to make the following pretrial rulings concerning the admissibility of certain evidence that is expected to be introduced at trial:

1. Based on lack of relevance and Rule 403 grounds, the Court should preclude the defense from eliciting testimony or otherwise introducing evidence regarding Speed's understanding of the operability of and time to register the HIT Devices.

2. Based on lack of relevance and Rule 403 grounds, the Court should preclude the defense from eliciting testimony or otherwise introducing evidence that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) notified other purchasers that their solvent traps met the definition of a "silencer" or were subject to registration requirements under the NFA.

3. Based on lack of relevance and Rule 403 grounds, the Court should preclude the defense from eliciting testimony or otherwise introducing evidence that the ATF did not issue public guidance that solvent traps can constitute a "silencer" or be subject to

registration requirements under the NFA.

4. Pursuant to the residual hearsay exception in Rule 807, the Court should admit emails from Hawk Innovative Tech to Speed regarding his purchase of the HIT Devices (Government Trial Exhibits 20D, 20E, 20F, and 20G).

5. The Court should allow the government to elicit testimony about Speed's participation in the incursion of the U.S. Capitol on January 6, 2021. Such testimony is relevant to proving Speed's mens rea in purchasing the unregistered silencers. And it is necessary to complete the story of and provide context to Speed's purchase of the unregistered silencers. As such, it is intrinsic to the offenses charged and not inadmissible character evidence under Rule 404(b).

As explained below, each of the requested rulings is well supported by the facts and law, and pretrial rulings on them will assist in ensuring a fair and efficient trial.

## BACKGROUND

### A.      Speed's Purchase of Hawk Innovative Tech Devices

On January 6, 2021, Speed participated in the incursion at the U.S. Capitol.[1] In the five months that followed, he went on a firearm-buying spree, purchasing at least twelve firearms (rifles, shotguns, and handguns) and spending tens of thousands of dollars at firearm and firearm-part retailers. He later made comments to an FBI undercover employee (UCE) that he was "panic buying" around that time.

In mid-February 2021, during the time that he was panic buying, Speed purchased four silencers from Silencer Shop, a company in Texas. Speed paid for four NFA tax stamps and completed paperwork for the ATF Forms 4.[2] Speed designated Herndon Arms as the location

---

[1] Speed is currently facing misdemeanor charges in the U.S. District Court for the District of Columbia related to his participation in the incursion at the U.S. Capitol on January 6, 2021. *See United States v. Hatchet Speed*, No. 1:22-CR-244 (D.D.C.).

[2] Under the NFA, a firearm may not be transferred unless the transferor files an application, called a Form 4, with the ATF and pays a tax. *See* 26 U.S.C. §§ 5811–5812; 27 C.F.R. §§ 479.82–479.86. If the application is approved, the ATF Director will affix an NFA stamp on the original application and return the approved application to the transferor. *See* 27 C.F.R. § 479.86. The NFA forbids the transferee from taking possession of a firearm before the ATF

2

where he would pick up the silencers.  The total for his purchase of the four silencers and NFA tax stamps was $4,109.00.  A Herndon Arms employee has informed law enforcement that he told Speed that the typical ATF processing time for NFA transfers was six to fourteen months, and not to expect a tax stamp before one year.

On March 11, 2021, Speed received an email from Silencer Shop informing him that his "application was received by the ATF and the payment for [his] tax stamp(s) was cashed."  The email stated that "[f]or many people, the best way to pass the time waiting for their approval is to just forget about it, but we realize that can be hard."  The email provided Speed with resources for tracking approval times for NFA transfers.

Faced with the delay in obtaining approval of the transfer of the silencers, Speed made a purchase from Hawk Innovative Tech, a company in Georgia, on March 17, 2021.  Financial records and emails show that Speed spent a total of $887.49 to purchase the following items from Hawk Innovative Tech:

(1) Titanium B Size Particulate Filter – 3/8" (9mm) = $330.86
(2) Aluminum B Size Particulate Filter - 7/16" (.45) = $170.89
(3) Hybrid D Size Particulate Filter - 1/4" (.223/5.56) = $311.31
(4) Standard Adapters - 13/16-16 to 5/8-24 Stainless = $16.54
(5) EZ Connect Diffuser Adapter - 1/2-28 = $57.89

The invoice for the three "particulate filters" (also known as "solvent traps")—which are the HIT Devices—reflected a specific caliber size for each device.  On or about March 19, 2021, Hawk Innovative Tech sent a package via priority mail to Speed at his home address in Vienna, Virginia.

The fact that Speed possessed the HIT Devices is not in dispute.  At oral argument on his

---

Director has approved the application and the firearm is registered to the transferee.  *See* 26 U.S.C. § 5812(b); 27 C.F.R. § 479.86.

motion to dismiss, his attorney represented that Speed has conceded that he "was in possession of the three solvent traps purchased from Hawk Innovative Tech's website."  Ex. A, at 5. Similarly, in his motion to dismiss, Speed implicitly admitted that he received and possessed the HIT Devices.  According to Speed, he purchased the devices with the "understanding that they were not functional as silencers upon purchase.  He kept the solvent traps in their original conditions for 15 months, only taking them out of their packaging on the day they arrived and immediately putting them back in their boxes.  He never looked at them again."  Def.'s Mot. to Dismiss Indictment 3 (Oct. 19, 2022) (Dkt. No. 23) (hereinafter, "Def.'s Mot. to Dismiss").

## B.      Speed's Comments to the FBI UCE

After acquiring the HIT Devices, Speed made multiple comments to the UCE reflecting that he knew the HIT Devices were for silencing, diminishing, or muffling the report of a portable firearm, and that he possessed them for that purpose.

During a meeting with Speed in March 2022, the UCE mentioned seeing on YouTube how people were selling and making solvent traps as a way to circumvent suppressors (i.e., silencers).  Speed responded that he "bought a couple of those," referring to solvent traps.  Speed stated that a hole had to be bored, which he said that he had not done yet.  But Speed observed that "the idea is to get everything except that, and then . . . you get a good drill press, and . . . just drill straight through," though Speed stated that he did not yet have a drill press.  Speed noted that if you drill the solvent trap and do not "submit the Form 1,"[3] then you have committed a felony.  Speed stated, "I figure, at least I'm closer.  If I do ever need to use it, all I have to do is find somebody with a drill press."  Speed did not indicate that he possessed the devices for any

---

[3] Individuals who want to make an NFA-covered firearm (such as a silencer) must file an application, called a Form 1, with the ATF and pay a tax.  *See* 26 U.S.C. §§ 5821–5822; 27 C.F.R. §§ 479.61–479.64.  The ATF Director must approve the application before the firearm may be made.  *See* 27 C.F.R. § 479.64.

other purpose (such as to clean his firearms).

In a subsequent meeting in April 2022, the UCE and Speed again discussed the use of solvent traps to make silencers. The UCE asked if a solvent trap could shoot more than one round and stay quiet. Speed responded that he had "to test and see . . . but yeah, uh, they stay quiet." When the UCE asked where he could buy one, Speed responded that a local firearm store had them or he could get them online. Speed stated that he purchased his solvent traps online before realizing that the local firearm store sold them. Speed could not remember the name of the site where he bought his solvent traps, but he said that they seemed to be good quality. Speed indicated that if the UCE went to the local firearm store or any place that sells solvent traps, the retailers there would know the purpose of the solvent trap and that UCE would not have to "say . . . what it's for."

Speed stated that he had not used his solvent traps as silencers yet. Speed repeated that a "Form 1" must be submitted before drilling the hole in order to make the silencer legally. Speed, however, stated, "[T]hat would be the legal way of doing it, you know. If you forget to fill out Form 1, nobody ever finds you on the form." When the UCE asked about the drill bit size to use, Speed noted that "you buy [the solvent trap] sized for a particular caliber . . . but then . . . your drill bit has to be the right size." Speed explained, "I haven't figured that detail out. I just figure when I want to figure that detail out, it will be easier to figure out the drill bits and whatnot. If that's all I have to figure out then everything is," and then was interrupted.

At one point during the same meeting, Speed confirmed to the UCE that he had the solvent traps for potential use in an act of violence in furtherance of his anti-Semitic ideology. Speed explained that, living in the D.C. area, there were a lot of "enemies that appear because this is where the seat of government is." Speed discussed trying to figure out how to identify

5

potential targets who were "reachable" by someone like him.  When the UCE asked if he was referring to the "ADL" (the Anti-Defamation League), Speed confirmed that he was and that "they're . . . pretty high up."  Speed suggested using a "mock trial" to identify potential targets.

The UCE then asked Speed, "You think at that point your . . . solvent traps would come in handy?" Speed responded, "My what?" The UCE repeated, "your solvent traps would come in handy at that point?" Speed responded, "Yeah.  Yeah, that's the idea."  Speed then proceeded to praise the approach of jihadists and suggested that their approach would be an effective way to "wipe out" the opposition, referring to Jewish people.  He also described how kidnappings would be more effective than killing people.

## C.       Seizure and Examination of Hawk Innovative Tech Devices

On June 22, 2022, the FBI executed a search warrant on Speed's storage unit in Alexandria, Virginia.  During the search, the FBI seized the three HIT Devices from Speed's storage unit.  The HIT Devices were still in their original packaging when the FBI seized them. The packaging advertised each device as an "HIT Solvent Filter" and stated, "Use Only as Intended."  Inside the packaging were instructions ostensibly on how to assemble the device and use it to clean a firearm.  The instructions stated that "[a]ny modifications or alterations for purposes other than those stated are not condoned by the seller or manufacturer and are the sole responsibility of the user."  The instructions disclaimed responsibility of the seller or manufacturer "for misuse of the product."

In addition, the FBI also seized numerous firearms and firearm parts.  Some of the firearms that the FBI seized could be fitted with the HIT Devices.  The FBI also seized multiple silencers that were registered to Speed (or his trust, "Concord Trust") in the NFRTR.

The FBI provided the HIT Devices to ATF's Firearms Technology Criminal Branch.  An ATF Firearms Enforcement Officer (FEO) examined the HIT Devices.  On August 11, 2022, the

FEO issued a report with her findings.

Despite the advertisement of the devices as solvent traps (or particulate filters), the FEO concluded that each of the HIT Devices was a "device for silencing, muffling, or diminishing the report of a portable firearm" and therefore a silencer.  The FEO explained that the "objective design features and characteristics of these [devices] demonstrate that they are both inefficient when used as solvent traps but are particularly effective firearm silencers.  This includes the presence of parts and dimensions that are unnecessary for solvent traps but effective in reducing the report of a portable firearm."  The FEO's report detailed the design characteristics that showed the HIT Devices were meant to be used as silencers, not solvent traps.

The HIT Devices seized from Speed's storage unit did not have a completed hole already drilled into the front end-cap for a bullet to pass through.  Instead, each front end-cap had a screw that was drilled into the center and attached an extra baffle and spacers.  As the FEO noted, "the center holes could be completed in a matter of minutes using a hand drill or drill press."  In fact, the FEO tested one of the devices by using a hand drill to drill a center hole in the front end-cap (where the screw had been located) and assembling the rest of the silencer with the parts included with the device.  The whole drilling and assembly took less than 10 minutes.  The FEO then fired a handgun with the device attached.  The device effectively reduced the report of the handgun by 23.58 decibels.

### D.    Procedural History

On September 6, 2022, the grand jury returned an indictment charging Speed with three counts of unlawful possession of a silencer that was not registered to him in the NFRTR, in violation of 26 U.S.C. §§ 5841, 5861(d), 5871.  *See* Indictment (Sept. 6, 2022) (Dkt. No. 1).  The next day, Speed was arrested, had his initial appearance, and was released on a personal recognizance bond with conditions.  *See* Minute Entry (Sept. 7, 2022) (Dkt. No. 12).  The Court

held Speed's arraignment on September 22 and scheduled his jury trial to begin on December 12, 2022. *See* Minute Entry (Sept. 22, 2022) (Dkt. No. 17).

Almost a month later, on October 19, Speed filed a motion to dismiss the indictment. *See* Def.'s Mot. to Dismiss. In his motion, Speed argued (1) that § 5861(d) is unconstitutionally vague as applied to him and (2) that it violates the Second Amendment. After hearing oral argument on November 10, 2022, the Court denied the motion without prejudice. *See* Minute Entry (Nov. 10, 2022) (Dkt. No. 28).

## DISCUSSION

The rules of evidence provide that the Court "must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104(a). "In so deciding, the [C]ourt is not bound by evidence rules, except those on privilege." *Id.* If "the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." *Id.* R. 104(b). But "[t]he court may admit the proposed evidence on the condition that the proof be introduced later." *Id.*

The Court has the inherent authority to address such preliminary questions in limine prior to trial. "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions in limine "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987)).

A.   **The Court Should Preclude the Defense from Eliciting Testimony or Otherwise Introducing Evidence Regarding Speed's Understanding of the Operability of and Time to Register the HIT Devices.**

In his motion to dismiss, Speed argued that he cannot be guilty of the charges because he understood the HIT Devices not to be functional as silencers upon purchase and he intended to file a Form 1 and register them if he drilled them to make them functional.  *See* Def.'s Mot. to Dismiss 3-4.  This defense, however, rests on a mistake of law that a device must be operable to constitute a "silencer" and be subject to registration under the NFA.  The Court should preclude Speed from presenting such evidence to the jury because it is irrelevant and unfairly prejudicial, and the danger that such evidence would confuse and mislead the jury substantially outweighs any probative value that it has.

1.   ***Speed's knowledge of the law is not an element of the offense.***

To convict Speed of the pending charges, the government will have to prove four elements beyond a reasonable doubt: (1) Speed knowingly possessed the firearm described in the indictment; (2) the firearm was a silencer as defined in section 921 of Title 18, United States Code; (3) Speed knew of the characteristics of the firearm as described in the indictment, that is, Speed knew the firearm had the characteristics of a silencer as defined in section 921 of Title 18 of the United States Code; and (4) the firearm was not registered to Speed in the NFRTR.  *See Staples v. United States*, 511 U.S. 600, 619 (1994); *United States v. Wilson*, 979 F.3d 889, 903-04 (11th Cir. 2020); *United States v. Jamison*, 635 F.3d 962, 967-68 (7th Cir. 2011), *cited with approval in United States v. Garrett*, 645 F. App'x 256, 258 (4th Cir. 2016); *United States v. Springer*, 609 F.3d 885, 888 (6th Cir. 2010); Gov't's Proposed Jury Instructions, Instruction No. 1 (Nov. 25, 2022).

To establish the third element related to Speed's knowledge, the Supreme Court has been clear that this mens rea requires that the "defendant must know the *facts* that make his conduct

illegal." *Staples*, 511 U.S. at 619 (emphasis added).  As the Supreme Court has held, the government must prove that the defendant "knew of the features of his [firearm] that brought it within the scope of the [National Firearms] Act."  *Id.*  Here, that means the government must prove that Speed knew the HIT Devices had the features of a "silencer" as defined by the NFA: either (1) that the "device" was "for silencing, muffling, or diminishing the report of a portable firearm"; (2) that the "combination of parts" was "designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler"; or (3) that the single part was "intended only for use" in assembling or fabricating a firearm silencer or firearm muffler.  18 U.S.C. § 921(a)(25); *see also* 26 U.S.C. § 5845(a)(7) (incorporating this definition of "silencer" in the NFA).

The government does not have to prove Speed's knowledge of the law.  *See Bryan v. United States*, 524 U.S. 184, 193 (1998) (recognizing that "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense," not knowledge of the law).  There is no requirement that Speed "knew that his possession was unlawful," *id.*, or that he "knew what features define a 'firearm' under 26 U.S.C. § 5845(a)," *Wilson*, 979 F.3d at 904 (quoting *United States v. Ruiz*, 253 F.3d 634, 638 n.4 (11th Cir. 2001)) (internal quotation marks omitted).  Nor does the government have to prove that Speed "knew the firearm must be actually be registered because of 26 U.S.C. §§ 5861(d) and 5845(a)—i.e., not that he had knowledge of the statute at issue or its specific prohibitions." *Jamison*, 635 F.3d at 968.  In fact, under binding Supreme Court precedent, the government does not have to prove that Speed knew the silencers were unregistered.  *See Staples*, 511 U.S. at 609; *United States v. Freed*, 401 U.S. 601, 607 (1971).

2.     *Speed's defense is based on a mistake of law that the HIT Devices had to be operable to qualify as silencers and be subject to the NFA registration requirements.*

The basic flaw in Speed's defense is a mistaken belief that a device must be operable to constitute a "silencer" and subject to the registration requirements of the NFA.

In defining the term "firearm," the NFA includes "any silencer (as defined in section 921 of title 18, United States Code)." 26 U.S.C. § 5845(a)(7). Section 921 defines the term "firearm silencer" to "mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).

The statutory text of this definition reflects that a device does not have to be operable to qualify as a "silencer." The text of the statute focuses on what the device is *for*, as opposed to using "language such as 'is capable of silencing' or 'that silences.'" *United States v. Carter*, 465 F.3d 658, 667 (6th Cir. 2006). That "word choice indicates a concern for the *purpose* of the mechanism, and the parts thereof, not the *function*." *Id.* "Where Congress wanted to define a device by its capability, it said so explicitly."[4] *United States v. Musso*, 914 F.3d 26, 31 (1st Cir. 2019) (holding that a grenade with an inoperable fuze constituted a "destructive device"). Thus, as multiple courts have recognized, a device need not be operable to constitute a silencer, as long

---

[4] The NFA contains multiple examples in which Congress used explicit language to define a firearm by capability. For example, the NFA's definition of "machinegun" includes "any weapons *which shoots* . . . automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b) (emphasis added). And the NFA defines the term "any other weapon" to include "any weapon or device *capable of* being concealed on the person from which a shot *can be* discharged through the energy of an explosive." *Id.* § 5845(e) (emphasis added). The NFA's definition of the term "destructive device" includes "any type of weapon by whatever name known *which will* . . . expel a projectile by the action of an explosive or other propellant." *Id.* § 5845(f)(2) (emphasis added).

11

as its purpose is to silence, muffle, or diminish the report of a portable firearm.[5]  *See United States v. Rose*, 522 F.3d 710, 720 (6th Cir. 2008); *Carter*, 465 F.3d at 667; *United States v. Rogers*, 270 F.3d 1076, 1081-82 (7th Cir. 2001); *United States v. Siemers*, No. 99-4928, 2000 WL 864208, at *1 (4th Cir. June 29, 2000); *United States v. Syverson*, 90 F.3d 227, 232 (7th Cir. 1996); *United States v. Hawkins*, No. 3:20-cr-642, 2022 WL 743571, at *5 (N.D. Ohio Mar. 11, 2022).

This interpretation is consistent with the fact that the definition of the term "silencer" includes not just devices, but also parts intended for use in fabricating or assembling a silencer. Under the statute, if a "combination of parts" is "designed or redesigned, and intended for use in assembling or fabricating a firearm silencer," then it qualifies as a "silencer."  § 921(a)(25). Even a single part qualifies as a "silencer" if it is "intended only for use" in assembling or fabricating a firearm silencer.  *Id.*  Congress's inclusion of such parts within the definition of "silencer" reinforces that it was not concerned with the operability of the device.[6]

There is nothing anomalous about including inoperable devices in the definition of a

---

[5] The Eighth Circuit has stated that a defendant must know "that the relevant item could in fact function to diminish the sound of a gun."  *United States v. Hall*, 171 F.3d 1133, 1151 (8th Cir. 1999).  In that case, however, the court addressed a functioning silencer and the primary issue involved the defendant's knowledge.  *See id.* at 1151-52.  The Eighth Circuit did not address, much less distinguish, *Syverson*, in which the Seventh Circuit had held three years beforehand that "a device can be a silencer for the purposes of [§ 921] even if it does not actually silence," 90 F.3d at 232.  In any event, to the extent that the Eighth Circuit was holding that a device must be operable to qualify as a silencer, such a decision is inconsistent with the text of the statute and against the weight of authority.

[6] As the government has previously explained, the evidence in this case would also support convicting Speed for possessing a combination of parts that is designed and intended for use in assembling or fabricating a firearm silencer.  *See* Gov't Resp. in Opp'n to Def.'s Mot. to Dismiss Indictment 18 (Nov. 2, 2022) (Dkt. No. 24) (hereinafter, "Gov't Resp. Br.").  Each HIT Device involved a combination of parts (expansion chamber, end-caps, spacers, baffles, etc.). *See, e.g.*, *id.* Ex. I (reflecting internal component parts of one of the devices).

silencer.  It is consistent with the fact that Congress has defined other firearms to include

inoperable devices.  Most notably, § 921 defines the term *firearm* as follows:

> The term "firearm" means (A) any weapon (including a starter gun) which will or
> is designed to or may readily be converted to expel a projectile by the action of an
> explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler
> or firearm silencer; or (D) any destructive device.  Such term does not include an
> antique firearm.

18 U.S.C. § 921(a)(3).  Like other courts to have considered the issue, the Fourth Circuit has held

that this definition of "firearm" includes inoperable firearms.  *See United States v. Harris*, 708 F.

App'x 764, 766-67 (4th Cir. 2017); *United States v. Williams*, 445 F.3d 724, 732 n.3 (4th Cir.

2006); *United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005); *United States v. Willis*, 992

F.2d 489, 491 n.2 (4th Cir. 1993).

Thus, as long as the *purpose* of the HIT Devices was to silence, muffle, or diminish the

report of a portable firearm, they qualified as silencers under the NFA.  As such, the NFA

expressly forbade Speed from taking possession of the silencers before they were registered to

him in the NFRTR.  *See* 26 U.S.C. § 5812(b) ("The transferee of a firearm [such as a silencer]

shall not take possession of the firearm unless the Secretary has approved the transfer and

registration of the firearm to the transferee . . . ."); *id.* § 5861(d) ("It shall be unlawful for any

person . . . to receive or possess a firearm which is not registered to him in the [NFRTR].").

Whether Speed thought he needed to file a Form 1 before drilling the holes (as he told the UCE)

is irrelevant because, if the HIT Devices were already silencers, it was illegal for him to possess

them.

Nor is it relevant whether Speed thought the devices did not become a "silencer" and

subject to the NFA's registration requirement until the holes in the front end-caps were

completed.  Speed does not need to have knowledge of the law to violate § 5861(d).  *See supra*

pp. 9-10.  As a result, his ignorance or mistake of law is no excuse.  *See United States v. Moody*,

2 F.4th 180, 197-98 (4th Cir. 2021) (rejecting mistake-of-law defense for felon in possession

charge); *United States v. Dodson*, 519 F. App'x 344, 350-51 (6th Cir. 2013) (rejecting mistake-

of-law defense in context of machinegun prosecution under 18 U.S.C. § 922(o)).

> **3.      Evidence about Speed's belief that the HIT Devices were not functional upon
> purchase and that the time to register them was when he drilled the holes
> should be excluded as irrelevant and under Rule 403.**

The Court should preclude Speed from eliciting testimony or otherwise introducing

evidence of his subjective understanding concerning (1) the operability of the HIT Devices (e.g.,

that he understood the HIT Devices not to be operable as silencers upon purchase or before the

holes in the front end-caps were completed), and (2) the time to register the HIT Devices (e.g.,

that he understood the time to register the HIT Devices was when the holes were drilled or that

he intended to register them by filling out a Form 1 before drilling them).  This includes eliciting

testimony regarding statements that Speed made to the UCE about filing a Form 1 before drilling

the hole in a solvent trap, as such statements reflect a mistake of law and would sow significant

confusion among the jury.

To be sure, evidence about the operability of a silencer can be relevant if it is probative of

the design of the device—whether the device is designed *for* the purpose of silencing, muffling,

or diminishing the report of a portable firearm.  *See, e.g.*, *United States v. Alkufi*, 636 F. App'x

323, 329 (6th Cir. 2016) (affirming district court's exclusion of evidence about the operability of

a firearm because the "evidence did not show that the [firearm] was not designed to operate as a

firearm, only that it did not perform that function well"); *United States v. Counce*, 445 F.3d

1016, 1018 (8th Cir. 2006) ("Although § 921(a)(3) does not require a firearm to be operable, the

operation of a weapon may be relevant to whether it is designed to expel a projectile by the

action of an explosive.").  For example, in this case, the FEO's expert testimony that the HIT

Devices operated as effective silencers upon testing will be relevant in proving that the devices

were designed for the purpose of silencing, muffling, or diminishing the report of a portable

firearm.  The defense will be able to cross-examine the expert on that point and introduce

evidence insofar as it relates to the design features of the device.

But Speed's *subjective understanding* about the operability of the HIT Devices upon

purchase and the time to register them is not relevant to this determination.  It is not probative of

the design features of the devices.  Nor is it relevant to whether he knew the devices had the

features of a silencer, since operability is not a defining feature of a silencer under the statute.

Instead, such evidence is simply an attempt to put facts supporting an improper mistake-of-law

defense before the jury.  The Court should preclude Speed from eliciting testimony or otherwise

introducing evidence to support such a defense.  *See United States v. Reed*, 114 F.3d 1053, 1057

(10th Cir. 1997) (affirming a district court's order precluding the defendant from introducing

evidence that "he did not know the statute prohibited him from possessing an inoperable firearm"

because such a defense rested on "ignorance of the law").

Even if the evidence has some relevance, the Court should exclude it because "its

probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the

issues, [and] misleading the jury."  Fed. R. Evid. 403.  Allowing such evidence presents an

undue danger that the jury would be swayed and distracted by improper considerations of

Speed's mistake of law.  It also creates a significant risk of confusing the jury to think that the

devices were not silencers unless they were operable.  *See United States v. Hardin*, 889 F.3d 945,

949 (8th Cir. 2018) (affirming the district court's granting of a motion in limine to exclude

evidence of the operability of a firearm on Rule 403 grounds); *Counce*, 445 F.3d at 1019

(holding that "the evidence of firearm inoperability was properly excluded under Rule 403

because such evidence would have yielded substantial juror confusion without having significant

probative value regarding the issue of weapon design").

The Tenth Circuit's decision in *United States v. Markey*, 393 F.3d 1132 (10th Cir. 2004), is instructive.[7]  There, an acquaintance gave the defendant four sticks of dynamite.  *See id.* at 1134.  The defendant, who used explosives while in the military, concluded that the dynamite could not be detonated through conventional methods.  *See id.*  The defendant even tested one stick of the dynamite, and it did not explode.  *See id.*  The defendant therefore kept the remaining sticks of dynamite in his apartment.  *See id.*  After his brother-in-law alerted law enforcement, the government charged the defendant under 18 U.S.C. § 842(i)(1), which "makes it unlawful for any person who has been convicted of a felony to 'possess any explosive which has been shipped or transported in or affecting interstate . . . commerce.'"  *Id.* (quoting § 842(i)(1)).  Based on relevance and Rule 403 grounds, the district court granted the government's motion in limine to preclude the defendant from introducing evidence that the dynamite was incapable of exploding. *Id.*  The defendant entered into a conditional plea and appealed the district court's ruling on the motion in limine.  *See id.* at 1134-35.

In affirming the district court's ruling, the Tenth Circuit held that the defendant's "belief that the dynamite could not explode is irrelevant to whether he knowingly possessed an explosive for purposes of § 842(i)(1)."  *Id.* at 1136.  In reaching this conclusion, the Tenth Circuit observed that the government was required to prove that the defendant "knew the objects he possessed had the characteristics that brought them within the statutory definition of an explosive," *id.*, which is essentially the same mens rea that applies in this case.  The Tenth Circuit noted that the question of "[w]hether evidence of the dynamite's explosive capacity is

---

[7] The Fourth Circuit has cited *Markey* approvingly in rejecting a defendant's argument that, to prove that he received or possessed an explosive, the government had to prove that his "blasting caps would or could explode."  *See United States v. Goff*, 517 F. App'x 120, 122 (4th Cir. 2013).

relevant depends on whether the Government must prove that a particular device is capable of exploding to be classified as an 'explosive' under § 842(i)(1)." *Id.* "An 'explosive,' for purposes of § 842(i)(1), is 'any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives.'" *Id.* (quoting § 841(d)). Based on this definition, the Tenth Circuit determined that "the ordinary meaning of the terms 'primary or common purpose' connotes a device's intended and usual use—not its actual capability." *Id.* Thus, the Tenth Circuit concluded that "the Government need not show that a device is actually able to explode to prove that a defendant knowingly possessed an explosive under § 842(i)(1)." *Id.* The Tenth Circuit further rejected the defendant's argument "that because he believed in good faith that the dynamite could not explode, he should be exonerated," stating that this argument "appears to be one of ignorance of the law," a "type of argument [that] is 'easily rejected.'" *Id.* (quoting *Reed*, 114 F.3d at 1057).

The Tenth Circuit's reasoning in *Markey* applies with equal force here. Just as the government did not have to prove the operability of the explosive in *Markey*, the government does not have to prove the operability of the silencers here. Speed's subjective understanding about the operability of the devices, therefore, is irrelevant to the charges against him. As in *Markey*, the Court should reject his attempt to use such evidence to support a "good faith" or "mistake of law" defense.

**B.   The Court Should Preclude the Defense from Eliciting Testimony or Otherwise Introducing Evidence Regarding ATF Notifications to Other Purchasers of Solvent Traps.**

In his motion to dismiss, Speed argued that "[w]hile some individuals who had purchased solvent traps received letters from the ATF advising them that their solvent traps were now 'silencers' . . . not everyone did, including Mr. Speed." Def.'s Mot. to Dismiss 11-12. At oral

17

argument, defense counsel contended that the ATF gave "selective notice" by sending out letters to other individuals about the registration requirements.  *See* Ex. A, at 7.  More recently, the defense submitted a discovery request seeking "any and all ATF emails, letters, or other correspondence sent to purchasers of Hawk Innovative Tech devices in which they were notified of the registration requirements for solvent traps and similar HIT devices."  The Court should preclude the defense from eliciting testimony or otherwise offering evidence that the ATF notified other purchasers that their solvent traps met the definition of a "silencer" or were subject to registration requirements under the NFA.

Such evidence is irrelevant in this case.  Evidence that other purchasers were notified that their "solvent traps" constituted silencers does not relate to a "fact . . . of consequence in determining the action."  Fed. R. Evid. 401.  It does not have any bearing on whether Speed knowingly possessed an unregistered silencer.  *See supra* p. 9 (stating elements of the offense). As described above, Speed did not have to know that "his possession of the [HIT Devices] was unlawful or . . . what features define a 'firearm' under 26 U.S.C. § 5845(a)."  *Wilson*, 979 F.3d at 904 (quoting *Ruiz*, 253 F.3d at 638 n.4) (internal quotation marks omitted).  Nor did Speed need to know that the HIT Devices had to "be registered because of 26 U.S.C. §§ 5861(d) and 5845(a)."  *Jamison*, 635 F.3d at 968.  Thus, whether the ATF sent other purchasers of solvent traps a notification letter but not Speed is irrelevant in this case.

Even if relevant, the probative value of such evidence would be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time."  Fed. R. Evid. 403.  Allowing such evidence risks inviting the jury to acquit on the basis of Speed's ignorance of the registration requirements, even though such knowledge is unnecessary to commit the offense.  Such evidence also risks inviting the jury to

18

speculate that the government has improperly singled out Speed for prosecution.  To prevent such speculation, the government would have to seek to introduce rebuttal evidence to explain why the letters were sent to distinguish those situations from this case.  This would create a needless sideshow that would waste time and divert the jury's attention from the material facts of this case.

### C.   The Court Should Preclude the Defense from Eliciting Testimony or Otherwise Introducing Evidence that the ATF Did Not Issue Public Guidance that Solvent Traps Can Constitute Silencers.

In his motion to dismiss, Speed argued that the ATF failed to issue "public guidance to provide fair notice" to individuals who possessed solvent traps.  Def.'s Mot. to Dismiss 10.  The Court should preclude Speed from eliciting testimony or otherwise introducing evidence about whether the ATF issued public guidance that solvent traps could constitute silencers.

The ATF was not required to issue public guidance cataloguing the various types of devices that could constitute a silencer.  And, as described above, ignorance of the law is no excuse to these charges.  *See supra* pp. 9-14.  To commit the charged offenses, Speed did not need to know that his conduct was unlawful or the legal requirements establishing when a device must be registered as a silencer.  *See supra* pp. 9-10.  Instead, Speed simply needed to know of the features of the HIT Devices that subjected them to regulation as silencers.  *See Staples*, 511 U.S. at 619.  As a result, it is irrelevant whether the ATF informed the public that solvent traps could constitute silencers.

Even if relevant, the Court should exclude such evidence under Rule 403.  The introduction of such evidence presents a substantial risk of inviting the jury to acquit Speed on the improper basis of ignorance of law.  Whatever marginal probative value of the evidence concerning ATF's failure to issue public guidance would be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury."  Fed. R. Evid.

403.

**D.     The Court Should Admit the Hawk Innovative Tech Emails Under the Residual Hearsay Exception.**

Under the residual exception, a hearsay statement is not to be excluded by the rule against hearsay if it satisfies two conditions.  *See* Fed. R. Evid. 807(a).  First, the statement must be "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement."  *Id.* R. 807(a)(1).  Second, the statement must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  *Id.* R. 807(a)(2).  Pursuant to this exception, the government requests that the Court admit Government Exhibits 20D, 20E, 20F, and 20G.

The proposed exhibits are probative of a material point at trial.  As described above, the government will prove that Speed was panic buying firearms and firearm parts in the five months following the events at the U.S. Capitol on January 6, 2021.  In mid-February 2021—during the time that he was panic buying—Speed initially followed the NFA registration process in purchasing four silencers from a company called Silencer Shop.  Then, faced with the delay in obtaining NFA approval for the transfer of those silencers, Speed purchased the three HIT Devices from Hawk Innovative Tech a month later—on March 17, 2021—without complying with the NFA registration requirements.  The common-sense inference from this evidence is that Speed purchased the HIT Devices to circumvent the wait time for NFA approval of the transfer of silencers at a time when he was panic buying.  This evidence helps establish that Speed knew the HIT Devices had the features of silencers and possessed them for that purpose.

Exhibits 20D, 20E, 20F, and 20G are all probative of this point because they establish that Speed purchased the HIT Devices during his time of panic buying.  Exhibit 20D—an email

from Hawk Innovative Tech to Speed—reflects that Speed created an account with Hawk Innovative Tech on March 17, 2021.  Exhibits 20E and 20F—an email with an invoice from Hawk Innovative Tech to Speed—shows that Speed purchased the three HIT Devices from Hawk Innovative Tech on that same day.  Exhibit 20G—an email with a tracking number sent from Hawk Innovative Tech to Speed—shows that the HIT Devices were shipped to Speed around March 20, 2021.

The emails are undeniably trustworthy.  The government obtained them from a judicially authorized search of Speed's Google account.  Google provided a 902(11) certificate that will authenticate the emails and establish that it kept them in the ordinary course of its business.  *See* Gov't Trial Ex. 20A.  On their face, the emails reflect routine order confirmations of the type that people regularly receive when they purchase items online.  *See Christopher Phelps & Assocs. v. Galloway*, 492 F.3d 532, 541 (4th Cir. 2007) (holding that receipts and a ledger could be admitted under the residual hearsay exception).  There is no reason for them to contain false information.  *See United States v. Simmons*, 773 F.2d 1455, 1459 (4th Cir. 1985) (allowing the introduction of ATF trace forms under the residual hearsay exception because "there is simply no reason for the manufacturers of these weapons to falsify the entries on the routine ATF forms").

Independent evidence, moreover, corroborates the veracity of the information in the emails.  Consistent with the date and amounts listed in the exhibits, Speed's bank records show that he spent $887.49 at Hawk Innovative Tech on March 17, 2021.  *See* Gov't Trial Ex. 14B, at 64.  Corroborating the tracking information in Exhibit 20G, U.S. Postal Service (USPS) data for the tracking number reflect that USPS picked up the parcel in Bowdon, Georgia (the city listed for Hawk Innovative Tech on the invoice) on March 19, 2021, and delivered it to an address in Vienna, Virginia (the city listed for Speed on the invoice) on March 23, 2021.  *See* Gov't Trial

Ex. 21B.  Finally, the government seized the HIT Devices described in the invoice when it searched Speed's storage unit on June 22, 2022.  *See* Gov't Trial Exs. 34A to 34G (pictures of the devices from the time of search).

Unlike the other business records in this case, the government could not realistically seek a witness or certificate from Hawk Innovative Tech to authenticate this information.  As the seller of the unregistered silencers, Hawk Innovative Tech has potential criminal exposure.  The government has publicly acknowledged that it has an ongoing criminal investigation into Hawk Innovative Tech.  In fact, the ATF has seized Hawk Innovative Tech's website.  *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, Seized Website: Hawk Innovative Tech (Oct. 26, 2021), *available at* https://www.atf.gov/atlanta-field-division/seized-website-hawk-innovative-tech (last visited Nov. 20, 2022) (attached as Exhibit B).  Under these circumstances, the government cannot reasonably be expected to procure testimony or a certificate of authenticity from Hawk Innovative Tech regarding Speed's purchase.  *See Simmons*, 773 F.2d at 1459 (affirming the district court's finding that ATF trace forms "were more probative than any other evidence which could be reasonably procured, when it determined that it was not reasonable to require the government to bring in the record custodians from different parts of the country to prove this simple fact").

### E.   The Court Should Allow the Government to Elicit Testimony About Speed's Participation in the Incursion of the U.S. Capitol on January 6, 2021.

At trial, the government intends to introduce testimony that Speed participated in the incursion of the U.S. Capitol on January 6, 2021.  As explained below, such testimony is relevant and intrinsic to the charged offenses.

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in

accordance with the character." Fed. R. Evid. 404(b)(1). But such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). To introduce evidence under this exception, the government must comply with the notice requirements of Rule 404(b)(3).

Evidence falls outside of Rule 404(b) if it "is intrinsic to the alleged crime." *United States v. Webb*, 965 F.3d 262, 266 (4th Cir. 2020) (quoting *United States v. Sutherland*, 921 F.3d 421, 430 (4th Cir. 2019)). As the Fourth Circuit has explained, evidence is intrinsic to the crime charged if "it involves the same series of transactions as the charged offense, or *if it is necessary to complete the story of the crime on trial*." *Id.* (quoting *Sutherland*, 921 F.3d at 430) (emphasis added). Stated differently, "[e]vidence is intrinsic if it is necessary to 'provide context relevant to the criminal charges.'" *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (quoting *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007)).

Here, the testimony about Speed's participation in the incursion of the U.S. Capitol on January 6 is necessary to complete the story of and provide relevant context to the crimes on trial. The testimony will provide the jury with the necessary context by which to understand Speed's panic buying of firearms and firearm parts in the five months following January 6. As described above, that evidence goes directly to proving Speed's knowledge that the HIT Devices were meant to serve as silencers. The evidence shows that he purchased them at a time when he was panic buying and sought to circumvent the NFA approval time for the transfer of a silencer.

Without testimony about Speed's participation in the incursion of the U.S. Capitol on January 6, the jury will be left confused (and therefore potentially skeptical) about the evidence that he was panic buying. For example, the government will introduce a statement in which Speed admitted to the UCE that he bought a 6.5 Creedmoor rifle when he "was panic buying

during all the, you know, nonsense."  Gov't Trial Ex. 1E.  Firearm purchase forms will show that Speed completed an ATF Form 4473 to obtain that Creedmoor rifle on or about March 12, 2021—two months after January 6.  *See* Gov't Trial Ex. 10B, at 19.  The jury needs to hear about Speed's participation in the events of January 6 to understand what he meant when he referred to panic buying during the "nonsense."

Because evidence of Speed's participation in the incursion of the U.S. Capitol on January 6 is relevant, necessary, and intrinsic to the offenses charged, the Court should allow the government to introduce testimony to that effect.

## CONCLUSION

For the foregoing reasons, the Court should (a) preclude the defense from eliciting testimony or otherwise introducing evidence regarding Speed's understanding of the operability of and the time to register the HIT Devices; (b) preclude the defense from eliciting testimony or otherwise introducing evidence that the ATF notified other purchasers that their solvent traps met the definition of a "silencer" or were subject to the registration requirements under the NFA; (c) preclude the defense from eliciting testimony or otherwise introducing evidence that the ATF did not issue public guidance that solvent traps can constitute a "silencer" or be subject to registration requirements under the NFA; (d) admit the above-identified Hawk Innovative Tech emails to Speed under the residual hearsay exception; and (e) allow the government to elicit testimony about Speed's participation in the incursion at the U.S. Capitol on January 6, 2021.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____/s/_____
Thomas W. Traxler
Amanda Lowe
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3746
Facsimile (703) 299-3980
Email: Thomas.traxler@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of November, 2022, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system.


_____/s/_____
Thomas W. Traxler
Assistant United States Attorney