IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Case No. 1:22-CR-165 |
| HATCHET M. SPEED, | ) ) ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S OBJECTIONS TO THE GOVERNMENT'S PROPOSED EXHIBITS**

Pursuant to the Court's Order dated November 10, 2022, the government hereby submits its response to the objections filed by the defendant, Hatchet Speed, to the government's proposed exhibits. As the Court is well aware, the crux of this case will turn on whether the three Hawk Innovative Tech devices (collectively, "HIT Devices") possessed by Speed were silencers and whether Speed knew that they were silencers. Speed's filings have demonstrated that he vehemently contests the evidence that the devices were silencers and his mens rea in possessing them. It is unsurprising, then, that all of the exhibits to which Speed objects are highly probative of those central questions. For the reasons stated below, the Court should overrule his objections and allow admission of the evidence.

**I.    SPEED'S MENTAL STATE IS A CENTRAL DISPUTE AT TRIAL**

To prove Speed violated the National Firearms Act (NFA), 26 U.S.C. § 5861(d), as charged in the indictment, the government will have to establish four elements beyond a reasonable doubt: (1) Speed knowingly possessed the firearm described in the indictment; (2) the firearm was a silencer as defined in section 921 of Title 18, United States Code; (3) Speed knew of the characteristics of the firearm as described in the indictment, that is, Speed knew the

firearm had the characteristics of a silencer as defined in section 921 of Title 18 of the United States Code; and (4) the firearm was not registered to Speed in the National Firearms Registration and Transfer Record.  *See Staples v. United States*, 511 U.S. 600, 619 (1994); *United States v. Wilson*, 979 F.3d 889, 903-04 (11th Cir. 2020); *United States v. Jamison*, 635 F.3d 962, 967-68 (7th Cir. 2011), *cited with approval in United States v. Garrett*, 645 F. App'x 256, 258 (4th Cir. 2016); *United States v. Springer*, 609 F.3d 885, 888 (6th Cir. 2010); Gov't's Proposed Jury Instrs., Instr. No. 1 (Nov. 25, 2022) (Dkt. No. 34).

   To establish the third element related to Speed's knowledge, the Supreme Court has been clear that this mens rea requires that the defendant "knew of the features of his [firearm] that brought it within the scope of the [National Firearms] Act." *Staples*, 511 U.S. at 619 (emphasis added).  Speed claims that the government must prove his subjective intent for a device to be a silencer.  *See* Def.'s Resp. in Opp'n to Gov't's Mot. in Limine 3 (Nov. 30, 2022) (Dkt. No. 52).  As explained in the government's reply brief in support of its motion in limine, Speed's argument for a subjective-intent standard is based on a misinterpretation of the statute.  Still, the issue goes to show how disputed the mens rea element is in this case.

   Throughout this litigation, Speed has made it clear that his primary defense will be that he lacked the necessary knowledge (or, under his view of the law, the intent) to be convicted.  According to Speed, he "lacks the requisite criminal intent for the Government to prevail on these charges because . . . [he] never intended to possess devices that qualify as 'silencers' without registering them first." *Id.*; *see also* Def.'s Mot. to Dismiss Indictment 3 (Oct. 19, 2022) (Dkt. No. 23) (same).  Speed, therefore, has put his mens rea at the heart of this case.

## II. THE GOVERNMENT'S PROPOSED EXHIBITS ARE HIGHLY PROBATIVE OF SPEED'S MENTAL STATE

### A. Government Exhibits 1B and 1E

Speed objects to the admission of Government Exhibits 1B and 1E based on relevance and Rule 403 grounds. *See* Def.'s Objs. to Gov't's Proposed Exs., at 2-4 (Nov. 30, 2022) (Dkt. No. 53) (hereinafter, "Def.'s Objs."). Exhibit 1B is a portion of a recording of a meeting between the FBI undercover employee (UCE) and Speed on March 15, 2022. Exhibit 1E is a transcript of that recording. This evidence is relevant to proving Speed's knowledge that the HIT Devices were silencers, and its probative value heavily outweighs any risk of prejudice.

As the government has previously previewed, it intends to introduce evidence of the context of Speed's purchase of the HIT Devices to prove that he knew they were silencers. Specifically, the government will prove that Speed was panic buying firearms and firearm parts in the five months following the events at the U.S. Capitol on January 6, 2021. In mid-February 2021—during the time that he was panic buying—Speed initially followed the NFA registration process in purchasing four silencers from a company called Silencer Shop. Then, faced with the delay in obtaining NFA approval for the transfer of those silencers,[1] Speed purchased the HIT

---

[1] The government previously informed the Court that "[a] Herndon Arms employee ha[d] informed law enforcement that he told Speed that the typical ATF processing time for NFA transfers was six to fourteen months, and not to expect a tax stamp before one year." Gov't's Mot. in Limine 3 (Nov. 25, 2022) (Dkt. No. 37); Gov't's Resp. in Opp'n to Def.'s Mot. to Dismiss Indictment 6 (Nov. 2, 2022) (Dkt. No. 24). In a subsequent meeting with this Herndon Arms employee within the last week, however, the employee stated that he did not remember whether he informed Speed in particular about the timeline for NFA approval for the transfer of silencers. The employee stated that he recalled that customers always asked and he told everyone that the process would take about a year. In any event, the fact remains that on March 11, 2021, Speed received an email from Silencer Shop informing him that his "application was received by the ATF and the payment for [his] tax stamp(s) was cashed." Gov't Trial Ex. 20C. The email stated that "[f]or many people, the best way to pass the time waiting for their approval is to just forget about it, but we realize that can be hard." *Id.* The email provided Speed with resources for tracking approval times for NFA transfers. *See id.* Less than a week later, Speed bought the HIT Devices.

Devices from Hawk Innovative Tech a month later—on March 17, 2021—without complying with the NFA registration requirements. The common-sense inference from this evidence is that Speed purchased the HIT Devices to circumvent the wait time for NFA approval of the transfer of silencers at a time when he was panic buying. This evidence helps establish that Speed knew the HIT Devices had the features of a silencer and possessed them for that purpose.

Exhibits 1B and 1E—and the evidence of panic buying more generally—are probative of this point. As reflected in this recording, Speed informed the UCE that he bought a 6.5 Creedmoor, a type of rifle, when he "was panic buying during all the, you know, nonsense." Firearm purchase forms will show that Speed completed an ATF Form 4473 to obtain that Creedmoor rifle on or about March 12, 2021—a mere five days before he purchased the HIT Devices. *See* Gov't Trial Ex. 10B, at 19; Gov't Trial Ex 13. Thus, the evidence will establish that Speed was panic buying during that time.

This evidence of Speed's panic buying is also relevant to countering one of his defenses regarding his mental state. *See United States v. Walker*, 32 F.4th 377, 388 (4th Cir. 2022) ("The governing hypothesis of any criminal prosecution, for the purpose of determining relevancy of evidence introduced, consists of elements of the offense charged and any relevant defenses raised to defeat criminal liability." (quoting *United States v. Lamberty*, 778 F.2d 59, 60-61 (1st Cir. 1985))); *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005) (holding that the defendant's "defense theories made" contested evidence "highly relevant"). In disputing the evidence of his knowledge, Speed has argued that after purchasing the HIT Devices, he "kept [them] in their original conditions for 15 months, only taking them out of their packaging on the day they arrived and immediately putting them back in their boxes." Def.'s Mot. to Dismiss Indictment 3. Speed maintains that "[h]e never looked at them again." *Id.* He argues that although he

4

"appeared to be aware of how to convert the solvent traps into silencers, the Government has not shown that he took any steps toward doing so." *Id.* But even if those facts are accurate, they say little about Speed's knowledge or intent in light of the evidence that he was panic buying and stockpiling weapons. In fact, as reflected in these exhibits, Speed also informed the UCE that he had not yet shot the 6.5 Creedmoor that he purchased when he was panic buying. Exhibits 1B and 1E show that Speed's failure to do anything with the HIT Devices for a year owed to the fact that he was stockpiling weaponry, not because of a lack of knowledge that they were silencers.

Speed challenges the strength of the evidence in Exhibits 1B and 1E on the basis that it involved the "singular use of the term 'panic buying.'" Def.'s Objs. 2. But that argument goes to the weight of the evidence, not its admissibility. In any event, independent evidence will corroborate that Speed was panic buying during that time. Firearm purchase forms will establish that Speed acquired twelve firearms between February 11, 2021, and May 26, 2021. *See* Gov't Trial Exs. 10A-13. Bank records will establish that Speed spent at least $42,000 at firearm and firearm-part retailers between February 11, 2021, and May 26, 2021. *See* Gov't Trial Exs. 14A-16. A cooperating witness has informed the government that Speed told him that Speed was stockpiling weapons during that time.

Finally, Speed has failed to demonstrate that this evidence is unfairly prejudicial, much less that any unfair prejudice substantially outweighs its probative value. In this respect, his sole argument is that "tying the term 'panic buying' to January 6 is inflammatory and unduly prejudicial." Def.'s Objs. 4. As the government has previously explained, the limited testimony that it will offer about January 6 is not unfairly prejudicial. *See* Gov't's Resp. in Opp'n to Def.'s Mot. in Limine 2-3 (Nov. 30, 2022) (Dkt. No. 50). But even if the Court excluded testimony about January 6 (which it should not), such a ruling should not preclude the relevant evidence

that Speed was panic buying during the time around his purchase of the HIT Devices.

### B. Government Exhibits 3A and 3E

Next, Speed objects to the admission of Government Exhibits 3A and 3E on relevance and Rule 403 grounds. Exhibit 3A is a portion of a recording of a meeting between the UCE and Speed on April 7, 2022. Exhibit 3E is a transcript of that recording. This evidence is highly probative of Speed's knowledge that the HIT Devices were silencers and should be admitted.

#### 1. *The government does not intend to introduce extraneous evidence of Speed's racist or anti-Semitic beliefs in its case-in-chief.*

Speed broadly objects to the government introducing what he describes as "Personal Ideology" evidence. Def.'s Objs. 4. Aside from any remarks that are intrinsic to Speed's relevant statements in Exhibits 3A and 3E, the government does not intend to introduce evidence of his racist or anti-Semitic beliefs in its case-in-chief. *See, e.g.*, Decl. of Special Agent Christon Turner ¶¶ 17-19 (Sept. 7, 2022) (Dkt. No. 10-1) (describing some such statements).

The government may submit evidence that Speed became more anti-government around the time that he purchased the HIT Devices. Such evidence is relevant to his panic buying and willingness to circumvent the government-mandated registration process in the NFA. And evidence of anti-government attitudes are not inflammatory so as to present "an undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules; *see also United States v. Crim*, 451 F. App'x 196, 204 (3d Cir. 2011) (holding that "[t]he probative value of [the defendant's] anti-government beliefs was not substantially outweighed by the danger of prejudice to him").

#### 2. *The government intends to introduce Speed's statements in Exhibits 3A and 3E.*

The government intends to introduce Exhibits 3A and 3E because they are relevant to his mental state in possessing the HIT Devices. As noted, Exhibits 3A and 3E reflect a portion of a

meeting between the UCE and Speed on April 7, 2022.

The selected conversation begins with Speed discussing his approach to figuring out how to identify potential targets against whom to take violent action. Gov't Trial Ex. 3E, at 1. He suggested that he is "sure about George Soros," but questioned when he is "ever going to have the opportunity to" reach him. He stated, "What I need to be sure of is people in my neighborhood. People that are actually . . . reachable by someone like me. . . . People who don't have bodyguards. People who don't have intel organizations helping them out." *Id.* at 1-2. When the UCE asked if he was referring to the "ADL," Speed confirmed that he was and that "they're . . . pretty high up." *Id.* at 2. Speed discussed using a "mock trial" to identify potential targets. *Id.*

The UCE then asked Speed, "You think at that point your . . . solvent traps would come in handy?" *Id.* Speed responded, "My what?" *Id.* The UCE repeated, "your solvent traps would come in handy at that point?" *Id.* Speed responded, "Yeah. Yeah, that's the idea." *Id.* (The jury will have already heard evidence of a prior meeting in which Speed and the UCE discussed purchasing "solvent traps" to serve as silencers and Speed's possession of such devices. *See* Gov't Trial Exs. 2C, 2D.)

Speed then mentioned that he "never killed anybody" despite deploying and "carrying a weapon around everywhere [he] went." *Id.* at 3. He proceeded to praise the approach of jihadists and suggested that their approach would be an effective way to "wipe out" the opposition, referring to Jewish people. *Id.* at 3-5. Speed stated that "two percent of this population is Jewish." *Id.* at 4. He explained that if "[o]nly three percent [of the population] would take action," then "we can literally win just on the numbers." *Id.* Speed stated "we could just literally take out just one person, one to one," and "[w]e'd wipe out the opposition." *Id.* at 4-

7

5. He stated, "as soon as we pull our trigger against the fucking person, you will succeed, we'd be done. You have . . . done more than your fair share." *Id.* at 5. He described it as a "numbers game, like, just take out one here, one there." *Id.*

Speed then immediately began discussing kidnapping people to achieve this goal. He explained that "[k]idnappings are harder than killing people . . . but they're more effective." *Id.* at 6. He stated, "What I would love to see is you take somebody out, and they simply disappear. Nobody knows what happened to them . . . That means we can't report on it, the media doesn't know how to spin it. . . . And all of those people who were left behind . . . have no way to close that bridge, no way to know if they're in danger." *Id.* Speed stated that "if you leave nothing behind, they never find the body." *Id.* at 7.

> 3. ***Exhibits 3A and 3E are highly probative of Speed's mental state in possessing the HIT Devices.***

These statements by Speed are relevant to proving the key contested issue in this trial—his mental state in possessing the HIT Devices. As reflected in Exhibits 3A and 3E, Speed's confirmation that his solvent traps would come in handy in taking violent action proves that he knew (or, under his view of the law, intended) the HIT Devices to be silencers. The nature of this evidence is unlike other aspects of the government's evidence that is relevant to proving his knowledge. Speed's statements in Exhibits 3A and 3E indicate that he had a specific purpose in mind for the devices to serve as silencers.

That Speed had a specific purpose in mind for the HIT Devices is an important fact necessary to address his defense. It is worth revisiting the summary of his defense as described in his motion to dismiss:

> Mr. Speed lacks the requisite criminal intent for the Government to prevail on these charges because the discovery provided by the Government demonstrates that Mr. Speed never intended to possess devices that qualify as "silencers" without registering them first. . . . Mr. Speed purchased the three solvent traps

8

>from Hawk Innovative Tech based on the (correct) understanding that they were not functional as silencers upon purchase. He kept the solvent traps in their original conditions for 15 months, only taking them out of their packaging on the day they arrived and immediately putting them back in their boxes. He never looked at them again. *Though Mr. Speed appeared to be aware of how to convert the solvent traps into silencers, the Government has not shown that he took any steps toward doing so.* Indeed, Mr. Speed could not have converted the solvent traps because he did not possess the necessary tools to do so, such as a drill press (used to drill the hole into the solvent trap that would allow a bullet to exit), or the information required to do so, namely, determining which drill bit would be the correct size (to ensure the hole was sized to the correct caliber). . . . Moreover, Mr. Speed was aware that he needed to submit a Form One to the ATF before drilling the solvent traps to convert them into silencers. Mr. Speed submitted all required paperwork to register the other silencers in his possession, and the Government has not shown that Mr. Speed intended to waver from that established practice. *Despite all of this, the Government is seeking to prosecute Mr. Speed on the basis that someday the devices he stored in their original packaging for over a year could be converted into "silencers," and that Mr. Speed might do so without registering them properly.*

Def.'s Mot. to Dismiss Indictment 3-4 (emphasis added). In other words, Speed is going to argue that his failure to drill the holes or purchase the drills bits more than a year after purchasing the HIT Devices shows that he did not know or intend for them to be silencers.

As reflected in Exhibits 3A and 3E, Speed's statements to the UCE undercut that defense. His statements show that, even a year after he purchased the devices, he still possessed them with the belief that they would be useful in committing violent acts. Thus, Exhibits 3A and 3E are necessary to counter Speed's argument that the passage of time without him drilling the holes is an indication that he did not know or intend for the devices to be silencers.

In preparing Exhibits 3A and 3E, the government was careful to include only relevant portions of the conversation. The government pared down the recording from this meeting to omit unnecessary and potentially inflammatory anti-Semitic statements that Speed made. *See* Decl. of Special Agent Christon Turner ¶¶ 17-19 (describing some of these statements from the April 7 meeting). As a result, Exhibits 3A and 3E do not contain extraneous anti-Semitic or

9

racist comments. Any statements reflecting anti-Semitic beliefs are intrinsic to the relevant evidence.

All of the remaining statements in Exhibits 3A and 3E are necessary to demonstrate the context of Speed's confirmation that he possessed the HIT Devices for use in violent action and to prove that his statements reflected his genuine intent. Without the full picture of this conversation, the jury could believe that Speed's statements about using violence were idle talk that did not genuinely reflect his intent. In his response, Speed has already demonstrated that he intends to downplay the significance of his statements and suggest that the UCE unduly prompted them. *See* Def.'s Objs. 5 ("The exhibits show, at most, that Mr. Speed held certain anti-Semitic beliefs and, when prompted by an undercover FBI agent, discussed hypothetical and potentially violent situations informed by such beliefs. It is, perhaps, possible to draw the inference from this that Mr. Speed imagined acting on such beliefs in real life under certain circumstances."). But when read in full, Speed's comments demonstrate that his thinking was quite advanced, even to the point that he was discussing potential means for carrying out the action by using kidnappings (an act that could especially benefit from the use of silencers). The surrounding context in the exhibits, moreover, reflect that Speed needed little prompting to discuss this violent action at length. The jury needs to hear the full discussion of his plan for violent action to properly weigh how much significance to ascribe to Speed's comments.

    **4.**    ***Any danger of unfair prejudice does not substantially outweigh the significant probative value of Exhibits 3A and 3E.***

Contrary to Speed's argument, the Court should not exclude this evidence on Rule 403 grounds.

Rule 403 allows the Court to exclude relevant evidence when "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. As the rule

states, "[e]vidence may be excluded under Rule 403 only if the evidence is *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the evidence." *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008). "Evidence is unfairly prejudicial . . . when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence." *United States v. Walker*, 32 F.4th 377, 394 (4th Cir. 2022) (quoting *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)) (internal quotation marks omitted). In conducting this analysis, the fact that evidence goes to a key, disputed issue at trial is an important consideration. *See, e.g.*, *United States v. Norweathers*, 895 F.3d 485, 491 (7th Cir. 2018) (holding that evidence was properly admitted, even though it was "inflammatory" and the "prejudice they present[ed] [was] obvious," because the evidence was "highly probative of the issues that, at the time, appeared to be central to [the defendant's] defense"); *United States v. Horner*, 853 F.3d 1201, 1215 (11th Cir. 2017) (holding that "any unfair prejudice from the . . . evidence did not substantially outweigh its probative value" when the defendants "vigorously contested the issue of intent at trial"); *United States v. Beahm*, 664 F.2d 414, 417 (4th Cir. 1981) (holding that while the evidence "[u]ndoubtedly . . . had some inflammatory effect on the jury, . . . the district court could well conclude that its probative value outweighed this prejudice when defendant chose to make intent an issue").

Here, any danger of unfair prejudice does not outweigh the probative value of Speed's statements in Exhibits 3A and 3E. As demonstrated above, Speed's statements go to the key disputed issue in this case—whether he knew (or, in his view, intended) the HIT Devices to be silencers (as defined by 18 U.S.C. § 921(a)(25)). Because his statements are highly probative of such a hotly contested element, Speed cannot establish that the prejudicial effect of his

statements outweigh (much less *substantially* outweigh) their probative value.

Speed emphasizes that his statements involve "political and religious violence, conspiracy theories, and anti-Semitism." Def.'s Objs. 6. But that fact alone does not mean that the prejudicial effect of the evidence inherently outweighs (much less substantially outweighs) its probative value. Here, the prejudicial effect of such statements does not outweigh the high probative value of Exhibits 3A and 3E to proving Speed's mental state in possessing the HIT Devices. *See United States v. Lehder-Rivas*, 955 F.2d 1510, 1518 (11th Cir. 1992) (holding that the district court did not err in admitting "evidence of [the defendant's] views on Hitler and other 'revolutionaries' such as Che Guevara" or in "allow[ing] comparisons between [the defendant's] organization and the Third Reich" because "[t]he evidence was . . . of considerable probative value in proving [his] motives for his continued participation in the conspiracy as well as for articulating the nature and scope of the conspiracy"). Speed, moreover, has failed to offer an alternative exhibit that maintains the relevant portion of the conversation but redacts the portions that he believes are unfairly prejudicial. *See* Order 3 (Nov. 10, 2022) (Dkt. No. 30) ("In those instances where an objection is asserted to only a portion of an exhibit, the objecting party should submit a version of the exhibit that it does not object to."). In any event, the government does not object to the Court giving a limiting instruction to alleviate any dangers of unfair prejudice. *See United States v. Henley*, 811 F. App'x 159, 165 (4th Cir. 2020).

    C.    **Government Exhibit 16**

Speed also objects to the admission of Government Exhibit 16. *See* Def.'s Objs. 7-8. Exhibit 16 is a summary chart that shows purchases Speed made between February 11, 2021, and May 26, 2021. The summary chart reflects information in bank statements from Speed's accounts. *See* Gov't Trial Exs. 14B, 15B. In authenticating the exhibit, the government anticipates that a witness will provide admissible testimony that all the vendors listed on Exhibit

16 sell firearms or firearm parts (including ammunition and firearm accessories)—which is obvious from the names of many of the vendors listed on the exhibit (e.g., "Alamo Ammo," "Ammo Freedom," "Guns Dot Com," "SP & G Shooting Range," "Eagle Eye Guns LLC," etc.).

The evidence is relevant to proving Speed's panic buying in the six months after January 6, 2021. It shows that Speed spent more than $40,000 at these firearm and firearm-part retailers alone in the six months following January 6, 2021. For the reasons explained above, Speed's panic buying is probative of the fact that he knew the HIT Devices had the features of silencers and purchased (and possessed) them for that purpose.

Speed argues that "the chart is unhelpful to establish even that fact as no description of what was actually purchased is provided." Def.'s Objs. 7. Considered in the context of Speed's other comments about panic buying and stockpiling firearms during this time, the jury can reasonably infer that he was purchasing firearm-related items from these retailers. The government has not sought to prove what Speed actually purchased from all of these retailers—evidence of which is generally reflected in purchase order confirmations obtained from the search warrant on his Google account—out of concern that it would waste time and unduly belabor the point. It defies belief that the defense wants the government to catalogue all of his purchases, such as the amount of ammunition and types of firearm accessories and/or tactical gear that he purchased. In any event, the defense is free to challenge the weight of the evidence on this point if it wishes.

**D.     Government Exhibits 38 to 43**

Finally, Speed objects to the admission of Government Exhibits 38 to 43. *See* Def.'s Objs. 8-9. Exhibit 38 is a Sig Sauer MCX Multi-Caliber Firearm, and Exhibit 39 is an FN 9mm pistol, both of which were seized from Speed's storage unit. Exhibits 40 to 43 are photographs of and chain-of-custody forms for these two firearms. The government anticipates that a witness

will testify that the HIT Devices fit these firearms and potentially demonstrate that fact for the jury. This testimony will be unique, not cumulative. The fact that Speed possessed firearms on which the HIT Devices could actually fit is relevant to proving that the devices are silencers and that he knew as much. *See United States v. Thompson*, 82 F.3d 849, 854 (9th Cir. 1996) (emphasizing that a "silencer was a 'good fit' for [the defendant's] pistol" in determining that sufficient evidence existed to prove the defendant's knowledge).

## CONCLUSION

For the foregoing reasons, the Court should overrule Speed's objections to Government Exhibits 1B, 1E, 3A, 3E, 16, and 38 to 43.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____/s/_____
Thomas W. Traxler
Amanda Lowe
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3746
Facsimile (703) 299-3980
Email: Thomas.traxler@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of December, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

_____/s/_____<br>
Thomas W. Traxler<br>
Assistant United States Attorney