IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:22-CR-165 |
| v. | ) | |
| | ) | The Honorable Michael S. Nachmanoff |
| HATCHET M. SPEED, | ) | |
| | ) | Sentencing: April 13, 2023 |
| Defendant. | ) | |

## <u>GOVERNMENT'S POSITION ON SENTENCING</u>

The defendant, Hatchet M. Speed, comes before the Court for sentencing after being convicted by a jury of three counts of possession of an unregistered silencer, in violation of the National Firearms Act (NFA), 26 U.S.C. §§ 5801–5872. As properly calculated in the Presentence Investigation Report (PSR), the Sentencing Guidelines advise that the Court sentence the defendant in the range of 33 to 41 months of imprisonment. Based on the individual circumstances of this case, the government recommends that the Court sentence the defendant to 41 months of imprisonment.

The nature and circumstances of the offense warrant a sentence at the high end of the guidelines range. Given the inherent dangers that firearm silencers pose to public safety, the failure to comply with the registration requirements for possessing a silencer is a serious crime. The context of this offense is exceptionally serious: the defendant was stockpiling weapons after participating in the incursion at the U.S. Capitol on January 6, a time when he anticipated civil war and spoke of the need for political violence. The defendant sought to add silencers to his stockpile, and when he faced delays in obtaining approval for the transfer of silencers that he had purchased and sought to register, he purchased the three unregistered silencers to circumvent the wait time and add them to his stockpile more quickly. Under these circumstances, a sentence of

41 months is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and "to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A)-(B).

A 41-month term of imprisonment is likewise necessary to "protect the public from further crimes of the defendant."  *Id.* § 3553(a)(2)(C).  In conversations with an FBI undercover employee just a year ago, the defendant expressed a proclivity to use violence to achieve his political and anti-Semitic ideologies, at one point confirming that he had the unregistered silencers for that very purpose.  He discussed reading manifestos written by convicted domestic terrorists (Eric Rudolph and Ted Kaczynski) to learn from them.  He described in detail his thoughts on how to wipe out the Jewish population.  He explained his efforts to identify targets in his "neighborhood" who were "reachable by someone like [him]," including using a mock trial to determine worthy targets to add to the "list."  He advocated the use of kidnappings in which "you take somebody out, and they simply disappear" and "[n]obody knows what happened to them" because "[i]f you leave nothing behind, they never find the body."  All the while, the defendant was sitting on a stockpile of firearms and ammunition.

## BACKGROUND

The defendant is a 41-year-old, highly educated resident of the Eastern District of Virginia.  He earned a Bachelor of Science degree in applied physics from Brigham Young University in 2008.  Dkt. No. 150, ¶ 87 (hereinafter, "PSR").  He then took classes toward obtaining a Master's degree in computer engineering.  *See id.* ¶ 86.

Since then, the defendant has been employed in a number of sensitive positions.  *See id.* ¶¶ 89-92.  Most recently, from 2014 to March 2022, he worked as a software developer and technical lead for a cleared defense contractor in Vienna, Virginia.  *See id.* ¶¶ 15, 89.  And from

December 2002 to February 2023, he served as a Petty Officer First Class in the U.S. Navy reserves. *See id.* ¶ 92. At the time of the offense conduct, the defendant possessed a Top Secret security clearance, with Sensitive Compartmented Information access (TS/SCI). *See id.* ¶ 15.

## A.   The Defendant's Participation on January 6, 2021

The defendant believed that fraud occurred during the 2020 presidential election and the election had been stolen. On January 6, 2021, the defendant intentionally participated in the mob at the U.S. Capitol that obstructed Congress's certification of the Electoral College vote, *see* Ex. A, at 3-4, believing that it "'was the last opportunity to stop the steal,'" *id.* at 8. As the district court found in convicting him of obstructing an official proceeding,[1] the evidence that "the defendant intended to obstruct or impede the official proceeding" was "the strongest and most damning" of "all the obstruction-related cases [that the judge had] considered to date." *Id.* at 5.

The defendant predicted ominous consequences arising from the certification of the election. As the defendant stated over text message on January 6, "[w]e came on the day of the count to [p]ut pressure on [C]ongress to do the right thing, because if they don't[,] they won't like what happens next." Ex. B. The defendant stated that "if they steal the election," then "the only other place to go" was civil war. *Id.* He asserted, "This is bigger than Trump. If they steal the presidency, the country is gone." *Id.*

A couple of weeks later, the defendant emphasized the need for political violence. On January 23, 2021, just a few days after the presidential inauguration, R.W. emailed the defendant and asked, "What are the PB's saying?" Ex. C. The term "PB's" was a reference to the Proud

---

[1] For his conduct on January 6, the defendant has been convicted of corruptly obstructing, influencing, and impeding an official proceeding, a felony in violation of 18 U.S.C. § 1512(c)(2). *See* Verdict, *United States v. Speed*, No. 1:22-CR-244-TNM (D.D.C. Mar. 21, 2023) (Dkt. No. 59). The defendant was also convicted of four misdemeanors. *See id.*

Boys—an organization that the defendant had been a member of since June 2020, *see* Ex. D, at 2.[2]  The defendant responded to R.W., "About anything in particular, or just the coup in general?" Ex. C.  The defendant stated that the Proud Boys were "lying low, letting all the conservatives who criticized the events of the 6th learn for themselves that surrendering to the communists will only mean more violence." *Id.*  The defendant further stated, "Conservatives need to overcome their aversion to direct action, but we can't take that journey for them.  We'll see how much oppression they need to experience before they wake up." *Id.*

### B.      The Defendant's Panic Buying of Firearms After January 6, 2021

Against this backdrop, the defendant went on a firearm-buying spree from February 11, 2021, to May 26, 2021.  During that period, the defendant purchased at least twelve firearms (rifles, shotguns, and handguns) and spent more than $40,000 at stores that sold firearms, firearm accessories, and ammunition.  *See* PSR ¶¶ 17-19.  He later made comments to the UCE and a co-worker that he was "panic buying" around that time.  *See id.* ¶ 17; Trial Tr. 176-77, 179 (Dec. 31, 2022) (Dkt. No. 95); Ex. E.

On February 15, 2021, during the time that he was panic buying, the defendant purchased four silencers from Silencer Shop, a company in Texas, for $4,109.00.  *See* Ex. F, at 24; PSR ¶ 20.  Two of the silencers were for a 9mm caliber firearm, and two of the silencers were for a .45 caliber firearm.  *See* Ex. F, at 24-25.  The defendant paid for four NFA tax stamps and completed paperwork for the ATF Forms 4.[3]  *See* PSR ¶ 20.

---

[2] The "Proud Boys are a self-described 'Western Chauvinist' fraternal organization, some of whose members have committed violence against perceived adversaries at First Amendment-protected events in the United States.  The Proud Boys are a national organization with many, largely autonomous U.S. chapters and some activity in other Western countries."  Dkt. No. 10-1, ¶ 10 n.1.

[3] Under the NFA, a firearm may not be transferred unless the transferor files an application, called a Form 4, with the ATF and pays a tax.  *See* 26 U.S.C. §§ 5811–5812; 27 C.F.R.

The defendant then faced delay in getting the necessary approval for the transfer of the silencers. On March 11, 2021, the defendant received an email from Silencer Shop informing him that his "application was received by the ATF and the payment for [his] tax stamp(s) was cashed." *Id.* ¶ 21. The email stated that "[f]or many people, the best way to pass the time waiting for their approval is to just forget about it, but we realize that can be hard." *Id.* The email provided the defendant with resources for tracking approval times for NFA transfers. *Id.*

Faced with the delay in obtaining the silencers, the defendant purchased three devices from Hawk Innovative Tech, a company in Georgia, on March 17, 2021. *See id.* ¶ 22. He spent a total of $887.49 to purchase the three devices and two adapters. *Id.* Like the silencers that he was waiting for the approval to receive from Silencer Shop, one of the devices was for a 9mm caliber firearm and another was for a .45 caliber firearm. *Id.* The third device was for a .223/5.56 caliber firearm. *Id.* These devices were not registered to the defendant in the National Firearms Registration and Transfer Record (NFRTR). *See* Dkt. No. 79. In sharp contrast to the silencers that he bought and sought to register from Silencer Shop (the transfer of which was still pending approval), the defendant received these unregistered devices from Hawk Innovative Tech on March 23, 2021, less than a week after purchasing them. *See* Ex. F, at 29.

Hawk Innovative Tech marketed the devices as "particulate filters," "solvent traps," and "solvent filters," ostensibly to be used to capture and recycle solvent fluid when cleaning the barrel of a firearm. *See* PSR ¶ 31; Ex. G, at 59. But as proven at trial, the devices were actually designed to be silencers, not solvent traps. *See* Ex. G. Consistent with firearm silencer designs, they had an outer body tube with end-caps that created an expansion chamber, *see id.* at 29, and

---

§§ 479.82–479.86. The NFA forbids the transferee from taking possession of a firearm before the ATF Director has approved the application and the firearm is registered to the transferee. *See* 26 U.S.C. § 5812(b); 27 C.F.R. § 479.86.

internal components called "baffles" and "spacers" that created smaller expansion chambers inside the device, *see id.* at 37-40, and were made from expensive metals, *see id.* at 30.  In fact, the Hawk Innovative Tech devices were consistent with patented silencer designs.  *See id.* at 33.

While the Hawk Innovative Tech devices did not have a completed hole in the front end-cap for a bullet to exit, they were designed so that a hole could be easily completed.  *See* PSR ¶ 32; Ex. G, at 36-45.  Each device had a screw that held an extra baffle and spacer in the front end-cap.  PSR ¶ 32.  When that screw was removed, it left a blind indexing hole in the center of the front end-cap.  *Id.*  Using a simple commercial hand drill, the center hole could be completed in a matter of minutes, at which point the device was a fully functional silencer.  *Id.*  An ATF Firearms Enforcement Officer tested one of the Hawk Innovative Tech devices by drilling the hole with a commercial hand drill and firing the device with a handgun.  *Id.*  The device served as a highly effective silencer, reducing the report of the handgun by 23.58 decibels.  *Id.*

On or about April 14, 2021, less than a month after the defendant's purchase, the ATF seized Hawk Innovative Tech's website.[4]  The seizure notice on the website cautioned people that "[t]he possession of a silencer sold by Hawk Innovative Tech may be a violation of federal law" and that "[i]f you are in possession of a silencer sold by Hawk Innovative Tech, you should contact your nearest ATF office."  Dkt. No. 111-1, at 2.

C.     **The Defendant's Admissions About the So-Called "Solvent Traps" to the UCE**

In February 2022, the UCE met the defendant for the first time at a coffee shop in Vienna, Virginia, presenting as a like-minded individual.  *See* PSR ¶ 33.  After that initial interaction, the defendant and the UCE got together again on multiple occasions.  *See id.*

---

[4] *See* Verified Compl. for Forfeiture ¶¶ 6-8, *United States v. Assorted Firearm Silencers, Assorted Firearm Silencer Parts & the Domain Name Hawkinnovativetech.com*, No. 3:21-cv-213-TCB (N.D. Ga. Dec. 15, 2021) (Dkt. No. 1).

During two of these meetings, the defendant made comments demonstrating that he knew the Hawk Innovative Tech devices were designed as silencers and that he possessed them for that reason.  *See id.* ¶ 24.  At no point during his meetings with the UCE did the defendant indicate that he owned the "solvent traps" to clean his firearm barrels.  *See id.* ¶ 25.

In a meeting with the defendant on March 22, 2022, the UCE mentioned seeing on YouTube how people were selling and making solvent traps to convert to suppressors (i.e., silencers).  *Id.*  The defendant responded that he had "bought a couple of those," referring to solvent traps that are to be used as silencers.  *Id.*  The defendant stated that a hole had to be bored in the devices that he purchased, which he said that he had not done yet.  *Id.*  The defendant observed that "the idea is to get everything except that, and then . . . you get a good drill press, and . . . just drill straight through," though the defendant stated that he did not yet have a drill press.  *Id.*  The defendant noted that if you drill the solvent trap and do not "submit the Form 1,"[5] then you have committed a felony.  *Id.*  The defendant stated, "I figure, at least I'm closer if I do ever need to use it, all I have to do is find somebody with a drill press."  *Id.*

In a subsequent meeting on April 7, 2022, the defendant and UCE further discussed the use of his "solvent traps" as silencers.  *Id.* ¶ 26.  The UCE asked if a solvent trap could shoot more than one round and stay quiet.  *Id.*  The defendant responded that he had "to test and see . . . but yeah, uh, they stay quiet."  *Id.*  When the UCE asked where he could buy one, the defendant responded that solvent traps could be purchased at Vienna Arsenal and online.  *Id.*  The defendant stated that he purchased his solvent traps online before realizing that Vienna Arsenal sells them.  *Id.*  The defendant stated that he could not remember the name of the

---

[5] The ATF Form 1—an Application to Make and Register a Firearm—must be submitted and approved before a person makes an NFA-regulated firearm.  *See* 27 C.F.R. § 479.62(a).

company where he bought his solvent traps, but he said that they seemed like good quality. *Id.* The defendant indicated that if the UCE went to Vienna Arsenal or any place that sells solvent traps, the retailers there would know the purpose of the solvent trap—that the UCE would not have to "say . . . what it's for." *Id.* The defendant stated that he had not used his solvent traps as silencers yet. *Id.* ¶ 27.

In this meeting, the defendant repeated that a "Form 1" must be submitted before drilling the hole in order to make the silencer legal. *Id.* The defendant, however, stated, "[T]hat would be the legal way of doing it, you know. If you forget to fill out Form 1, nobody ever finds you on the form." *Id.* The defendant also indicated that he had not yet figured out which drill bits were needed. *Id.* The defendant explained, "I haven't figured that detail out. I just figure when I want to figure that detail out, it will be easier to figure out the drill bits and whatnot. If that's all I have to figure out then everything is. . ." *Id.*

At one point during the April 7 meeting, the defendant confirmed to the UCE that he maintained the solvent traps to potentially use in an act of violence in furtherance of his anti-Semitic ideology. *See id.* ¶ 27. The defendant discussed trying to figure out how to identify potential targets who were "in [his] neighborhood" and "reachable by someone like [him]," even suggesting that he was thinking of Anti-Defamation League people who were "pretty high up." *Id.* ¶¶ 49-50. The defendant then suggested using a "mock trial" in which he would "write down the arguments for and against . . . and come to a decision, then say, okay, now this person' . . . 'I can put this person on the list and I know I'm sure.'" *Id.* ¶ 50.

At this point of the discussion, the UCE asked the defendant, "***You think at that point your . . . solvent traps would come in handy***?" *Id.* ¶ 27 (emphasis added). The defendant asked,

"My what?" *Id.*  The UCE asked again, "your solvent traps would come in handy at that point?"
*Id.*  The defendant responded, "***Yeah. Yeah, that's the idea.***"  *Id.* (emphasis added).

After that exchange, the defendant praised the approach of jihadists and suggested that
their methods would be an effective way to "wipe out" the opposition, referring to Jewish
people.  *Id.* ¶ 51.  The defendant explained that because two percent of the U.S. population is
Jewish, if just "three percent" of the country took action against the Jewish population, "we can
literally win just on the numbers."  *Id.*  The defendant told the UCE that "as soon as we pull our
trigger against the fucking person, you will succeed" and "have done more than your fair share."
*Id.*  He advocated to "just take out one here, one there . . . [m]aybe every few months" and that
"[i]t doesn't necessarily have to be a full-time thing," "but we're doing something that's going to
have a big impact."  *Id.*

In this conversation, the defendant continued by describing how kidnappings would be
"harder" but "more effective" than simply killing people.  *Id.* ¶ 52.  The defendant told the UCE,
"What I would love to see is you take somebody out, and they simply disappear.  Nobody knows
what happened to them."  *Id.*  The defendant explained, "That means we can't report on it, the
media doesn't know how to spin it. . . . And all of those people who were left behind have . . . no
way to close that bridge, no way to know if they're in danger. . . . We need to foster distrust
within the opposite side, just like they do for us. . . . If you leave nothing behind, they never find
the body."  *Id.*

**D.      The Defendant's Other Concerning Statements to UCE**

Over the course of his meetings with the UCE in early 2022, the defendant made other
comments demonstrating a proclivity to use violence in furtherance of his anti-government and
anti-Semitic beliefs.  *See* PSR ¶¶ 33-41.

Of notable concern, the defendant made comments that he was trying to learn from notorious convicted domestic terrorists Eric Rudolph and Ted Kaczynski (also known as the "Unabomber") by reading their manifestos. *Id.* ¶¶ 36-40.  He stated that he was "trying to find more books like that," from which he took away "yeah, you're assassinating bad guys, that's cool, but if it's approved . . . you're always killing the small fry, you're never actually going after the people who actually," before trailing off.  *Id.* ¶ 38.  He stated that "as people who can see their country fall deeper and deeper into wherever we're going, we all know we have to do something[,] so it's useful to see what worked and what didn't work.  So, it's useful to get into these people's heads and . . . try and come up with a better game plan than they had."  *Id.* ¶ 39.

The defendant also advocated for the use of violence over nonviolence to effectuate change.  In describing January 6, the defendant said that "[i]t should've gotten to the point where . . . Nancy Pelosi . . . resigned out of fear for her life."  Ex. L, at 2.  He said that did not happen "because too many Americans have this idea that we have to be peaceful at all costs."  *Id.* He complained that "as soon as we're violent then we lose the moral authority," claiming this mindset was a result of "[e]very superhero movie made by Jews."  *Id.*  He described the idea that the civil rights movement "was a triumph of nonviolence" was a "myth," stating the "nonviolent effort worked . . . because the government wanted it to."  *Id.* at 3.  The defendant asserted that "[t]here's no such thing as a nonviolent revolution with a noncooperative government."  *Id.*

The defendant criticized being taught nonviolence when he was growing up.  *See id.* ¶ 41. He stated that, despite being taught the virtues of nonviolence, when he grew up he "wanted to join the military and go shoot guns and kill people."  *Id.*  The defendant said, "It's innate. Imagine how much more could have been accomplished if I hadn't been steered away from that my entire life."  *Id.*

### E.     Law Enforcement's Search of the Defendant's Residence and Storage Unit

On June 22, 2022, law enforcement searched the defendant's residence and storage unit. In searching his storage unit, the agents seized the three Hawk Innovative Tech silencers, which were still in their original packaging and had not been modified.  *See* PSR ¶ 28.  Also from the storage unit, the agents seized eight firearms, more than 18,000 rounds of ammunition, and numerous firearm accessories, including three silencers that the defendant purchased in June 2020 and various firearm sights, lights, and optics.  *See* Ex. H.  From the defendant's residence, the agents seized another firearm and ammunition, and the four silencers that the defendant purchased from Silencer Shop in February 2021.  *See* Ex. F, at 5-20.  The agents did not seize an additional three firearms from his residence and two from his storage unit because they determined the search warrant did not authorize them to seize those weapons.  *See* Mot. for Conditions of Release 2, *United States v. Speed*, No. 1:22-CR-244-TNM (D.D.C. June 23, 2022) (Dkt. No. 6).

### F.     Procedural History

On September 6, 2022, a grand jury in the Eastern District of Virginia returned an indictment charging the defendant with three counts of unlawful possession of a silencer that was not registered to him in the NFRTR, in violation of 26 U.S.C. §§ 5841, 5861(d), 5871.  *See* Dkt. No. 1.  The next day, the defendant was arrested, had his initial appearance, and was released on a personal recognizance bond with the same conditions as imposed in D.C.[6]  *See* Dkt. Nos. 12,

---

[6] On June 21, 2022, the U.S. Attorney's Office for the District of Columbia charged the defendant by complaint with misdemeanor offenses related to January 6, 2021.  *See United States v. Hatchet Speed*, No. 1:22-CR-244-TNM (D.D.C.).  Law enforcement arrested the defendant on June 22, 2022, in McLean, Virginia.  The government did not request detention and the D.C. court released the defendant on a personal recognizance bond.  Among other conditions of release, the D.C. court forbade the defendant from possessing firearms, destructive devices, or other weapons, and imposed home detention and location/GPS monitoring.

14.  The Court held the defendant's arraignment on September 22 and scheduled his jury trial to begin on December 12, 2022.  *See* Dkt. No. 17.

The defendant's first trial began on December 12.  *See* Dkt. No. 87.  It ended in a mistrial due to a hung jury.  *See* Dkt. No. 99, at 27-28.  At the government's request, the Court scheduled a retrial to begin on January 17, 2023.  *See id.* at 34.

The defendant's retrial began on January 17.  *See* Dkt. No. 137.  At trial, the defendant argued that the Hawk Innovative Tech devices were solvent traps, not silencers.  *See* Ex. G, at 66-85.  He maintained that he thought the devices were solvent traps and did not know that the devices had the characteristics of a silencer.  *See id.* at 74.  He claimed that "the government has gone on a *witch hunt* to convict an innocent man."  *Id.* at 84 (emphasis added).

At the end of the two-day retrial, the jury deliberated for less than two hours before convicting the defendant of all three counts in the indictment.  *See* Dkt. No. 140.  The Court ordered the defendant's detention pending sentencing and Court scheduled the sentencing hearing for April 13, 2023.  *Id.*

## DISCUSSION

The defendant stands convicted of three counts of possession of an unregistered silencer. *See* 26 U.S.C. § 5861(d).  This offense carries a maximum term of imprisonment of ten years. *See id.* § 5871.  It also carries a maximum fine of $10,000, *see id.*, and a maximum supervised release term of three years, *see* 18 U.S.C. § 3583(b)(2).

In imposing a sentence within the statutory range, the Court must consider the factors set forth in § 3553(a).  *See* 18 U.S.C. § 3582(a).  These factors require the Court to consider the Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct. *Id.* § 3553(a)(1), (4)-(6). The sentence should be "sufficient, but not greater than necessary," to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, protect the public from further crimes of the defendant, afford adequate deterrence to criminal conduct, and provide the defendant with necessary training and treatment. *Id.* § 3553(a)(2). Considering all the factors under § 3553(a), the Court must make an "individualized assessment based on the facts presented" to determine the appropriate sentence. *United States v. Abed*, 3 F.4th 104, 118 (4th Cir. 2021) (quoting *Gall v. United States*, 552 U.S. 38, 49-50 (2007)).

As explained below, the government's recommended sentence—41 months of imprisonment—is sufficient but not greater than necessary to achieve the goals in § 3553(a).

### A.   The Recommended Sentence Is Consistent with the Defendant's Sentencing Guidelines Range.

Section 3553(a) requires the Court to consider the Sentencing Guidelines when sentencing a defendant. *See* § 3553(a)(4). Despite their advisory nature, the guidelines remain "the 'starting point' and 'initial benchmark' for sentencing." *United States v. Davis*, 855 F.3d 587, 595 (4th Cir. 2017) (quoting *Beckles v. United States*, 580 U.S. 256, 265 (2017)). While the guidelines do not constrain the Court's discretion, they nevertheless guide that "discretion by serving as 'the framework for sentencing.'" *Beckles*, 580 U.S at 265 (quoting *Peugh v. United States*, 569 U.S. 530, 542 (2013)).

The Government agrees with the calculation of the defendant's guidelines range in the PSR. The defendant is a criminal history category I.[7] The applicable base-offense level is 18

---

[7] Because the defendant has not yet been sentenced in the District of Columbia for the January 6 offenses, the guidelines assign only one criminal history point for them, even though they included a felony conviction. *See* U.S.S.G. § 4A1.2(a)(4). If the defendant had been sentenced for those offenses first and received a sentence of at least sixty days of imprisonment, the

because the "offense involved a firearm described in 26 U.S.C. § 5845(a)," U.S.S.G.

§ 2K2.1(a)(5), namely, a silencer, *see* 26 U.S.C. § 5845(a)(7).  A 2-level enhancement applies

because the offense involved three firearms.[8]  *See* U.S.S.G. § 2K2.1(b)(1)(A).  The defendant is

not entitled to an adjustment for acceptance of responsibility because he denied essential factual

elements of guilt (e.g., by claiming that the devices were solvent traps, not silencers, and that he

did not know they had the characteristics of a silencer), put the government to its burden of proof

at trial, and has not accepted responsibility for his conduct.  *See id.* § 3E1.1 cmt. n.2; *United

States v. Jeffery*, 631 F.3d 669, 678 (4th Cir. 2011).  As a result, the defendant's total offense

level is 20.

Where, as here, the defendant has an offense level of 20 and a criminal history category I,

the Sentencing Guidelines recommend 33 to 41 months of imprisonment.  U.S.S.G. ch. 5, pt. A.

The government's recommendation of 41 months of imprisonment is within that range.

**B.     The Other § 3553(a) Factors Support the Recommended Sentence.**

In addition to being consistent with the Sentencing Guidelines, the other § 3553(a) factors

support a term of imprisonment of 41 months.

### 1.     *Nature and circumstances of the offense*

By purchasing and possessing unregistered silencers, the defendant has committed a

serious offense.  Firearm silencers are an especially dangerous form of weaponry because they

"can be used to conceal where a shot is coming from" by diminishing the sound of the gunshot

---

conviction would have resulted in two criminal history points, *see id.* § 4A1.1(b), putting the
defendant in a criminal history category II with a guidelines range of 37 to 46 months.

[8] For purposes of this guideline, the term "'[f]irearm' has the meaning given that term in 18
U.S.C. § 921(a)(3)."  U.S.S.G. § 2K2.1 cmt. n.1.  Under § 921(a)(3), "[t]he term 'firearm'
means . . . any . . . firearm silencer."  18 U.S.C. § 923(a)(3)(C).

and concealing the muzzle flash.  Trial Tr. 17 (Dec. 31, 2022) (Dkt. No. 96).  In fact, the historical record shows that silencers were perceived as dangerous almost immediately after their invention and that they were quickly used to facilitate crimes.  *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 L. & Contemp. Probs. 231, 246-49 (2020).  Because of the "close association of the use of silencers with criminal acts," *id.* at 249, Congress included them within the types of firearms regulated under the NFA.  *See United States v. Springer*, 609 F.3d 885, 888 (6th Cir. 2010) (recognizing that the purpose of the NFA "is to curb the proliferation of especially dangerous weaponry 'identifiable generally and broadly, if not exclusively, with criminal activities'" (quoting *United States v. Black*, 431 F.2d 524, 528 (6th Cir. 1970))).

The nature and circumstances of the defendant's possession of the Hawk Innovative Tech silencers are exceptionally serious.  The defendant purchased them at a time when he was stockpiling weapons, predicting civil war, and asserting that "[c]onservatives need to overcome their aversion to direct action" and that "surrendering to the communists will only mean more violence."  Ex. C.  And this belief in the use of violence to further his ideological goals appears to have only intensified over the time that he possessed the silencers.  Almost a year after he purchased them, the defendant was talking to the UCE about how to identify targets for violence and wipe out the Jewish population.  When asked if his so-called "solvent traps" would come in handy for that purpose, he confirmed "that's the idea."  PSR ¶ 27.

Throughout the litigation in this case, the defendant sought to excuse his conduct by pointing to his statements to the UCE indicating that he thought the devices did not need to be registered until the hole in the front end-cap was drilled.  But even if the defendant was under that impression, it does not warrant leniency in this case.  This is not a situation in which the

defendant was confused as to what the devices actually were. All the evidence—his statements to the UCE and the context of his purchase—shows that he knew the devices were designed to be silencers and possessed them for that reason. No evidence suggests that he owned the devices to use in cleaning his firearm or for any purpose other than as silencers.

Instead, the defendant's statements to the UCE suggest, at most, that he (wrongly) thought he found a loophole in the law and could exploit that loophole to avoid complying with the NFA's registration requirements. But the defendant acted at his own peril in trying to skirt the registration requirements. Especially when dealing with highly regulated, dangerous items such as silencers, the burden was on the defendant to ensure that his actions were within the bounds of the law. His effort to circumvent the NFA's registration requirements to obtain silencers faster—during a time when he was convinced by the need for political violence and had already participated in the obstruction on January 6—is inexcusable.

The fact that the defendant had not yet used the silencers does not mitigate his conduct, either. The evidence showed that the defendant was stockpiling firearms and that the Hawk Innovative Tech silencers were part of that stockpile.[9] In April 2022, two months before his storage unit was searched, the defendant confirmed to the UCE that he possessed them for use in a potential act of violence. *See* PSR ¶ 27. In this context, the defendant's failure to use the Hawk Innovative Tech silencers before they were seized does not indicate that he had no plans to use them in the future.

---

[9] The defendant had other firearms that he had not yet used. For example, in March 2022, he told the UCE that he had not yet fired his 6.5 Creedmoor rifle, *see* Ex. E, which he had purchased the year before during the same panic-buying spree.

Under these circumstances, a 41-month term of imprisonment is appropriate "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2)(A).

### 2.    Need for deterrence

In addition, a substantial sentence is necessary to "afford adequate deterrence to criminal conduct."  § 3553(a)(2)(B).  In the 2017-2021 period, the ATF recovered 9,130 silencer and silencer parts—a 176% increase as compared to the number of silencer and silencer parts seized in the 2012-2016 period (3,298).  *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Commerce and Trafficking Assessment, Vol. 2: Crime Gun Intelligence and Analysis (Jan. 11, 2023), *available at* https://www.atf.gov/file/175261/download (last visited Apr. 5, 2023).

The sale of unregistered silencers that are marketed as "solvent traps" in particular has been a troubling trend.  In April 2017, the ATF issued a Technical Bulletin describing the historical use of items like oil filters and fuel filters to make firearm silencers (i.e., dual-use items).  *See* Dkt. No. 23-1, at 2-6.  As the ATF noted, however, the "current trend" involves manufacturers making devices designed to be silencers but calling them "solvent traps."  *Id.* at 6.  Unlike dual-use items that serve a legitimate purpose but can be repurposed to be silencers, these devices are specifically designed as silencers.  *Id.*  As the evidence proved at trial, the Hawk Innovative Tech devices fell within this category of devices designed as silencers but marketed as solvent traps.

The Court's sentence should send a message that such deceptive and unlawful attempts to circumvent the legal requirements for possessing a silencer will warrant a substantial sanction. Prospective offenders must understand that the illegal possession of unregistered silencers will

not be treated as an insignificant infraction, but as a threat to public safety. A 41-month term of imprisonment—a sentence at the high end of the guidelines range—would convey this message.

### 3.  *History and characteristics of the defendant*

As reflected in the PSR, there is nothing about the defendant's history and characteristics that mitigates his conduct in this case. The defendant is a highly educated man who is experienced with firearms. He knew exactly what registration requirements he was avoiding when he obtained the unregistered silencers, because he had gone through the process of purchasing registered silencers in compliance with the NFA twice before.

The defendant's conduct involved a stark betrayal of the public trust. As the possessor of a TS/SCI security clearance, the defendant was expected to scrupulously follow the law—not figure out ways to circumvent it. As a member of the armed forces, he took an oath to "support and defend the Constitution of the United States against all enemies, foreign and domestic," and "bear true faith and allegiance to the same." Yet he purchased these unregistered silencers at a time when he was preparing for domestic strife and extolling the need for political violence. And he confirmed that the "idea" of having them was for use in an act of violence targeting the Jewish population. The defendant's conduct was incompatible with the oath that he swore as a member of the armed forces. His betrayal of the public trust warrants a substantial sentence.

The evidence, moreover, shows that the defendant is a danger to public safety. As outlined above, the evidence demonstrates that the defendant was already on a dangerous path when he committed this offense. Just two months before, he joined a mob intending to obstruct Congress's certification of the Electoral College vote related to the 2020 presidential election. He was predicting civil war, chastising conservatives for their "aversion to direct action," and warning that "surrendering to the communists will only mean more violence."

18

The defendant also embraced the violence in which the Proud Boys—an organization that he joined in June 2020—was involved.  When discussing Hitler's book Mein Kampf (which he described as "incredible"), the defendant favorably drew parallels between the Proud Boys and pro-Nazi paramilitary forces that Hitler used when rising to power, asserting that both groups were used to stop Antifa.  *See* Ex. I, at 5.  The defendant told the UCE that "on the streets [the Proud Boys are] actually really good," which they have to be because they "are generally outnumbered by Antifa."  Ex. J, at 4.  The defendant praised that the "Proud Boys are good at fighting because they literally just enjoy fighting."  *Id.* at 5.

The defendant did more than just talk; he actively sought to participate in these violent confrontations.  For example, he told the UCE about participating in a "November rally here in DC" where "there were almost 500 Antifa" and "100 of us Proud Boys."  *Id.* at 4.  Contemporaneous communications show that the defendant participated in a rally in Washington, D.C., on November 14, 2020, *see* Exs. K, M, which ended with a violent clash between protestors and counterprotesters in the night.[10]  As reflected in text messages, the defendant drove into D.C. that night after being told that "[b]ig boss told us we are going back in" and expressed a fear of missing out when he was told that things were "[p]retty quiet we stomped them out."  Ex. K.

Other evidence shows that the defendant embraced these violent confrontations.  For example, on January 1, 2021, five days before the incursion at the U.S. Capitol, the defendant

---

[10] *See* Marissa J. Lang et. al, *After Thousands of Trump Supporters Rally in D.C., Violence Erupts When Night Falls*, Washington Post (Nov. 15, 2020), *available at* https://www.washingtonpost.com/dc-md-va/2020/11/14/million-maga-march-dc-protests/ (last visited Apr. 5, 2023); Jason Slotkin, *Trump Supporters, Counterprotesters Clash at D.C. Rally Contesting Biden's Victory*, NPR (Nov. 14, 2020), *available at* https://www.npr.org/2020/11/14/934957728/trump-supporters-descend-on-d-c-for-events-contesting-election-results (last visited Apr. 5, 2023).

sent a text message describing where he lived as a "[s]uburban environment, but close enough to the city for those days when I just wanna be part of a riot."  Ex. M.  Consistent with that mentality, law enforcement recovered from the defendant's residence a tactical "Make America Great Again" hat that had a hard interior shell.[11]  *See* Ex. N.  As reflected below, photographs of the defendant from a December 2020 rally reflect him wearing the hat and other tactical gear, along with the yellow-and-black Proud Boys colors.  *See* Ex. M.  The photographs show that the defendant was ready for a brawl.




The defendant's proclivity for violence continued and appears to have intensified up to the time period when he was arrested.  As recently as March and April 2022, less than three months before his initial arrest, the defendant was still talking about using violence to further his

---

[11] Law enforcement did not find any other similar hat when searching the defendant's residence and storage unit.

ideological goals.  The defendant's comments show that he is a clear danger to the public, such as his statement to the UCE about learning from convicted domestic terrorists, identifying targets in his "neighborhood" who were "reachable by someone like [him]," using a mock trial to determine worthy targets to add to the "list," winning "on the numbers" by each person killing one Jewish person to "wipe out the opposition," and advocating the use of kidnappings in which "you take somebody out, and they simply disappear" and "[n]obody knows what happened to them."  The defendant's rhetoric is especially frightening considering that he possessed a stockpile of weaponry to carry it out.

Given the "history and characteristics of the defendant," and the need "to protect the public from further crimes of the defendant," § 3553(a)(1), (a)(2)(C), the Court should sentence the defendant to 41 months of imprisonment.

### 4.    *The need to avoid unwarranted sentencing disparities*

By imposing a guidelines sentence in this case, the Court would "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  § 3553(a)(6).  The Court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities' when it carefully review[s] and calculate[s the defendant's] guidelines range at the sentencing hearing."  *United States v. Sueiro*, 59 F.4th 132, 141-42 (4th Cir. 2023) (quoting *Gall*, 552 U.S. at 54).  The Court is "not obligate[d] . . . to engage in case-by-case comparisons of sentences imposed in cases unconnected to the case before [it]."  *Id.* at 142.  In fact, such comparisons can "be treacherous because each sentencing proceeding is inescapably individualized."  *United States v. Friend*, 2 F.4th 369, 382-83 (4th Cir. 2021) (quoting *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012)).  There are no cases connected to this one before the Court.  Under the

individualized circumstances here, a 41-month term of imprisonment—a sentence at the high end of the guidelines range—is appropriate.

## CONCLUSION

For the foregoing reasons, the Court should sentence the defendant to a term of imprisonment of 41 months.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:         _____/s/_____
Thomas W. Traxler
Amanda Lowe
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3746
Facsimile (703) 299-3980
Thomas.traxler@usdoj.gov
Amanda.lowe@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of April, 2023, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system.


_____/s/_____
Thomas W. Traxler
Assistant United States Attorney