**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cr-00165-MSN** |
| | ) | **Hon. Michael S. Nachmanoff** |
| **HATCHET M. SPEED,** | ) | **Sentencing Date: April 13, 2023** |
| *Defendant.* | ) | |

_____

## MEMORANDUM IN AID OF SENTENCING

Mr. Speed is a veteran of the United States military and has no prior criminal record. Those close to him describe Mr. Speed as thoughtful, caring, and considerate. He has never been in trouble before last year and will never be in a situation like this again. Based on his lack of criminal history, the nature of the offense conduct, and the fact that Mr. Speed did not intend to break the law, the defense submits that a sentence of no more than twelve months and one day is appropriate in this case. The felony conviction, incarceration, and collateral consequences—which include a lifelong prohibition on firearm ownership—are more than sufficient to address the seriousness of the offense, provide just punishment, and protect the public.

It is well established that "[c]onsciousness of wrongdoing is a principal 'as universal and persistent in mature systems of [criminal] law as belief in freedom of the human will. . . .'" *Ruan v. United States*, 142 S.Ct. 2370, 2376 (2022) (*quoting Morissette v. United States*, 342 U.S. 246, 250 (1952)). As the Supreme Court explained in *Morisette*, this principle is not only relevant to criminal liability, but is also reflected in the evolution from "retaliation and vengeance" as the primary goal

of criminal punishment before the 18th century to "deterrence and reformation" in our modern system of criminal justice. 342 U.S. at 251. Knowledge that conduct is wrongful, in other words, is an important consideration both in defining the line between guilt and innocence and in determining punishment.

Mr. Speed comes before this Honorable Court convicted of three counts of possession of unregistered firearms. The *actus reus* of his offenses—possessing firearm silencers—is something that the United States government at the time of his conduct *authorized* him to engage in with respect to three other devices he then possessed. He was convicted of possessing unregistered silencers, items he purchased on the internet and had not modified to serve as functioning silencers, even though he believed the items he purchased were not "silencers" under federal law and did not require registration in the form in which he possessed them. To be sure, the Court held that this mistake was no defense to conviction. But Mr. Speed's belief that he was not violating the law is nonetheless relevant to sentencing. A person who has endeavored to follow the law with respect to the offense conduct for which he is before the Court is far outside the heartland of criminal cases and the advisory Sentencing Guidelines. Accordingly, "deterrence and reformation" simply do not support a lengthy sentence of the type suggested by the Guidelines.

## I.   A Sentence Is Meant To Be "Sufficient, But Not Greater Than Necessary" To Promote The Goals Of Sentencing, Notwithstanding the Applicable Guideline Range.

After *United States v. Booker*, the Sentencing Guidelines range is advisory, and courts must consider it as just one of more than a half-dozen statutory sentencing

factors enumerated in 18 U.S.C. § 3553(a).[1]  *See* 543 U.S. 220, 259-60 (2005); *see also Kimbrough v. United States*, 552 U.S. 85 (2007) (Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in § 3553(a)); *Gall v. United States*, 552 U.S. 38 (2007) (same). The primary directive in the actual language of § 3553(a) is to "impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes" of sentencing. (Emphasis added).

The Court must keep in mind that, as the Department of Justice recently noted, determining the guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice."  *See Gov't Supp. & Amend. Sent. Mem.*, *United States v. Stone*, Case No. 19-cr-18-ABJ, Dkt. No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors).  Imposing a sentence that is sufficient, but not greater than necessary, is not just another factor for the Court to consider along with the others set forth in § 3553(a).  Rather, it sets an independent limit upon the sentence.

---

[1] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

## II.    Mr. Speed's Personal History Warrants a Sentence of No More Than One Year and One Day

Hatchet Speed is a 41-year-old man whom friends describe as caring, contemplative, and compassionate as well as curious, well-read, and respectful.  *See* Exhibit A, Letters from Loved Ones.  Mr. Speed was raised in Salt Lake City, where his family belongs to the Church of Jesus Christ of Latter Day Saints.  Mr. Speed was raised Mormon, and his family raised him to value volunteerism, civil disobedience, and education.

At a young age, it became apparent that traditional schooling did not provide a curriculum rigorous enough to challenge Mr. Speed.  His parents decided to homeschool him beginning in third grade.  Even with a more demanding curriculum, Mr. Speed excelled in school – skipping grades and earning straight As.  With parents whose educational backgrounds were in languages and sciences, Mr. Speed learned a great deal about those subjects.  But the home was also replete with books about history – including military history – and political science.   Mr. Speed eagerly absorbed material from all the subjects, and he graduated from high school early at age 16.

In addition to focusing on his studies, Mr. Speed also participated in extracurricular activities.  He was a Boy Scout, and he ran track.  In fact, Mr. Speed earned his nickname, Hatchet, from his track teammates.  Mr. Speed's older brother, who also ran track, was nicknamed Axe.   Eventually "Little Axe," as Mr. Speed was initially called, became known as Hatchet.  He legally changed his name years later.

After graduating from high school, Mr. Speed attended Brigham Young University.   Mr. Speed attended the university for three years before attending a two-year church mission in Venezuela.  PSR ¶ 78.  Upon returning from Venezuela, Mr. Speed resumed his studies.  He graduated from BYU in 2008 with a degree in Applied Physics.   He later completed coursework towards a Masters' degree in computer engineering.

While at BYU, Mr. Speed demonstrated the volunteerism instilled in him by his family.  In addition to his mission trip, Mr. Speed volunteered with the Even Start Program, where he assisted Spanish-speaking adults to complete secondary education requirements.   Furthermore, he enlisted in the military.  He joined the Navy Reserves in 2002.   PSR ¶ 79.

Mr. Speed has had a decorated military career spanning several reenlistments and three deployments.   PSR ¶ 79.  Whether it be through formal education or self-teaching, Mr. Speed developed at least elementary proficiency in several languages – Spanish, French, Latin, Portuguese/Brazilian, and Hebrew.  With his knack for languages, Mr. Speed initially served as a military linguist.   His military records commend him as a "world-class linguist."  Further honors were bestowed upon Mr. Speed for his deployments to Iraq in 2009 (Army Achievement Medal, Iraq Campaign Medal, Navy Overseas Service Ribbon), Afghanistan in 2011 (Afghanistan Campaign Medal, NAVY/MC Overseas SVC Ribbon, Joint Services Commendation Medal, Armed Forces Reserve Medal) and Africa in 2016.

Meanwhile, Mr. Speed worked full time as a software engineer and developer. PSR ¶¶ 89-91. When he was not working or fulfilling his military duties, Mr. Speed nurtured several hobbies, including maintaining and fixing old trucks, and he remained actively involved with the Mormon Church until approximately 2022. Until recently, Mr. Speed attended church functions, participated in group motorcycle rides, and engaged in community service activities.

Disillusioned with the results of the 2020 election, however, Mr. Speed's beliefs became more conservative/radical, and as they did, he drifted away from his involvement with the Mormon church. Despite his more fringe beliefs, Mr. Speed enjoyed discussing current events, eagerly debated policy, and appreciated hearing differing viewpoints. And, he did so respectfully. *See* Exhibit A, Letters from Derek Bloom and Slade Horacek. Notwithstanding his beliefs, his respectful nature and the valued relationships he cultivated over time have prompted several close friends to offer support to Mr. Speed through the pendency of his case and beyond. *Id*.

### III. The Nature of the Offense Conduct Does Not Warrant a Lengthy Prison Sentence

Mr. Speed is nothing if not meticulous when it comes to purchasing, owning, and possessing firearms. One of the primary arguments made by the government at trial was that Mr. Speed was "panic buying" firearms in the early months of 2021. However, 2021 was not the first time that Mr. Speed purchased firearms and his behavior in the purchase of each weapon should be noted.

In June of 2020, Mr. Speed purchased three commercial silencers from an online firearms dealer called Silencer Shop. PSR ¶ 20. In purchasing these silencers,

Mr. Speed had to fill out a Form 4 for each device.  The Form 4 requires Mr. Speed to provide a government-issued identification, a valid address, phone number, email address, and a photograph.  The form also records the make, model, and serial number of the weapon in question, allowing the weapon to be traced in the National Firearm Registration and Transfer Record.  Because of the nature of the weapon, there was also a waiting period to obtain the actual devices.  While Mr. Speed made his original purchase in June of 2020, he waited until February of 2021 before receiving his devices.  Subsequently, Mr. Speed repeated this same behavior in February of 2021 in purchasing four additional commercial silencers.

Silencers are not the only items that Mr. Speed purchased.  As a gun enthusiast, Mr. Speed had purchased and owned a number of other firearms, including handguns and rifles.  And while the registration process is not the same for these weapons, Mr. Speed still acted in accordance with the law.  The case agent, Mariam Hanna, even testified at trial that none of Mr. Speed's purchase of various firearms and firearm accessories was illegal.  Mr. Speed was not prohibited from purchasing or possessing those items and did not exceed any quota in his purchases. Mr. Speed continuously complied with the law for every single weapon he owned.

Now, Mr. Speed stands convicted of three counts of possession of unregistered silencers for the Hawk Innovative Tech devices that he purchased in March of 2021. But it is clear from Mr. Speed's history, as well as his statements, that he did not intend to illegally possess these items.  A year after purchasing them, Mr. Speed stated to the undercover FBI officer, whom at that time Mr. Speed believed to be a

friend, that if you don't submit the Form 1 when modifying these devices, then you've become a felon. Mr. Speed recognized that when a person decides to essentially build a weapon, a procedure exists in order for one to comply with the law. And Mr. Speed's comments indicate not only that he did not believe the items as he possessed them required registration, but also that he intended to follow the registration procedure if he modified them because—firearms being important to him—he did not wish to become a felon.

One of the ways that Mr. Speed's friends describe him is curious. He enjoys learning new things and mastering new crafts – whether that be experimenting with sound effects pedals or hang gliding. *See* Exhibit A, Letter from Sean Graham. And turning these solvent traps into silencers would have just been another project for Mr. Speed. But it was a project he never got to. Fifteen months after he purchased these devices, they were in Mr. Speed's storage unit, still in their packaging, unmodified and unused. Mr. Speed never purchased a drill or drill press in order to modify the devices. He never removed and replaced the internal components to see how they were configured. He never did more than open one up, look at it, and put it away. And he never registered them because he did not believe he had to.

Mr. Speed's mistake in that regard may not be relevant to guilt or innocence, but it is highly relevant to mitigation. While we believe that Mr. Speed's misunderstanding was a mistake of fact, rather than a mistake of law, the point is still the same. Mr. Speed knew that if he created a weapon, he needed to file a Form 1 so that the device would be registered. But Mr. Speed did not know that these HIT

devices, while unmodified, could already qualify as silencers subject to registration requirements. And deterrence, specific or general, is a meaningless concept in the absence of that knowledge because criminal consequences can deter one only from conduct one understands, at the time of the conduct, to trigger those consequences.

## IV. Mr. Speed Raises Three Objections to the Presentence Investigation Report

Defense counsel has had the opportunity to review the Presentence Investigation Report (PSR) with Mr. Speed. He agrees that the base offense level and the specific offense characteristics are properly calculated. Mr. Speed also has no further objection to the "John Doe" alias listed on page 3 of the PSR, However, Mr. Speed notes the following objections: first, that the PSR should exclude numerous statements and actions taken by Mr. Speed that are protected under the First Amendment to the Constitution, and many of which were not presented at trial; second, that on one occasion the PSR improperly misstates the evidence in the case; and third, that the Court should consider granting Mr. Speed a 2-point reduction in his advisory guidelines range for acceptance of responsibility.

### A. Mr. Speed's statements and purchases are protected by the First Amendment to the Constitution and are irrelevant to the offense conduct.

"The first amendment demands extraordinary safeguards whenever the state would use against an individual his association with others on the basis of shared beliefs. This is particularly true when those beliefs place the group outside the mainstream of our society and beyond the sympathies and perhaps even the comprehension of the average citizen." *United States v. Lemon*, 723 F.2d 922, 943

(D.C. Cir. 1983).  While it is permissible for the Court to receive and consider any and all information concerning the background, character and conduct of a defendant appearing for sentencing, 18 U.S.C. §3661, it is inappropriate for a court to base a sentence "to any degree on activity or beliefs protected by the first amendment."  *Id.* at 938.   A sentence based to any degree on beliefs protected by the First Amendment is constitutionally invalid.  *Id.*

Paragraph 16 of the PSR references a purchase made by Mr. Speed of Neo-Nazi items, and paragraphs 35 through 51 of the PSR provide transcripts of small snippets of conversation between Mr. Speed and the FBI undercover employee where Mr. Speed's personal ideologies are discussed.  At the time that Mr. Speed made those statements he believed that he was talking to a friend, or at minimum, a person who held the same world views.  And he believed that he was speaking to a friend because that was the entirety of the undercover employee's purpose – to build a level of trust with Mr. Speed to entice him to speak freely.  Regardless of the relationship, these statements and Mr. Speed's purchase are legally permissible and irrelevant to the charged conduct.

Mr. Speed cannot be punished for his personal opinions about certain individuals, specific groups, or the government.  Inclusion of these statements, most of which were not admitted at trial, serves one purpose – to attempt to punish Mr. Speed for his speech.  But Mr. Speed was not on trial for his speech, and he was not charged with the use of abusive language.  In fact, the Fourth Circuit has held that even where a defendant is charged with abusive language, the government must

-10-

prove that "the language had a direct tendency to cause immediate acts of violence by the person to whom, individually, it was addressed." *See United States v. Bartow*, 997 F.3d 203 (4th Cir. 2021). All the statements made by Mr. Speed were done in private conversations and Mr. Speed did not have contact with any of the individuals whom he discussed with the undercover employee.

Furthermore, the timeline of these events supports the fact that these private statements were no more than musings, unrelated to the charged conduct. Mr. Speed purchased the devices in question in March of 2021. The statements were made in March and April of 2022. And Mr. Speed was not charged with the current offense until September of 2022, more than a year after his purchase of the devices in question. Again, the devices were also untouched and unmodified. Thus, there was no immediate threat to anyone. Similarly, his purchase of a patch and a coin with Neo-Nazi symbolism was not illegal and irrelevant to the charged conduct.

While Mr. Speed was convicted of possession of unregistered firearms, the devices in question were not used to commit a crime, nor were they used in support of any statements made by Mr. Speed. To consider these statements at sentencing, unsavory as they are, would be improper and a violation of Mr. Speed's constitutional rights.

**B. Paragraph 24 of the PSR improperly states the evidence in the case.**

The purpose of the PSR is to provide accurate information to the Court so that a fair and appropriate sentence can be fashioned. *See United States v. Sanders*, 812 F. Supp. 813 (N.D. Ill. 1992). Paragraph 24 of the PSR is not an accurate statement

of the facts in this case.  It reads: "After acquiring the HIT Devices, SPEED made multiple comments to UCE-1 reflecting that he knew the HIT Devices were for silencing, diminishing, or muffling the report of a portable firearm, and that he possessed them for that purpose."

Paragraph 24 is phrased in a way that presumes that Mr. Speed knew that, in their unmodified state, the HIT devices met the statutory definition of a silencer. That would also presume that Mr. Speed knew the statutory definition of a silencer. But the evidence in the case shows the opposite.

Each silencer that Mr. Speed purchased – that Mr. Speed knew was a silencer – was registered.  He also made it clear through his conversations with the UCE that he believed that the device needed to be modified in order to function as a silencer, stating that "you get a good drill press, and …just drill straight through."  There is no evidence that Mr. Speed knew or believed that he could remove one of the HIT devices from its packaging, attach it to a firearm, and use it as a silencer in its unmodified state.

Paragraph 24 is inaccurate because it misstates the evidence in the case and should be removed.

### C. Mr. Speed should receive a reduction in the advisory guidelines range for acceptance of responsibility.

The PSR improperly denies Mr. Speed an adjustment for acceptance of responsibility. The PSR claims that Mr. Speed "put the Government to its burden of proof at trial by denying the essential factual elements of his guilt," but Mr. Speed did not deny his guilt and instead challenged the applicability of the statute to his

conduct. PSR ¶ 56. This differentiation makes Mr. Speed eligible to receive credit for his acceptance of responsibility.

The Guidelines credit a defendant "who clearly demonstrates acceptance of responsibility for his offense" by decreasing his offense level by 2 levels. U.S.S.G. § 3E1.1(a). "Conviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction." *Id*. cmt. n. 2. In some situations, a defendant can clearly demonstrate his acceptance of responsibility, despite exercising his constitutional right to go to trial. *Id*. A defendant who goes to trial can still demonstrate an acceptance of responsibility when he went to trial to "assert and preserve issues that do not relate to factual guilt." *Id*. An example of this includes challenging the applicability of a statute to the defendant's conduct. *Id*.

Although Mr. Speed did not enter a guilty plea in this matter, he should still be credited for his acceptance of responsibility given that Mr. Speed asserted a claim unrelated to factual guilt–that the statute did not apply to his conduct. The government argued that Mr. Speed's solvent traps were classified as a silencer, defined as a "device for silencing, muffling, or diminishing the report of a portable firearm," 18 U.S.C. § 921(a)(25) which falls under the definition of a "firearm" in 26 U.S.C. § 5845(a)(7). Mr. Speed did not contest the ownership of such solvent traps but instead argued that the solvent traps he possessed, in the form in which he possessed them, did not qualify as silencers and, therefore, that his actions were not prohibited by 26 U.S.C. §§ 5841 and 5861(d).  Mr. Speed even stipulated to both the possession

of the devices and the fact that he had not registered them, two essential elements of the offense conduct. *See* ECF No. 78 – 79.

Courts have previously held that a defendant has accepted responsibility for their crime, notwithstanding the fact that they put the government to its burden at trial. *See United States v. Gauvin*, 173 F.3d 798, 805 (10th Cir. 1999); *United States v. Guerrero-Cortez*, 110 F.3d 647, 656 (8th Cir. 1997); *United States v. Rodriguez*, 975 F.2d 999, 1009 (3rd Cir. 1992). The Tenth Circuit held that Gauvin accepted responsibility despite going to trial because he only contested the legal element of intent. *Guerrero-Cortez*, 110 F.3d at 806. Gauvin did not contest that he engaged in the acts that make up the offense. *Id*. Instead, he argued that he did not possess the required intent. *Id*. The court reiterated that the guideline should not apply to "a defendant who falsely denies, or furiously contest, relevant conduct that the court determines to be true." *Id*. (*quoting* U.S.S.G. § 3E1.1 cmt. n. 1(a)). However, similar to Mr. Speed, Gauvin admitted to all of the conduct with which he was charged. *Id*. Gauvin simply disputed whether his state of mind met the legal criteria of intent to harm and therefore, he challenged the applicability of a statute to his conduct, making him eligible to receive a downward departure for acceptance of responsibility. *Id*.

Given that Mr. Speed went to trial to challenge the applicability of a statute to his conduct, the PSR wrongly denies him an adjustment for acceptance of responsibility.

## V.   A Sentence of No More Than One Year and One Day is Appropriate to Avoid Unwarranted Sentencing Disparities

In fashioning an appropriate sentence, sentencing courts are to consider "the need to avoid unwarranted sentencing disparities among defendants of similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6). Prosecutions under the NFA are relatively rare in this district, but a review of prior cases demonstrates that where, as here, the criminal conduct is limited to violating firearm regulations rather than to some distinct underlying criminality, sentences well below the advisory Guideline range are common.   Here, Mr. Speed's request is consistent with sentences imposed by Courts in this District.   For example:

- *United States v. Minin*, 1:21-CR-54 (TSE) (imposing sentence of 3 years of supervised release following a remand of several hours for a veteran defendant who purchased, and did not register, several silencers from China and whose guideline range was 30-37 months)

- *United States v. McCullough*, 1:13-cr-230 (LO) (imposing a sentence of six months' incarceration followed by two years of supervised release with a condition of six months' home confinement for a defendant who faced a Guideline range of 18-24 months for possession of a machinegun, which he was found to have removed from his home in anticipation of a search in an unrelated criminal investigation)

- *United States v. Teel*, 1:17-cr-139 (AJT) (imposing a sentence of time-served (two days) followed by supervised release including six months' home detention for a defendant who faced a Guideline range of 21-27 months for possession of a short-barreled shotgun)

- *United States v. Nichols,* 1:18-CR-469 (TSE) (imposing probationary sentence conditioned upon intermittent home confinement for a defendant who illegally manufactured and sold AR and AK style weapons and short-barreled rifles and whose guideline range was 24-30 months)

- *United States v. Shaver*, 1:16-cr-306 (CMH) (imposing sentence of 12 months and 1 day, far below the advisory guideline range of 27-33 months, for a defendant found with unregistered shotgun and silencers where the firearm was discovered after the defendant fatally shot a friend in his home (for which he was never charged due to a self-defense claim), and where the defendant was also charged with domestic violence and found to be in possession of controlled substances)

Of course, no two cases are identical. Nevertheless, when measured against the cases referenced above, the requested sentence is appropriate and avoids unwarranted sentencing disparities because violations of the NFA often result in sentences far below the advisory sentencing range.

## VI.  A Sentence of No Greater Than One Year and One Day, in Addition to the Collateral Consequences of His Conviction, Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment

The imposition of a felony criminal conviction alone would be an adequate deterrent for someone like Mr. Speed - someone with no prior convictions. In addition to the loss of his ability to vote and possess a firearm, valuable rights that he will no longer have, Mr. Speed faces a significant loss of future employment prospects.

Although Mr. Speed was unemployed just prior to his incarceration, in part due to neck and back pain, PSR ¶ 83, as a servicemember with a high-level security clearance, he had ample potential job opportunities. His conviction, however, means the loss of his security clearance and diminished employment opportunities in his field. Further, the impact of his status as a felon on his military benefits remains unclear.

When a defendant suffers consequence for his criminal conduct—apart from the sentence imposed through the criminal court process—the sentencing court can take this collateral punishment into account in fashioning a sentence. *See* e.g., *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as a result of his EPA-related charges). In *United States v. Samaras*, for example, the district court granted a variance from the Guidelines in part because the defendant had lost a good public sector job as a result of his conviction. *Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005).

With this case, however, there is more than just the imposition of a felony conviction. Not only have Mr. Speed's job prospects plummeted and his military career been halted, but Mr. Speed has also served his incarceration in administrative segregation.

Courts have made clear that the circumstances of detention are an appropriate factor to consider under 3553(a). *See United States v. Peters*, 394 Fed.Appx. 665, 2010 WL 3394478, *2 (11th Cir. 2010) (implicitly stating that a court may consider the

-17-

harshness of protective custody under 3553(a) factors). Because protective custody or administrative segregation imposes greater restrictions and harsher conditions, it has had a more punitive effect on Mr. Speed than ordinary detention.

In general, it is indisputable that conditions in administrative segregation or protective custody, even when imposed for non-punitive purposes, are significantly harsher than conditions in normal jail population. *See* e.g. Kim Shayo Buchanan, Our Prisons, Ourselves: Race, Gender and the Rule of Law, 29 YALE L. & POL'Y REV. 1, 28 (2010) ("Conditions in protective custody...can be so harsh that victims [of prison assaults] are deterred from reporting [them]" to avoid being sent to protective custody). In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court considered the conditions of administrative (non-punitive or protective) segregation at the Ohio State Penitentiary. The Court described the segregation as "quite harsh" and noted that the conditions included the prohibition of almost all human contact, no conversation allowed even cell to cell, and exercise for only one hour a day. *Id*. at 911. The Court had little difficulty finding that these conditions imposed "an atypical and significant hardship" beyond the normal incidents of prison life. *Id*.

Mr. Speed was placed in the segregation unit as a protective measure - not as punishment - because his case is "high-profile". He has been detained in this unit since January 18, 2023, with the exception of a short period of time spent in booking. At the Alexandria Detention Center, protective custody amounts to lockdown 22 hours a day. This is a drastic difference compared to the conditions in general population, where detainees are permitted to leave their cells for approximately 8 to

-18-

10 hours a day.  Mr. Speed is permitted only two hours a day to leave his cell for exercise, during which he can go into the unit.  Administrative segregation prisoners are granted their free time only two by two, to prevent communication between them. Although these conditions have been imposed to protect and not to punish Mr. Speed, the reality is that protective custody has made his jail time worse than it is for general population prisoners, and accordingly less jail time is necessary for Mr. Speed to accomplish the purposes of sentencing.

Moreover, even had Mr. Speed not served his time in protective custody, one year and one day is not a free pass; it is a significant sentence for a nonviolent offense committed by a first-time offender.  Given the nature of Mr. Speed's conduct, specifically the fact that evidence indicated that Mr. Speed believed he was complying with the law, one year and one day satisfies the goals of sentencing.

## VII.   Conclusion

For the foregoing reasons, Mr. Speed respectfully requests that this Court sentence him to no more than one year and one day of incarceration, so as not to exceed the sentence of the Shaver case, where an individual was killed by the owner of the unregistered firearms.  Mr. Speed also requests that he be placed at a facility as close as possible to the Northern Virginia area.

Respectfully Submitted,

**HATCHET SPEED**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

-19-

by: /s/_____
Courtney Dixon
*Pro hac vice*
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
courtney_dixon@fd.org
Brooke Rupert
VA Bar No. 79729
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
brooke_rupert@fd.org